**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| OPHELIA CAGE, | ) | |
| | ) | No. 14 C 6818 |
| Plaintiff, | ) | |
| v. | ) | Judge Zagel |
| | ) | |
| CITY OF CHICAGO, | ) | Mag. Judge Schenkier |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

**DEFENDANT CITY OF CHICAGO'S LOCAL RULE 56.1(a)(3)
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(a)(3), Defendant, City of Chicago ("City"), by its attorney, Stephen R. Patton, Corporation Counsel of the City of Chicago submits the following statement of undisputed material facts[1] in support of its motion for summary judgment, filed contemporaneously with this statement.

**PARTIES, JURISDICTION, AND VENUE**

1.  Ophelia Cage ("Plaintiff"), a sixty-five year-old, African-American, Female, is currently employed as a Water Rate Taker ("WRT")[2] in the City of Chicago's Department of Water Management ("DWM"). (Complaint, ¶¶ 1, 10, attached hereto as Exhibit ("Ex.") A; Deposition of Plaintiff ("Pl. Dep.") 6:24-7:5, excerpts of Pl. Dep. attached hereto as Ex. B; Affidavit of Maureen Egan ("Egan Aff."), ¶¶ 2, 24, attached hereto as Ex. C.) Plaintiff has worked as a WRT since June 1, 1991. (Pl. Dep., 7:12-15, Ex., B.)

---

[1] The City submits the following facts as undisputed solely for the purpose of its motion for summary judgment.

[2] A Water Rate Taker is also referred to as a "Water Meter Reader." (Deposition of Michael Duda ("Duda Dep."), 38:21-39:2, excerpts of Duda Dep. attached hereto as Ex., D.)

2.     Defendant City of Chicago is a governmental entity.  (Complaint, ¶ 2, Ex., A.)  The Court

has jurisdiction of this matter pursuant to the Age Discrimination in Employment Act of

1976, 29 U.S.C. §621, *et. seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, as

amended ("Title VII"), 42 U.S.C. 2000e, *et. seq.*, the Civil Rights Act of 1991 and 28

U.S.C. § 1343.  (Complaint, ¶¶ 3, 4, Ex., A.)  Venue is proper because Plaintiff resides in

the Northern District of Illinois and the alleged acts giving rise to her claims occurred in

this District.  (Complaint, ¶ 5, Ex., A.)

**THE DEPARTMENT OF WATER MANAGEMENT**

3.     DWM is an operating department of the City that is responsible for the effective and

efficient delivery of water and sewer services to residents of Chicago.  (Egan Aff., ¶ 2,

Ex., C.)  WRTs work in the Bureau of Meter Services of DWM.  (Egan Aff., ¶ 7, Ex., C.)

Julie Hernandez-Tomlin, a forty-five year-old, Hispanic, Female, has been the Managing

Deputy Commissioner in charge of the Bureau of Meter Services of DWM since 2006.

(Egan Aff., ¶ 7, Ex., C.)  Leo Lillard, a fifty year-old, African-American, Male, was the

Assistant Commissioner of the Bureau of Meter Services between August 1, 2005 and

July 15, 2015.  (Egan Aff., ¶ 7, Ex., C.)

4.     Maureen Egan has served as an Assistant Commissioner for the Bureau of Administrative

Support in DWM since 2000.  (Egan Aff., ¶¶ 2, 3, Ex., C.)  Ms. Egan works with the

unions and the Law Department with regard to all employment litigation and labor

matters, including responding to charges of discrimination with the Illinois Department of

Human Rights ("IDHR") or the Equal Opportunity Commission ("EEOC").  (Egan Aff.,

¶ 3, Ex., C.)  Ms. Egan would advise supervisors which City of Chicago Personnel Rule

should be cited in a Notice of Discipline and what level of discipline should be imposed

based upon the employee's prior disciplinary history, relevant City's Personnel Rules and the applicable Collective Bargaining Agreement. (Egan Aff., ¶ 19, Ex., C.)

5. Leonard Caifano, a sixty year-old, Caucasian, Male, held the title of Chief Water Rate Taker ("CWRT") from January 1, 2007 to August 31, 2013, when he voluntarily retired after thirty-seven years in public service. (Deposition of Leonard Caifano ("Caifano Dep."), 13:2-13, 13:22-24, 14:24-15:1, 16:22-17:1, excerpts of Caifano Dep. attached hereto as Ex., E.) Prior to becoming the CWRT, Mr. Caifano held the title of WRT, Water Meter Assessor ("WMA"), Supervisor of Water Rate Takers ("SWRT"), and Supervisor of Water Meter Assessors. (Caifano Dep., 14:16-15:1, Ex., E.) As CWRT, Mr. Caifano directed the field operations for the Bureau of Meter Services[3]. (Caifano Dep., 15:1-15, Ex, E; Egan Aff., ¶ 7, Ex., C.)

6. Tyrone Lewis, a fifty-three year-old, African-American, Male, has worked for the City since 1985 and has held the title of SWRT since 1998. (Deposition of Tyrone Lewis ("Lewis Dep."), 7:17-24, 8:23-9:23, excerpts of Lewis Dep. attached hereto as Ex., F.) As SWRT, Mr. Lewis is responsible for the productivity of the station he supervises, assigning work to the WRTs at his station and reviewing their work product. (Lewis Dep., 15:15-16:3, 24:10-25:7, 45:9-20, Ex., F; Caifano Dep., 81:24-82:3, Ex., E.) In 2012, Mr. Lewis supervised and assigned work to Plaintiff and other WRTs working out of the water station located at 4933 South Western Avenue ("49th & Western"). (Pl. Dep., 11:10-15, 12:1-7, 59:2-4, 216:1-4, Ex., B; Lewis Dep., 12:24-13:20, Ex., F.)

---

[3] Mr. Caifano mistakenly refers to the Bureau of Meter Services, which performs various water collection functions, as the "Water Collection Division."

7.      In 2012, Mr. Caifano worked out of the water station located at 1424 West Pershing Road ("39th & Iron" or "Headquarters"). (Caifano Dep., 28:5-8, 33:11-22, Ex., E; Lewis Dep. 90:8-20, Ex., F.) Mr. Caifano directly supervised a handful of WRTs and WMAs who were assigned to work out of 39th & Iron. (Caifano Dep., 111:13-113:3, Ex., E; Affidavit of Tyrone Lewis ("Lewis Aff."), ¶ 5, attached hereto as Ex., G.) Plaintiff was not assigned to work out of the same station as Mr. Caifano after he became the CWRT in 2007. (Pl. Dep., 217:5-8, Ex., B.)

**THE WATER RATE TAKER POSITION**

8.      A WRT reads and checks metered water accounts at residential and commercial properties, whereas a WMA performs field and office duties related to water rate assessments of non-metered water accounts. (Pl. Dep., 19:5- 21:1, 214:12-215:1, Ex., B; WRT Job Description, attached to Pl. Dep. as Ex.1, Ex., B; Lewis Dep., 23:10-15, Ex., F.) A "Route" is the term WRTs use to refer to the assignment of manually reading residential or commercial metered water accounts. (Pl. Dep., 18:3-7, Ex., B; Lewis Dep., 28:2-19, Ex., F.) WRTs may also post water-shutoff notices on properties with delinquent water bills ("Posting"). (Pl. Dep., 18:8-15, 29:20-30:3, Ex., B; Lewis Dep., 26:17-27:10, Ex., F.) In 2012, Plaintiff was assigned to either Routes or Postings. (Pl. Dep., 29:16-24, Ex., B.)

9.      In addition to Routes or Postings, in 2012, WRTs could have been assigned to the Two-Man Truck, Service Orders, Special Assignments or the Automated Meter Reading truck "AMR truck." (Pl. Dep., 30:1-31:10, Ex., B; Lewis Aff., ¶ 4, Ex., G.) A two-man truck involves reading meters for commercial properties that are located within a heavy vault in the ground and requires two people to access the meter. (Lewis Aff., ¶ 4, Ex., G.)

"Service Orders" include customer complaints or customer service orders, and "Special Assignments" typically requires a WRT to verify a property vacancy. (Lewis Dep., 149:6-151:19, Ex., F.) The AMR truck requires driving a special City truck equipped with the ability to remotely read automated meters. (Caifano Dep., 93:6-24, Ex., E.) Employees must be specifically trained on how to operate an AMR truck. (Lewis Aff., ¶ 5, Ex., G.)

10. WRTs work five days-a-week, Monday through Friday, from 7:30 a.m. to 3:30 p.m. (Pl. Dep., 21:12-20, Ex., B; Egan Aff., ¶ 11, Ex., C.) WRTs are entitled to an hour break each day, which includes a thirty minute lunch break and an additional fifteen minutes to and from the lunch site. (Caifano Dep., 190:20-191:7, Ex., E; Lewis Dep., 77:12-20, 158:12-17, Ex., F.) WRTs are also given approximately thirty to forty-five minutes to leave the station and travel to the worksite, and thirty to forty-five minutes to return to the station at the end of the day. (Caifano Dep., 191:2-5, Ex., E; Lewis Dep., 158:21-159:1, Ex., F.) Accordingly, WRTs are expected to perform fieldwork for a minimum of five and one half to six hours per day and remain in their assigned work area during that time. (Caifano Dep., 190:20-192:9, Ex., E; Lewis Dep., 73:4-8, Ex., F.)

11. WRTs are required to know the geographical locations in the City. (Lewis Aff., ¶ 6, Ex., G; WRT Job Description attached to Pl. Dep., as Ex. 1, Pl. Dep., 19:5-20:22, Ex., B.) WRTs can be assigned to any area in the City for work. (Pl. Dep., 219:24-222:7, Ex., B; Lewis Dep., 57:8-59:19, Ex., F.) WRTs are provided with a street guide to aid in the process of locating a work location, and Plaintiff kept hers in her car in 2012. (Lewis Aff., ¶ 6, Ex., G; Pl. Dep., 224:7-8, Ex., B; Jessie Greenwood May 1, 2015 Deposition

("Greenwood Day1 Dep."), 19:6-11, excerpts of Greenwood Day1 Dep. attached hereto as Ex., H.)

12.    In 2012, each WRT was equipped with a Nextel phone that had GPS tracking ability. (Lewis Dep., 31:4-32:21, Ex., F.)  Each WRT was required to turn the phone on at the start of his or her workday.  (Lewis Dep., 32:17-21, Ex., F.)  The Nextel allowed employees to communicate with their supervisor while in the field, call in with emergencies, or obtain directions and it also operated as a tracking device that assisted the SWRT in determining whether a WRT was at the location of his or her work assignment throughout the course of the workday.  (Lewis Dep., 32:22-35:14, Ex., F.)

**ROUTES**

13.    A Route is a group of metered water accounts in proximity to each other.  (Lewis Dep., 28:2-19, Ex., F; Lewis Aff., ¶ 4, Ex., G.)  While Routes were initially listed on pieces of paper referred to as a book, in 2012, Routes were uploaded into MVRS computer devices "MVRS," which are also referred to as a "handhelds"[4]  (Lewis Dep., 17:1-10, 53:12-54:22, Ex., F; Pl. Dep., 60:10-63:7, Ex., B..)  Initially, WRTs assigned to Routes received one book or a single route per day containing eighty to one hundred stops; however, as Chicago residents converted their manual meters to automated meters, the number of stops in a Route decreased.  (Caifano Dep., 98:15-100:9, Ex., E.)  In 2012, Mr. Lewis assigned WRTs multiple Routes each workday containing anywhere from ten to forty stops, to ensure that the WRT had enough work to fill a full workday, and at the end of each workday, he would upload the results into DWM's computer network, which could

---

[4] Plaintiff mistakenly refers to the handheld in which routes are uploaded as the "G5" (Pl. Dep., 221:24-222:4, 331:20-24, Ex., B.)

not be accessed by a non-supervisor WRT. (Pl. Dep., 60:10-63:7; 221:24-222:4, Ex. B; Caifano Dep., 100:2-9, Ex., E; Lewis Aff.,¶¶ 7, 10 Ex., G.)

14. When assigned to Routes in 2012, Plaintiff always followed the same process: she would arrive at 49th & Western at approximately 6:30 a.m., she would retrieve the handheld from the charging station in front of Mr. Lewis's office, and unlock the handheld to see what area she was assigned to for the day by inputting her unique employee number into the handheld. (Pl. Dep., 220:8-14, 221:14-222:14, Ex., B.) Plaintiff usually left the station to head to her work area at approximately 8:15 a.m. (Pl. Dep., 230:13-16, Ex., B.) If assigned to the Northside, Plaintiff would typically stop for gas after leaving the station and would take either Western Avenue or Kedzie Avenue heading north toward her work area. (Pl. Dep., 230:22-232:4, Ex., B.)

15. Once Plaintiff arrived in her work area, she would park as close as possible to her first location in the Route, gather her tools, walk to the location, and then proceed to knock on doors or ring bells, and try to gain entry to read the meters at each location. (Pl. Dep., 224:10- 225:23, Ex., B.) If no one answered the bell after about two minutes, she would ring other bells trying to gain entry to the property. (Pl. Dep., 225:9-23, Ex., B.) If it was a larger building, Plaintiff would ask the security desk officer to locate maintenance staff, or she would attempt to find a maintenance person or janitor on her own. (Pl. Dep., 238:3- 239:2, Ex., B.) But, according to Plaintiff, "you could only wait so long." (Pl. Dep., 239:2, Ex., B.)

16. At each stop on the Route, Plaintiff was required to input information into the handheld detailing her success or failure at reading a particular meter. (Lewis Aff., ¶ 9, Ex., G.) If successful, Plaintiff had to input the meter reading into the handheld; if unsuccessful,

Plaintiff had to log a reason she was unable to read the meter which may include that she skipped the meter, or that the meter was locked, obstructed or could not be located. (Lewis Aff., ¶ 9, Ex., G.) The handheld automatically records the time that a WRT inputs a meter reading or an attempted reading. (Lewis Dep., 16:16-18:1, Ex., F.) Plaintiff testified that if she was unable to gain entry to a property in the morning, she would circle back after lunch, if time allowed, and try again. (Pl. Dep., 225:24-226:4, Ex., B.)

## POSTING

17. In 2012, WRTs assigned to Postings would typically be given a group of addresses on a sheet of paper, sorted by street, which listed properties facing termination of water service due to delinquent water accounts. (Lewis Dep., 149:21-150:1, Ex., F; Pl. Dep., 222:18-223:15, Ex., B) Depending on how far apart the addresses were located, Plaintiff would typically be assigned sixty to seventy addresses to Post. (Pl. Dep., 59:23-60:9, Ex., B) At the end of the day, WRTs would turn in their completed Posting sheets and top sheets on which they would tally how many Postings they had completed for the day. (Pl. Dep., 223:16 -224:6, Ex., B; Lewis Dep., 29:6-30:16, Ex., F)

## WRTs ARE REQUIRED TO PUT IN A FULL DAY'S-WORTH OF WORK

18. Neither Routes nor Postings contain the exact same number of stops each day. (Lewis Aff., ¶ 7, Ex., G.) WRTs, including Plaintiff, were never told that they needed to successfully complete a specific number of locations in a Route or Posting assignment per day, but were required to put in a full day's-worth of work. (Pl. Dep., 59:23-60:9, Ex.,B; Lewis Aff., ¶ 7 Ex., G.) SWRT Lewis would assign enough work in a Route or Posting assignment to provide for a full day's-worth of work. (Lewis Dep., 41:24-42:4, Ex., F; Lewis Aff., ¶ 7, Ex., G.)

8

19.  As the SWRT, Mr. Lewis was required to ensure that his WRTs put in a full day's work. (Lewis Dep., 15:15-16:13, Ex., F.) Mr. Lewis knows how long a particular Route or Posting assignment should take because he performed these assignments for thirteen years while he was a WRT, and because he has reviewed WRTs completed work as a SWRT for seventeen years. (Lewis Dep., 152:15-22, Ex., F; Lewis Aff.¶ 13, Ex., G.) Mr. Lewis investigates WRTs under his direct supervision when a WRT returns with less completed work than expected for a full day's worth of work. (Lewis Dep., 12:24-13:3, 15:15-16:9, 36:2-40:12, 41:12-47:13, Ex., F.)

20.  Mr. Lewis' investigation includes reviewing the WRT's GPS records for the day, the WRTs MVRS report if the WRT was assigned to Routes and/or the WRTs Posting sheets if the WRT was assigned to Postings. (Lewis Dep., 16:14-18:5, 36:22-37:9, 50:13-20, Ex., F.) Mr. Lewis will compare the time stamp on the MVRS report to the time stamp on the GPS records to determine whether the WRT was in the location of the assignment when they input information into the handheld. (Lewis Dep., 17:7- 18:17, Ex., F., Lewis Aff., ¶¶ 11, 14, Ex., G.) Mr. Lewis will also review the GPS records to determine if the WRT left the assigned work area during the day or returned to the station too early. (Lewis Dep., 17:22-18:8, Ex., F; Lewis Aff., ¶ 14, Ex., G.) In 2012, if Mr. Lewis believed a WRT did not give a full-day's effort, he would submit the GPS records, the MVRS report if the WRT was assigned Routes and the Posting sheet if the WRT was assigned Posting to Mr. Caifano and explain the discrepancies he found. (Lewis Dep., 18:6-20:6, 50:13-20, Ex., F.)

21.  Mr. Caifano decides whether the WRT's performance requires a pre-disciplinary hearing. (Lewis Dep., 48:19-49:3, Ex., F.) Not every investigation that Mr. Lewis sent to Mr.

Caifano regarding Plaintiff resulted in a pre-disciplinary hearing. (Lewis Dep., 153:14-155:17, Ex., F.)

## RELEVANT POLICIES AND PROCEDURES

22.  WRTs, including Plaintiff, are members of the bargaining unit represented by the Plumbers' Local Union 130; and therefore, their employment is governed by the terms of the labor contract between the City and the Chicago Journeymen Plumbers' Local Union 130, UA effective July 1, 2007 through June 20, 2017 ("CBA"). (Pl. Dep., 8:13-9:2, Ex., B; relevant excerpts of the CBA attached as Ex., 1 to Egan Aff., ¶ 8, Ex., C.) Article 2 of the CBA provides the employer with the right to suspend, discipline, or discharge for just cause, to assign work, to enforce reasonable rules and regulations, and to establish fair production standards, except as expressly abridged by a specific provision of the CBA. (Egan Aff., ¶ 9, Ex., C.) Article 3, Sections 3.2 and 3.3 of the CBA prohibit discrimination against employees based upon, *inter alia*, race, age, or sex and permits an employee alleging discrimination to file a grievance with the union. (Egan Aff., ¶ 10, Ex., C.) Article 5, Sections 5.2 and 5.3 require that employees work a full 8.5 hours, including a half-hour unpaid lunch, except where different hours are in effect. (Egan Aff., ¶ 11, Ex., C.)

23.  Article 11 of the CBA details the rights of employees subject to disciplinary action, and the procedures that must be followed to discipline an employee. (Egan Aff., ¶ 12, Ex., C.) For example, an employee who is subject to disciplinary action has the right to union representation and a pre-disciplinary hearing. (Egan Aff., ¶ 12, Ex., C.) The City within its discretion may determine whether disciplinary action should be an oral warning, written reprimand, suspension, or discharge, depending upon various factors,

10

including, but not limited to, the severity of the offense and the employee's prior record. (Egan Aff., ¶ 12, Ex., C)  Employees who receive a written notice of proposed disciplinary action may file a timely grievance challenging the disciplinary action as detailed in the CBA Section 11.2.  (Egan Aff., ¶ 12, Ex., C.)

24.   Rules V, XVI and XVII, of the City's Personnel Rules, revised November 18, 2010, explain the City's Equal Opportunity and Employment Policy and describe how an employee may file either a grievance or a complaint for discrimination with the City's Equal Employment Opportunity Office ("EEO Office") under the Policy.  (Excerpt of the City's Personnel Rules attached as Ex., 2 to Egan Aff., ¶¶ 13, 14, Ex., C.)  Personnel Rule XVIII, Section 1, describes the disciplinary process and sets forth the code of conduct for City employees, which includes the following prohibitions: "Misrepresentation" which includes "falsely representing to a superior the quality and/or quantity of work performed" (#6); "Criminal or Improper Conduct," which includes "restricting production output" (#26); "Job Performance," which includes "failing to take action as needed to complete an assignment or perform a task" (#29); "Inattention to duty including loafing, sleeping on duty, or loitering in the work area" (#38); and "Incompetence or inefficiency in the performance of the duties of the position …." (#39). (Egan Aff., ¶ 15, Ex., C.)  Personnel Rule XVIII, Section 2, details the City's policy of progressive discipline and describes the types of discipline that may be imposed in light of the totality of the circumstances, including the severity of the infraction, the number of times it has occurred, and the circumstances surrounding the misconduct. (Egan Aff., ¶ 16, Ex., C.)

11

25. Plaintiff recalls receiving a copy of the City's Personnel Rules five years ago.  (Pl. Dep., 9:3-13, Ex., B.)

## PLAINTIFF'S WORK PERFORMANCE AND DISCIPLINARY HISTORY

26. Mr. Lewis testified that there are times when Plaintiff is a good employee, but on occasion she has not given a "full effort" and "is lacking." (Lewis Dep., 162:23-164:9, Ex., F.)  Mr. Caifano testified that "generally [Plaintiff's] performance was more than adequate, if not adequate, but occasionally, periodically, …she had very short bursts of a day here and there… where the performance was so substandard that it needed further… investigation… and occasionally, she has an off day, by where the performance is so below standard it needs further attention." (Caifano Dep., 142:22-144:1, Ex., E.)

27. Plaintiff has been disciplined for misrepresentation and/or poor work performance twenty-five times between 1992 and 2010.  (Egan Aff., ¶ 17, Ex., C., summary of discipline history and supporting documentation attached as Ex. 3 to Egan's Aff.)  Twenty of Plaintiff's past disciplinary episodes occurred before Mr. Caifano became the CWRT in title in 2007, however, Mr. Caifano began acting-up in the position of CWRT in approximately May 2004.  (Egan Aff., ¶ 18, Ex., C; Lewis Aff., ¶ 2, Ex., G; Pl. Dep. 306:2-307:6, Ex., B, Plaintiff's prior discipline, attached to Pl. Dep. as Ex. 15.)  Even after Mr. Caifano became CWRT, John Zander, the labor liaison, conducted the pre-disciplinary hearings until February 2009 when he retired.  (Lewis Dep., 126:24-128:5, Ex., F; Duda Dep., 38:12-20, 134:7-135:4, Ex., D; Egan Aff., ¶ 18, Ex., C.)  Only two of Plaintiff's past twenty-five disciplinary episodes occurred when Mr. Caifano personally oversaw the pre-disciplinary hearing for Plaintiff.  (Egan Aff., ¶ 18, Ex., C.)

28. Mr. Caifano did not independently review the work product of WRTs who were not under his direct supervision unless a SWRT brought a work performance issue to his attention. (Caifano Dep., 110:19-113:3, Ex., E.) Mr. Caifano did not initiate discipline of a WRT that was under Mr. Lewis' direct supervision. (Lewis Dep., 156:19-157:9, Ex., F.) In 2012, Mr. Lewis directly supervised Plaintiff and assigned her work, and Mr. Caifano was not involved in the process of assigning and reviewing Plaintiff's work. (Pl. Dep., 59:2-4, 216:1-4, Ex., B; Lewis Dep., 55:24-57:1, Ex., F.)

**PLAINTIFF'S WORK ON JANUARY 5, 2012**

29. On January 5, 2012, SWRT Lewis assigned Plaintiff a handheld loaded with two Routes: Routes 7353 and 7417. (Pl. Dep., 228:18-230:23, Ex., B; Lewis Aff., ¶ 17, Ex., G.) Route 7353 contained thirty-three stops located on the Northeast side of the City (3200N), near the lakefront, and Route 7417 contained ten stops on the near Northeast side of the City (1900N). (Pl. Dep., 229:18-230:12, 231:18, Ex., B; MVRS Report January 5, 2012, attached to Pl. Dep. as Ex. 11; Lewis Aff., ¶¶ 17, 19, Ex., G.)

30. Plaintiff claims that it took her approximately one to one and a half hours to get to her work area after leaving 49th & Western between 8:15 a.m. and 8:30 a.m. on January 5, 2012. (Pl. Dep., 230:10-232:8, Ex., B. ) Plaintiff asserts that after getting gas, she drove to the work-area, parked away from the first stop because of limited parking, walked to the first location and attempted to gain entry to the meter at 3101 North Sheridan Road. (Pl. Dep., 231:12-13, 232:13-234:3, Ex., B.) Plaintiff asserts that she tried to find a doorbell for maintenance or the janitor, but was unable to locate anyone through the intercom at the property. (Pl. Dep., 233:4-22, Ex., B.) Plaintiff entered her first attempt

to read the meter at 3101 North Sheridan into the handheld at 8:56:49 a.m. and coded her failed attempt as "locked." (Pl. Dep., 233:23-234:3, Ex., B; Lewis Aff., ¶ 18, Ex., G.)

31. Plaintiff testified that she proceeded through her Route, walking to some of the locations and driving to others. (Pl. Dep., 234:4-235:12, 237:4-23, Ex., B.) Plaintiff claims that she continued trying to gain entry into the various locations along the route, ringing bells, waiting one to two minutes, and talking to doormen if the locations had doormen. (Pl. Dep., 237:4-239:17, Ex., B.)

32. Plaintiff logged the entire route as completed at 9:28:33 a.m. indicating that she had attempted to read meters at thirty-three different properties in thirty-one minutes, but every building was locked except for 401-09 West Barry Avenue, which she input as "cannot locate." (Pl. Dep., 240:13-242:9, 243:10-246:2, Ex., B; Lewis Aff., ¶ 18, Ex., G.) "Cannot locate" means that she either got into the building but could not find the meter, or the door to the meter could not be accessed. (Pl. Dep., 241:6-11, Ex., B.) The MVRS report for January 5, 2012 indicates that Plaintiff logged the first seven locations as "locked" in less than four minutes, between 8:56 a.m. and 9:00 a.m. (Lewis Aff., ¶ 18, Ex., G.) Plaintiff claims that after she attempted all thirty-three properties on her first Route, she then traveled to her second Route and "read quite a few meters"-- twenty before lunch and ten after lunch and proceeded back to the station at 1:45 p.m. (Pl. Dep., 245:24-246:16, Ex., B.)

33. GPS records for January 5, 2012 show Plaintiff left the station at 7:41 a.m. and headed north up Western Avenue. (GPS Records for January 5, 2012 attached to Lewis Aff., as Ex., 4, Lewis Aff., ¶ 20, Ex., G.) Although none of Plaintiff's assigned stops were further north than 3200N, GPS places Plaintiff at 5100N, approximately 20 blocks north

of her route.  (Lewis Aff.¶ 20, Ex., G.)  During the time that Plaintiff testified she was reading thirty-three meters, between 8:56 a.m. and 9:28 a.m., the GPS records showed she traveled approximately five miles, at speeds between zero to forty miles per hour, and also showed that she had been in constant motion between 7:45 a.m. and 9:29 a.m. (Lewis Aff., ¶ 20, Ex., G.)  GPS records indicated to Mr. Lewis that Plaintiff never traveled to the area of her second Route and left the Northeast side of the City at 12:33 p.m., arriving back at the station at 2:15 p.m.  (Lewis Aff., ¶ 20, Ex., G.)

34.   Mr. Lewis is unaware of any other WRT other than Plaintiff, who had "locked" or "cannot locate" for every stop on their route.  (Lewis Dep., 152:23-153:2, Ex., F.)  Based upon Mr. Lewis' knowledge of the job, in his opinion, it is impossible to perform thirty-three water meter readings in thirty-one minutes because "it takes time to get someone to answer the door and escort you to the meter," and to get from one meter to the next. (Lewis Dep., 153:3-13, Ex., F.)  Mr. Duda, who worked as a SWRT from 1998 to 2012, has never encountered any WRT under his supervision return without reading a single meter on a route or having "locked" or "cannot locate" for all of the locations on a Route. (Duda Dep., 15:1-10, 254:6-255:13, Ex., D.)

35.   Mr. Lewis investigated Plaintiff's work on his own initiative for this date; no one told him to investigate Plaintiff's work.  (Lewis Dep., 48:10-18, Ex., F.)  Mr. Lewis "red flagged" Plaintiff's work, and sent the paperwork to Mr. Caifano, who decided whether the performance warranted a pre-disciplinary hearing. (Pl. Dep., 253:12-254:10, Ex., B, Lewis Dep., 48:19-49:3, 81:6-12, Ex., F; Caifano Dep., 17:6-18:6, 18:22-19:3, 20:8-11, Ex., E.)

15

36.     Mr. Caifano reviewed Plaintiff's MVRS report and GPS records from January 5, 2012, and conducted a field inspection that included sending another WRT to perform the same Route the following day.  (Caifano Dep., 19:7-20:18, Ex., E.)  On January 6, 2012, Mr. Caifano also personally visited the CVS Pharmacy that Plaintiff indicated was locked.  (Caifano Dep., 20:12-21:14, Ex.,E; Route Status Report as it existed after Ron Blankus re-read Route 7353 attached as Ex. 6 to Lewis Aff., Lewis Aff., ¶ 21, Ex., G.)  Based on Mr. Caifano's field inspection, the CVS Pharmacy was open regular business hours, he was able to access the meter, and he spoke to the staff who indicated that no one tried to gain access to the meter the day before.  (Caifano Dep., 20:12-21:14, Ex., E.)

**PLAINTIFF'S WORK ON JANUARY 24, 2012**

37.     On January 24, 2012, SWRT Lewis assigned Plaintiff a handheld loaded with five Routes: Routes 7128 (six Stops), 7198 (eleven Stops), 7291 (fourteen Stops), 7449 (six Stops), and 7496 (five Stops) on the Northside.  (Pl. Dep., 254:11-16, Ex., B; Lewis Aff., ¶ 22, Ex., G.)  Plaintiff testified that she was unsure of how many stops she attempted on this date, but asserts that she took a lunch break between 1:00 p.m. to 1:30 p.m. and headed back to 49th & Western at 1:45 p.m.  (Pl. Dep., 254:14-255:10, Ex., B.)  GPS records from January 24, 2012 indicate that Plaintiff left the Northside at 11:45 and did not return to her work area that day.  (January 24, 2012 GPS records for Plaintiff attached to Lewis Aff. as Ex. 7; Lewis Aff., ¶ 22, Ex., G.)

**PLAINTIFF'S FIVE-DAY SUSPENSION**

38.      On January 26, 2012, Plaintiff was notified to appear at a pre-disciplinary hearing on January 30, 2012 related to her work performance on January 5, 2012.  (Pl. Dep., 111:6-116:20, Ex., B; Pre-Disc Memo attached as Ex. 7 to Pl. Dep., Ex., B.)  Mr. Lewis, Mr.

Caifano, Plaintiff and her union representative were in attendance at the pre-disciplinary hearing. (Pl. Dep., 115:7-116:5, Ex., B.) At the hearing, Mr. Caifano indicated that based upon the investigation, he believed that objective evidence indicated that Plaintiff had completed little or "no work whatsoever" on January 5, 2012 and that some of the work had been fabricated. (Caifano Dep., 17:9-15, 39:2-24, Ex., E.)

39. During the pre-disciplinary hearing, Plaintiff was provided an opportunity to hear the charges against her and present any evidence that she had to contradict the evidence presented. (Caifano Dep., 17:2-18:6, Ex., E.) However, when Plaintiff was asked to explain the events of January 5, 2012 at the pre-disciplinary hearing, she failed to provide any information or contrary documentation to "explain away the facts that seemed to point to the fact that the work was not completed as she had inscribed in her handheld data device." (Caifano Dep., 17:16-18:6, 39:18-41:5. Ex., B; Lewis Dep., 125:17-126:9, Ex., F.)

40. Caifano explained that Plaintiff had put a "locked" code for all of the addresses that she had purportedly visited on January 5, 2012, which, to Mr. Caifano, seemed "statistically impossible --virtually impossible that that reporting was true, whatsoever" because the timestamp showed that she had not traveled to the different locations she reported to have visited. (Caifano Dep., 40:12-41:3, Ex., E); Caifano reasoned that Plaintiff had failed to provide any explanation at the pre-disciplinary hearing for her poor work performance and fabricated work results on January 5, 2012. (Caifano Dep., 40:2-41:3, Ex., E.)

41. After the pre-disciplinary hearing, Mr. Caifano would report what he perceived to be infractions of the City's Personnel Rules to Managing Deputy Julia Hernandez-Tomlin

17

and to Assistant Commissioner Maureen Egan. (Caifano Dep., 53:17-56:24, 118:3-121:14. Ex., E; Egan Aff., ¶ 19, Ex., C.) Ms. Egan would advise which Personnel Rule should be cited in the Notice of Discipline and what level of discipline should be imposed based upon the employee's prior disciplinary history and the relevant City's Personnel Rules and CBA. (Egan Aff.. ¶ 19, Ex., C.) Caifano testified that collectively, he Ms. Egan and Ms. Hernandez-Tomlin would agree upon what level of discipline was appropriate and in accordance with the CBA. (Caifano Dep., 18.5-6, 119:19-120:6, Ex., E.) Based upon Mr. Caifano's recap of the facts elicited at Plaintiff's pre-disciplinary hearing held on or about January 30, 2012, Plaintiff violated the City's Personnel Rules Nos. 6, 29 and 39. (Egan Aff., ¶ 20, Ex., C.) Plaintiff received a notice of progressive discipline on March 19, 2012 indicating that she had received a 5-day suspension related to the January 5, 2012 incident, which was the next step of progressive discipline based upon Plaintiff's prior discipline history, which included a three-day suspension issued on May 20, 2010. (Pl. Dep., 111:20- 114:20, Notice of Progressive Discipline attached to Pl. Dep. as Ex., 8, Ex., B; Egan Aff., ¶ 20, Ex., C.)

42. Caifano could have brought charges against Plaintiff for her poor work performance on January 24, 2012, but chose to counsel Plaintiff instead, so as not to subject Plaintiff to a possible additional suspension. (Caifano Dep., 25:14-27:21, 29:12-30:10, Ex., E.)

43. The only reason that Plaintiff believes she should not have received this 5-day suspension is because she "does no more, no less than any other rate taker" and "[her] work is good as any of the other rate takers. No more. No less." (Pl. Dep., 268:16-269:5, Ex., B.)

## PLAINTIFF'S WORK ON OCTOBER 4, 2012

44.     On October 4, 2012, SWRT Lewis assigned Plaintiff to postings located on the Westside. (Pl. Dep., 256:1-11, 10/4/2012 Posting Assignment, attached to Pl. Dep. as Ex., 12, Ex., B; Lewis Aff., ¶ 23, Ex., G.)  GPS records from October 4, 2012 show that Plaintiff left the station at 8:07 a.m. and traveled to the far Northside of the City, even though all of her posting assignments were located on the Westside.  (Lewis Aff., ¶ 23, Ex., G.)  GPS records put Plaintiff in the vicinity of her work area just after 10:00 a.m.  (Lewis Aff., ¶ 24, Ex., G.)  According to the GPS records, Plaintiff left her work area by 10:20 a.m. and did not return to the work area that day.  (Lewis Aff., ¶ 24, Ex., G.)

45.     Plaintiff had a wellness appointment at 11424 South Western at 11:30 a.m. on October 4, 2012.  (Wellness Appointment attached to as. Ex., 11 to Lewis Aff., ¶ 25, Ex., G.) The health screening lasted fewer than ten minutes.  (Pl. Dep., 261:5-10, Ex., B.)  After the health screening, Plaintiff took lunch, but never returned to her work location.  (Pl. Dep., 261:14-262:9, Ex., B.)  Plaintiff only completed six postings throughout the entire day.  (Pl. Dep., 255:24-257:15, Ex., B.) When Plaintiff returned to the station, Mr. Lewis asked her about her work performance for the day, and Plaintiff responded that she could not complete her work because of her health screening appointment.  (Pl. Dep., 262:24-263:8, Ex., B.)

## PLAINTIFF'S WORK ON OCTOBER 12, 2012

46.     Plaintiff failed to complete twelve of the Postings assigned to her on October 12, 2012. (Pl. Dep., 263:22-266:14, October 12, 2012 Postings Assignment attached to Pl. Dep. as Ex., 13, Ex., B.)  Plaintiff testified that she could not locate the streets that she did not Post and drove around trying to locate them for approximately ten to fifteen minutes.  (Pl.

Dep., 264:14-265:12, 266:4-8, Ex., B.)  Plaintiff did not use her street guide, did not contact her supervisor Mr. Lewis, and did not stop to ask for directions in order to complete her assignment.  (Pl. Dep., 265:1-23, Ex., B.)  Plaintiff testified that she headed back to the station after lunch between 1:45 and 2:00 p.m. (Pl. Dep., 266:9-14, Ex., B.)

47.  Plaintiff's GPS records from October 12, 2012 indicate that she arrived in her work area at approximately 9:15 a.m., that she left her work area and began to drive south at noon, and that she never returned to her work area.  (Plaintiff's GPS records for October 12, 2012 attached to Lewis Aff., Ex., 13; Lewis Aff., ¶ 26, Ex., G.)

**PLAINTIFF'S SEVEN-DAY SUSPENSION**

48.  On October 15, 2012, Plaintiff was notified to appear at a pre-disciplinary hearing on October 18, 2012 related to her work performance on October 4, 2012 and October 12, 2012.  (Pl. Dep., 127:8-128:4, Ex., B.; Memorandum of Pre-Disc Hearing attached to Pl. Dep., as Ex., 10.)  Mr. Lewis, Mr. Caifano, Plaintiff and her union representative were in attendance at the pre-disciplinary hearing.  (Pl. Dep., 128:13-22, Ex., B.)  At the hearing, Mr. Caifano indicated that based upon the investigation, he believed that objective evidence indicated that Plaintiff had failed to perform her assignment and was inefficient in performance of her duties.  (Lewis Aff., ¶ 27, Ex., G.)  During the pre-disciplinary hearing, Plaintiff was provided an opportunity to hear the charges against her and present any evidence that she had to contradict the evidence presented, but failed to present any objective evidence in her defense.  (Pl. Dep., 129:18-130:15, Ex., B.)

49.  After the pre-disciplinary hearing, Mr.  Caifano would report what he perceived to be infractions of the City's Personnel Rules to Managing Deputy Julia Hernandez-Tomlin and to Assistant Commissioner Maureen Egan. (Caifano Dep., 53:17-56:24, 118:3-

121:14. Ex., E; Egan Aff.,¶ 19, Ex., C.)  Ms. Egan would advise which Personnel Rule should be cited in the Notice of Discipline and what level of discipline should be imposed based upon the employee's prior disciplinary history and the relevant City's Personnel Rules and CBA.  (Egan Aff.. ¶ 19, Ex., C.)  Caifano testified that collectively, he Ms. Egan and Ms. Hernadez-Tomlin would agree upon what level of discipline was appropriate and in accordance with the  CBA.  (Caifano Dep., 18.5-6, 119:19-120:6, Ex., E.)  Based upon Mr. Caifano's recap of the facts elicited at Plaintiff's pre-disciplinary hearing held on or about October 18, 2012, Plaintiff violated the City's Personnel Rules Nos. 38 and 39.  (Egan Aff., ¶ 21, Ex., C)  Plaintiff received a notice of progressive discipline on October 24, 2012 indicating that she had received a seven-day suspension, related to her October 4, 2012 and October 12, 2012 work performance, which was the next step of progressive discipline based upon Plaintiff's prior discipline history, which included a five-day suspension issued on March 13, 2012. (Notice of Progressive Discipline attached to Pl. Dep. as Ex. 9; Pl. Dep., 125:3-126:19, Ex., B; Egan Aff., ¶ 21, Ex., C.)

50.     The only reason that Plaintiff believes she should not have received a seven-day suspension is because "[she] do[es] the same thing ever other rate taker does."  (Pl. Dep., 269:6-20, Ex., B.)

**ALLEGED DISCRIMINATORY AND RETALIATORY COMMENTS**

51.     Plaintiff alleges that on January 24, 2012, Mr. Caifano accused her of questioning his authority, called her "an old nigger bitch" and said that "[she] need[s] to get out of his office." (Pl. Dep., 35:17-36:21, Ex., B.)  Plaintiff asserts that Mr. Caifano told her "I'm the Chief," "don't come in here telling him his job.  He's [her] boss.  [She's] not his."

(Pl. Dep, 35:23-36:2, Ex., B.)  Plaintiff testified that the January 24, 2012 date stands out in her mind, and that the conversation occurred in the conference room at 39th & Iron, on the first floor, before her shift started at approximately 8:00 a.m.  (Pl. Dep., 38:9-39:7, Ex., B.) The only negative comment that Plaintiff identified as having been made by Mr. Caifano regarding her age, race or gender was the statement allegedly made on January 24, 2012.  (Pl. Dep., 186:10-188:20, 194:4-195:11, Ex., B.)

52.     Toward the end of the first day of her deposition, Plaintiff added that during the January 24, 2012 conversation, she stated to Mr. Caifano that "he know as well as I do, I do more work than the majority of the rate takers, so why am I the only one being suspended." Plaintiff claims that Mr. Caifano replied, "as long as you keep filing charges, I'll keep suspending you." (Pl. Dep., 195:12-198:3, Ex., B.)

53.     Plaintiff's GPS records from January 24, 2012 indicate that Plaintiff drove north past the 39th & Iron Station and never stopped at 39th & Iron on this date.  (Plaintiff's GPS records from January 24, 2012 attached as Ex., 7 to Lewis Aff., ¶ 22, Ex., G.)

54.     Plaintiff asserts that she told SWRT Mike Duda about Mr. Caifano's alleged n-word comment, after she completed her work for the day on January 24, 2012 at 2:30 p.m.  (Pl. Dep., 39:8-41:5. Ex., B.) Plaintiff further testified that she told Mr. Duda about it to request paperwork to file "some charges."  (Pl. Dep., 40:10-41:8, Ex., B.)  Mr. Duda denies hearing that Mr. Caifano ever made a racist comment or that Plaintiff complained about a discriminatory comment.  (Duda Dep., 263:20-264:13, 267:16-268:4, Ex., D.)

55.     Plaintiff asserts that she also told fellow WRT Jessie Greenwood about Mr. Caifano's alleged n-word comment while in the parking lot, as she was leaving for the day on January 24, 2012, at approximately 3:30 p.m.  (Pl. Dep., 41:9-42:1, Ex., B.)     Ms.

Greenwood did not recall Ms. Cage ever mentioning this alleged comment to her.  (Jessie Greenwood June 24, 2015 Deposition ("Greenwood Day2 Dep."), 56:21-57:14, excerpts of Greenwood Day2 Dep attached hereto as Ex., I.)  Ms. Greenwood initially testified that she heard Mr. Caifano use the n-word in general, but in a subsequent day of deposition she denied hearing Mr. Caifano ever use the n-word.  (Greenwood Day2 Dep., 53:20-20; Jessie Greenwood August 20, 2015 Deposition ("Greenwood Day3 Dep."), 47:6-19, 79:6-80:5, excerpts of Greenwood Day3 Dep. attached hereto as Ex., J.)

56.     Plaintiff admits that she never told the personnel section in DWM, the City's Human Resources Department, or the City's EEO Office about Mr. Caifano's alleged comments, nor did she file a union grievance related to those comments.  (Pl. Dep., 43:10-24, 297:21-299:18, Ex., B.) Plaintiff never mentioned Mr. Caifano's alleged comments to Mr. Lewis, Leo Lillard or Julie Hernandez Tomlin.  (Pl. Dep., 300:6- 303:8, Ex., B.) Plaintiff also admits that she never filed an administrative charge with IDHR regarding Mr. Caifano's alleged comments.   (Pl. Dep., 44:1-12, Ex., B.)

57.     Plaintiff claims that on March 8, 2013, Mr. Caifano said "now get the fuck out of my office, you motherfucker."  (Pl. Dep., 186:21-187:24, Ex., B.) Plaintiff testified that she believed the comment was related to her age because "she was a black female."  (Pl. Dep., 193:16-22, Ex., B.)

58.     At the end of the first day of Plaintiff's deposition, she testified that Mr. Caifano responded to her question of why she was getting suspended by stating, "It is what it is. I'm the chief."  (Pl. Dep., 186:19- 187:12, Ex., B.)  She believes that Mr. Caifano was critical of her filing charges or complaints because of the way he said the comment.  (Pl. Dep., 196:20-198:3, Ex., B.)  Plaintiff was certain the January 24, 2012 comment and

March 8, 2013 comment were the only two instances in which she and Mr. Caifano discussed her suspensions. (Pl. Dep., 195:12- 198:3, Ex., B.)

59. Ms. Greenwood claims that she overheard Mr. Caifano say "stupid bitch," "who the fuck she think she is, who that bitch think she was," "she doesn't do shit," and "I need to get rid of her ass" in reference to Plaintiff, but she does not recall when Mr. Caifano allegedly made these statements. (Greenwood Day1 Dep., 44:20-46:24, 84:11-88:21, Ex., H.) Ms. Greenwood testified that Mr. Caifano would use term "fucking ass" to refer to both males and females. (Greenwood Day1 Dep., 88:23-89:11, Ex., H.)

60. Mr. Lewis has never heard Mr. Caifano make a derogatory comment regarding someone's race, age or gender, and has never heard Mr. Caifano complain about employees filing complaints. (Lewis Dep., 155:18-156:18, Ex., F.)

61. Plaintiff never heard Mr. Lewis make a derogatory comment regarding her race, age, gender, or about her filing charges or complaints. (Pl. Dep., 185:8-186:9, Ex., B.)

62. Plaintiff never heard Mr. Caifano or Mr. Lewis indicate that her age, race or gender were the reasons she was given either of the 2012 suspensions or that the suspensions were issued because she had filed a complaint or charge. (Pl. Dep., 119:15- 122:7, Ex., B.)

**GRIEVANCES**

63. Plaintiff filed grievances related to various suspensions on September 9, 2009 and January 30, 2012. (Pl. Dep., 89:15-91:15, Ex., B; September 2009 Grievance (Bates Nos. CAG000460) and January 2012 Grievance (Bates Nos. CAG000458) attached to Pl. Dep. as Group Ex. 3, Ex., B.)

64. Plaintiff filed a grievance on June 4, 2012, alleging that SWRT Duda spoke to her in a "demeaning, derogative and belligerent manner… [and she] felt insulted and embarrassed

24

in front of [her] co-workers." (Pl. Dep., 89:15-90:17, Ex., B; June 2012 Grievance (Bates Nos. CAG000456) attached to Pl. Dep. as Group Exhibit 3, Ex., B.) The City takes allegations of misconduct seriously, and therefore, Ms. Egan forwarded Plaintiff's Grievance to the City's EEO Office for further investigation. (Egan Aff. ¶ 22, Ex., C.)

## EEO COMPLAINT

65. On June 29, 2012, Plaintiff provided the City's EEO Office with a statement describing her complaints against Mr. Duda and Mr. Caifano. (Pl. Dep., 303:9-306:1, Ex., B; Plaintiff's EEO Statement, Ex. 14 to Pl. Dep., Ex., B.) Plaintiff mentioned that Mr. Duda allegedly called her an "old black bitch," but she never mentioned Mr. Caifano's alleged statements -- "old nigger bitch" or "as long as you keep filing charges, charges, I'll keep suspending you" to the EEO investigator. (Pl. Dep., 305:2-14, Plaintiff's EEO Statement, Ex. 14 to Pl. Dep., Ex., B.)

## INTERROGATORY ANSWERS

66. In Interrogatories Nos. 6, 7, 8 and 9 respectively, Plaintiff was asked to describe any act or omission by any City employee that she considered an instance of age, gender or race discrimination or retaliation. (Pl. Dep., 101:4-24, Ex., B; Plaintiff's Answers to Interrogatories, attached as Exhibit 6 to Pl. Dep., Ex., B.) Additionally, in Interrogatory No. 12, Plaintiff was asked to identify any comment or remark by Mr. Caifano that she believed evidenced age, race or gender animus. (*Id.*) Plaintiff fails to mention Mr. Caifano's alleged statements of "old nigger bitch" or "as long as you keep filing charges, charges, I'll keep suspending you," in response to the City's interrogatories. (Pl. Dep., 101:11-102:18, Ex., B.)

**PLAINTIFF'S ADMINISTRATIVE CHARGES & ALLEGATIONS**

67. On or about September 2004[5], Plaintiff filed Charge No. 2005CF0603 alleging discrimination with IDHR which was cross-filed with the EEOC. (Complaint, ¶ 47, Ex., A; Egan Aff., ¶ 28, Ex., C.) Plaintiff did not file any other charges alleging discrimination between 2005 and 2012. (Pl. Dep., 94:2-16, Ex., B.) On April 24, 2012, Plaintiff filed Charge No. 2012CA3088 with the Illinois Department of Human Rights ("IDHR") relating to her 5-Day suspension. (Complaint, Charge of Discrimination 5-Day, attached thereto as Ex. attached to Pl. Dep., as Ex., 2, Ex., B; Pl. Dep., 70:10-72:2, Ex., B.) Plaintiff completed and signed a questionnaire in support of her IDHR Charge, but did not mention Mr. Caifano's alleged comments. (Pl. Dep., 94:17-96:1, attached to Pl. Dep. as Ex. 4, Ex., B.)

68. On February 5, 2013, Plaintiff filed Charge No. 2013CA1663 with IDHR relating to her 7-day suspension. (Charge of Discrimination 7-Day attached to Complaint as Ex. C; Complaint, Ex., A; Pl. Dep., 73:23-74:4, Ex., B.) Plaintiff completed and signed a questionnaire in support of her IDHR Charge, but did not mention Mr. Caifano's alleged comments. (Pl. Dep., 96:2-97:3, Ex. 5 attached to Pl. Dep., Ex., B.)

69. During the IDHR investigation of Charge No. 2012CA3088 and 2013CA1663, Plaintiff never mentioned Mr. Caifano's alleged comments to the investigator. (Pl. Dep., 98:22-102:15, Ex.,B.) IDHR Charge Nos. 2012CA3088 and 2013 CA1663 were both cross-filed with the EEOC, and Plaintiff was issued a right to sue notice for each Charge.

---

[5] Plaintiff's Complaint mistakenly alleges that the Charge was filed in 2005, although records appear to indicate it was filed in 2004. (See Charge 2005CF0603 attached as Ex., 10 Egan Aff.,

(Complaint, ¶¶ 42-43, Right to Sue five-day, attached thereto as Ex. B, Right to Sue seven-day, attached thereto as Ex. D; Ex., A; Pl. Dep., 72:9-20, 75:9-13, Ex., B.)

70. Plaintiff filed her Complaint on September 3, 2014 alleging the following: Age Discrimination, (Counts I & II), Gender Discrimination, (Count III), Race Discrimination, (Count IV) related to her 5-day suspension, and Retaliation, (Count V) related to both her 5-day and 7-day suspensions. (Complaint ¶¶ 1-55, Ex., A.) The Complaint does not mention Mr. Caifano's alleged comments. (*Id.*)

## SIMILARLY-SITUATED EMPLOYEES

71. Ms. Cage testified that she is suing the City because younger, non- African American employees were treated better than her in that they were not reprimanded or suspended, but do less work and becuase she "wasn't treated fairly," meaning that she "was not treated the way [her] fellow co-workers were treated." (Pl. Dep., 182:5-25, 198:4-199:6, Ex., B.)

72. In her Complaint, Plaintiff, who is sixty-five years old, identifies employees who she believes are younger and who were treated more favorably than she was including: (1) Ron Blankus (63); (2) Darryl Tignor (55); (3) Inayat Kahn (68); (4) Pat Durant (59); (5) Renny Simmons (58); and Leslie Travis-Cook (51). (Complaint ¶ 14, Egan Aff. ¶ 24, Ex., C; List of demographic information for Plaintiff's co-workers attached as Ex. 7 to Egan Aff., Ex., C.) In 2012, the youngest WRT in DWM was born in 1970 and will be forty-five years old by December 31, 2015. ( Egan Aff., ¶ 24, Ex., C.) In her Complaint, Plaintiff, who is a female, identifies male employees who she believes were treated more favorably than she was, including: (1) Ron Blankus; (2) Darryl Tignor; (3) Inayat Kahn. (Complaint, ¶ 27, Ex., A; Egan Aff. ¶ 24, Ex., C; List of demographic information for

Plaintiff's co-workers attached as Ex. 7 to Egan Aff., Ex., C.)  In her Complaint, Plaintiff who is African American alleges that she was treated less favorably than non-African American employees with similar performance issues, but does not identify those employees in her Complaint.  (Complaint ¶ 38, Ex., A.)

73.    Plaintiff believes that Mr. Caifano favored the WRTs who were in his so-called "clique," and would give these individuals the AMR truck assignment, which in Plaintiff's opinion was the easiest assignment: Byron Lewis (54, African American, Male), Darryl Tignor (55, African American, Male), and Johnny Velazquez (57, Hispanic, Male). (Pl. Dep., 31:7-32:6; Egan Aff. ¶ 24, Ex., C; List of demographic information for Plaintiff's co-workers attached as Ex. 7 to Egan Aff., Ex., C.)  Plaintiff testified that Ben Williams (77, African American, Male) and Jeanette Elvia Aaron (68, African American, Female) were assigned to the AMR truck but were not "in the clique." (Pl. Dep., 31:16-33:10, Ex., B; Egan Aff. ¶ 24, Ex., C; List of demographic information for Plaintiff's co-workers attached as Ex. 7 to Egan Aff., Ex., C.)  Plaintiff acknowledges that Leo Lillard decided who would work the AMR truck.  (Pl. Dep., 275:16-276:1, Ex., B.)  Plaintiff admits both men and women have been assigned to the AMR truck.   (Pl. Dep., 281:14-16, Ex., B.)

74.    Plaintiff also believes the following individuals were in "Caifano's Clique" and were treated more favorably than she, but were not assigned the AMR truck:  Rose O'Neal (51, African American, Female, WMA); Jeff Sojka (55, Caucasian, Male, WMA); Pat Durant (59, African American, Female); Bridgette Jones (55, African American, Female); Edward Rodriguez ( 54, Hispanic, Male, WMA); Francisco Rios (45, Hispanic, Male); Sharon Brown (45, African American, Female); Rudy Espinosa (55, Hispanic, Male); (Ron Blankus (63, White, Male); Tony Kordowski (49, Caucasian, Male); and Jose

Sarabia (57, Hispanic, Male). (Pl. Dep., 31:7-33:17, 101:4-24, 281:17-282:15, Ex., B; Answers to Interrogatories Nos. 10, 13, 14, 15 attached to Pl., Dep. as Ex., 6, Ex., B; Egan Aff. ¶ 24, Ex., C; List of demographic information for Plaintiff's co-workers attached as Ex. 7 to Egan Aff., Ex., C.)

75. In 2012, while Plaintiff was stationed at 49th&Western, WRTs Pat Durant, Bridget Jones, Rudy Espinosa, Francisco Rios and Johnny Vasquez and WMAs Jerry Robinson, Rose O'Neal, Edward Rodriguez, and Jeff Sojka all worked out of 39th & Iron. (Pl. Dep., 213:10-214:9, Ex., B.) Plaintiff did not have occasion do go to 39th & Iron while she was stationed out of 49th & Western. (Pl. Dep., 212:19-213:3, Ex., N.) Plaintiff testified that no other WRT has been disciplined for job performance issues, however, she admits that she does not have access to any WRT's disciplinary records. (Pl. Dep., 131:22-144:23, 253:9-11, Ex., B.) Between the years of 2004 and 2013, WRTs of various ages and races and both genders have been disciplined for misrepresentation and/or poor performance related issues. (Discipline Recap attached to Egan Aff. as Ex., 8, Egan Aff., ¶ 25, Ex., C)

76. Jessie Greenwood (70, African American, Female) who worked directly under Mr. Caifano, always finished her daily work assignments. (Greenwood Day1 Dep., 9:11-16, 20:12-21:15, 115:3-5, Ex., H.) Ms. Greenwood was disciplined in 2006 after a member of the public reported that she had been discourteous and verbally abusive to a citizen. (Greenwood Day1 Dep., 95:12-97:5, Ex., H; Egan Aff., ¶ 26, Ex., C.) Ms. Greenwood was not disciplined after 2006, and her last disciplinary action prior to 2006 occurred in 1995. (Egan Aff., ¶ 26, Ex., C.) Mr. Caifano referred to both Ms. Greenwood and Leslie Travis-Cook as his "special person." (Jessie Greenwood August 20, 2015, Deposition ("Greenwood Day3 Dep."), 58:7-17, relevant excerpts attached hereto as Ex., J.)

77.    Caifano knows that Plaintiff is an African-American female, but does not know her age. He testified that she "hides it very well, I have no idea. I would have to guess in the neighborhood of, you know, mid 50s, or my age-ish." (Caifano Dep., 139:19-140:2, Ex., E.)

78.    Caifano testified that he could not recall any other WRT who performed "to the extent in which Miss Cage acted short of her responsibilities, I can't recall another so egregious offense, no." (Caifano Dep., 38:22-39:17, Ex., E.) Mr. Lewis testified that he believed Plaintiff received suspensions in 2012 because "she didn't give a full work effort." (Lewis Dep., 72:18-74:13, Ex., F.)

79.    Between January 1, 2010 and March 31, 2015, three WRTs filed charges with the City's EEO office, IDHR or EEOC. (List of WRTs who filed charges attached to Egan Aff., Ex., 9; Egan Aff., ¶ 27, Ex., C.) Other than Plaintiff, only one other WRT filed a discrimination charge between January 1, 2010 and March 31, 2015. (Egan Aff., ¶ 27, Ex., C.) This WRT, identified as "Employee A" on the summary list of charges filed by WRTs, was not subsequently disciplined after filing charges with the EEO Office and with IDHR. (Egan Aff., ¶ 27, Ex., C.)

**Dated: October 16, 2015**

Respectfully submitted,

STEPHEN R. PATTON
Corporation Counsel of the
City of Chicago

BY:    */s/ Meira Greenberg*_____
MEIRA GREENBERG
CARL JOHNSON
Assistant Corporation Counsel
DEJA NAVE
Senior Counsel

Employment Litigation Division
30 North LaSalle Street, Room 1020
Chicago, Illinois 60602
(312) 744-4939