Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4
 5   OPHELIA CAGE,               )
 6              Plaintiff,       )
 7        vs.                    )   No. 1:14-cv-6818
 8   THE CITY OF CHICAGO, a      )
 9   Municipal Corporation,      )
10              Defendant.       )
11
12         The deposition of OPHELIA CAGE, taken
13   pursuant to the Federal Rules of Civil Procedure of
14   the United States District Courts pertaining to the
15   taking of depositions, taken before JULIE A.
16   CONROY, CSR No. 84-2251, a Notary Public within and
17   for the County of DuPage, State of Illinois, and a
18   Certified Shorthand Reporter of said state, at
19   Suite 1020, 30 North LaSalle Street, Chicago,
20   Illinois, on the 29th day of April, A.D. 2015,
21   commencing at 10:14 a.m.
22
23
24
```

Page 2

```
 1   PRESENT:
 2
 3         BARRY A. GOMBERG & ASSOCIATES,
 4         (53 West Jackson Boulevard, Suite 1350,
 5         Chicago, Illinois  60604,
 6         312-922-0550), by:
 7         MR. BARRY A. GOMBERG,
 8         gomberglaw@aol.com,
 9              appeared on behalf of the Plaintiff;
10
11         OFFICE OF THE CORPORATION COUNSEL,
12         CITY OF CHICAGO,
13         (30 North LaSalle Street, Room 1020,
14         Chicago, Illinois  60602,
15         312-744-6951), by:
16         MR. CARL JOHNSON,
17         carl.johnson@cityofchicago.org,
18         MS. DEJA NAVE,
19         MS. MEIRA GREENBERG,
20              appeared on behalf of the Defendant.
21
22   REPORTED BY:  JULIE A. CONROY, CSR, RPR,
23              CSR No. 84-2251
24
```

Page 3

```
 1       MR. JOHNSON:  Let the record reflect that the
 2   time is 10:14 a.m., on April 29th, 2015.  This is
 3   the deposition of Ophelia Cage.
 4          Could you please swear in the witness?
 5            (WHEREUPON, the witness was duly
 6             sworn.)
 7       MR. JOHNSON:  Let the record reflect that the
 8   time is 10:14 a.m., on April 29th, 2015.  This is
 9   the deposition of Ophelia Cage, taken in the matter
10   of Cage vs. City of Chicago, Case No. 14-c-6818.
11   This deposition is taken pursuant to a notice of
12   deposition properly served in accordance with all
13   applicable rules and by agreement of the parties.
14            OPHELIA CAGE,
15   called as a witness herein, having been first duly
16   sworn, was examined and testified as follows:
17            EXAMINATION
18   BY MR. JOHNSON:
19       Q.  Ms. Cage, could you please state and
20   spell your full name for the record?
21       A.  Ophelia Cage, O-p-h-e-l-i-a, C-a-g-e.
22       Q.  Have you ever been deposed before?
23       A.  No.
24       Q.  Ms. Cage, I want to go over a few
```

Page 4

```
 1   ground rules.  Please answer questions out loud.
 2   Don't answer with uh-huh or uh-uh or a shake of the
 3   head, a nod of the head.  That's for the benefit of
 4   the record.  The court reporter can't take down
 5   non-verbal responses.  Okay?
 6       A.  Okay.
 7       Q.  You may anticipate my question, but
 8   please wait until I finish so that we don't talk
 9   over each other and I'll try to wait until you
10   answer before I ask the next question.  Okay?
11       A.  Okay.
12       Q.  The lawyers may object on occasion.  So
13   please wait until we are finished making our
14   objection before you answer.  You should answer
15   after objections are made unless your attorney
16   instructs you not to answer.  Okay?
17       A.  Okay.
18       Q.  Finally, if you need to take a break at
19   any time, that's fine.  Just please let me know.  I
20   would only ask that you answer the question that
21   is pending before we take a break.  Okay?
22       A.  Okay.
23       Q.  Ms. Cage, is there any reason why your
24   ability to answer the questions fully, truthfully,
```



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
5–8

Page 5

1   and accurately might be impaired today?
2       A.   No.
3       Q.   Is there any reason that your memory
4   might be impaired today?
5       A.   No.
6       Q.   Other than your attorneys, did you speak
7   to anyone in preparation for your deposition?
8       A.   No.
9       Q.   Did you review any documents to prepare
10  for your deposition today?
11      A.   No.
12      Q.   Ms. Cage, how old are you?
13      A.   64.
14      Q.   And what is your race?
15      A.   Black.
16      Q.   Have you ever been married?
17      A.   Yes.
18      Q.   Are you currently married?
19      A.   No.
20      Q.   Do you have any children?
21      A.   Yes.
22      Q.   How many?
23      A.   Two.
24      Q.   Where do you live currently?

Page 6

1       A.   6326 South Campbell Avenue.
2       Q.   And is that a home or an apartment?
3       A.   A two-flat.
4       Q.   Do you rent or own?
5       A.   Own.
6       Q.   Have you ever been convicted of a crime?
7       A.   No.
8       Q.   Ms. Cage, what's your highest level of
9   education?
10      A.   Two years of college.
11      Q.   Where did you attend two years of
12  college?
13      A.   It was called Loop Junior College when I
14  went.
15      Q.   How do you spell the first word of that?
16      A.   L-o-o-p.
17      Q.   Did you receive a diploma from Loop
18  Junior College?
19      A.   Yes, I did.
20      Q.   What was your degree?
21      A.   AA.
22      Q.   What's that?
23      A.   Associate in arts.
24      Q.   Ms. Cage, when did you start working in

Page 7

1   the City of Chicago water department?
2       A.   October, 1985.
3       Q.   And have you worked in the City water
4   department continuously since October, 1985?
5       A.   Yes.
6       Q.   What positions have you held in the
7   water department since October, 1985?
8       A.   A Clerk III and now a water rate taker.
9       Q.   From what year -- during what years were
10  you a Clerk III?
11      A.   1985 until June of 1991.
12      Q.   And from June, 1991, to the present,
13  have you been a water rate taker in the City water
14  department?
15      A.   Yes.
16      Q.   What's your current salary?
17      A.   Monthly $2,300.
18      Q.   Has your salary remained the same ever
19  since you became a water rate taker in June, 1991?
20      A.   No.
21      Q.   What has been the progression of your
22  salary since you started?
23      A.   Well, I got raises according to the
24  union contract.

Page 8

1       Q.   Do you receive medical benefits
2   currently as a water rate taker in the City water
3   department?
4       A.   Yes.
5       Q.   Do you contribute to a pension?
6       A.   Yes.
7       Q.   When did you begin contributing to a
8   pension?
9       A.   I'm not sure because they didn't take
10  out Social Security, so it may have been delayed.
11      Q.   Do you know approximately when?
12      A.   I'd say '95.
13      Q.   And, Ms. Cage, you said you are a member
14  of a union?
15      A.   Yes.
16      Q.   What's the name of that union?
17      A.   Plumbers Local 130.
18      Q.   And have you been a member of Plumbers
19  Local 130 union since you started at the water
20  department in October, 1985?
21      A.   No.
22      Q.   When did you --
23      A.   Two different unions.  When I started in
24  1985, I was in AFSCME because I was a clerk.  And I



OPHELIA CAGE

April 29, 2015

CAGE vs. CITY OF CHICAGO

9–12

1  didn't get into the plumbers union until I became a
2  water rate taker in 1991.
3      Q.    Have you ever received a copy of the
4  City's personnel rules?
5      A.    Yes.
6      Q.    When did you receive a copy of the
7  City's personnel rules?
8      A.    Five years ago.
9      Q.    Is that the last five years ago -- is
10  that the last time you received a copy, the most
11  recent time you received a copy of the City's
12  personnel rules?
13      A.    Yes.
14      Q.    Who is your current supervisor as a
15  water rate taker?
16      A.    Tyrone Lewis.
17      Q.    Before Mr. Lewis was your supervisor,
18  who was your supervisor before that?
19      A.    I can't recall his name.
20      Q.    Do you recall the name of any supervisor
21  before Mr. Lewis became your supervisor?
22      A.    Yes.  Leroy Taylor was a supervisor.  I
23  can only remember his last name, his name was
24  Mulligan.  He was a supervisor before Mr. Taylor.

1  And the one before Mr. Lewis, I can't think of
2  his name.  Oh, and I had a supervisor named Jim
3  McKenna.  Kroll, Bob Kroll, the supervisor before
4  Tyrone Lewis.
5      Q.    Do you remember approximately what
6  years -- for what years Bob Kroll was your
7  supervisor as a water rate taker?
8      A.    No.  I just remember that he was the
9  supervisor before Tyrone became my supervisor.
10      Q.    And when did Tyrone become your
11  supervisor?
12      A.    I have no idea.
13      Q.    Do you know approximately when?
14      A.    I'm going to say 2000, but that's a
15  guess.
16      Q.    And before Bob Kroll was your
17  supervisor, Leroy Taylor was your supervisor?
18      A.    I'm trying to think who was before who.
19  Leroy Taylor was before Bob Kroll.
20      Q.    Do you remember when Leroy Taylor was
21  your supervisor, what years?
22      A.    In the '90s.
23      Q.    And the individual whose last name is
24  Mulligan, was that person your supervisor before

1  Leroy Taylor?
2      A.    Yes.
3      Q.    This was while you were a Clerk III?
4      A.    No.  That's when I first became a water
5  rate taker.
6      Q.    And when was Jim McKenna your
7  supervisor?
8      A.    I'm thinking before or after Mulligan,
9  but I don't know which.
10      Q.    So in 2011, your supervisor was
11  Tyrone Lewis, correct?
12      A.    Yes.
13      Q.    And in 2012, your supervisor was
14  Tyrone Lewis?
15      A.    Yes.
16      Q.    Was Len Caifano or Leonard Caifano the
17  chief water rate taker in 2011 and 2012?
18      A.    Yes.
19      Q.    And as chief water rate taker, was he
20  your direct supervisor?
21      A.    Yes.
22      Q.    Was he the supervisor above Tyrone
23  Lewis?
24      A.    Yes.

1      Q.    So on a daily basis did you report to
2  Tyrone Lewis --
3      A.    Yes.
4      Q.    -- in 2011 and 2012?
5          Did you report directly to Len Caifano
6  in 2011 and 2012?
7      A.    No, to Tyrone Lewis.
8      Q.    Was Mike Duda ever your supervisor as a
9  water rate taker with the City?
10      A.    Yes, when we were stationed out of
11  79th and Lakefront.
12      Q.    Do you remember approximately what
13  years Mike Duda was your supervisor as a water
14  rate taker?
15      A.    No.
16      Q.    Do you remember in the progression
17  relative to Bob Kroll, Leroy Taylor, Mr. Mulligan,
18  or Jim McKenna where Bob Duda -- excuse me -- where
19  Mike Duda fit in?
20      A.    It's hard to say because we had four
21  stations and Tyrone was at Station 3, which was on
22  Springfield and North Avenue, and Mike Duda was on
23  the south side over here.  So they had scheduled me
24  to work at the south side station.  That's how Mike



OPHELIA CAGE
April 29, 2015
CAGE vs. CITY OF CHICAGO
13–16

Page 13

1  Duda became my supervisor because after Bob Kroll
2  left I think Mike was made supervisor then.
3      Q.   Was Mike Duda ever your supervisor
4  during 2011 or 2012?
5      A.   I think 20 -- I think 2011, but I'm not
6  sure because he left, resigned.
7      Q.   So besides Mike Duda, Tyrone Lewis,
8  Bob Kroll, Leroy Taylor, Mr. Mulligan, Jim McKenna,
9  and Len Caifano as chief water rate taker, are
10  there any other supervisors you've had as a
11  water rate taker?
12      A.   No.
13      Q.   What station do you currently work out
14  of as a water rate taker?
15      A.   39th and Iron.
16      Q.   Is that the only station for water rate
17  takers right now?
18      A.   Yes.
19      Q.   Was there a time when there was
20  more than one station for water rate takers?
21      A.   Yes.
22      Q.   When did the stations consolidate into
23  one station for water rate takers?
24      A.   When they -- before we came to 39th and

Page 14

1  Iron we were at 49th and Western and that was the
2  only station that we had.  They had closed down
3  23rd and Ashland which we were originally scheduled
4  and they closed down the one at Springfield and
5  North Avenue.  So everybody was at 49th and Iron --
6  I mean, 49th and Western.  And from there they put
7  us on 39th and Iron.
8      Q.   Do you remember when it was narrowed
9  down to only 49th and Western, approximately what
10  year?
11      A.   No.
12      Q.   Do you remember when everyone moved to
13  39th and Iron?
14      A.   We've been there two years I think.
15      Q.   So approximately?
16      A.   This will be the third year I think.
17      Q.   So approximately beginning of 2012?
18      A.   I think so.
19      Q.   You were at 39th and Iron?
20      A.   Yes.
21      Q.   Do you recall where you were stationed
22  out of in 2011?
23      A.   I think 49th and Western, but I'm not
24  sure.

Page 15

1      Q.   At the station at 39th and Iron, are
2  there multiple floors?
3      A.   Yes.
4      Q.   How many floors are there?
5      A.   They have the mezzanine, first floor,
6  second floor.
7      Q.   So three?
8      A.   Yes.
9      Q.   What floor of the building do you
10  currently work on?
11      A.   The basement.
12      Q.   Did you work in the basement in 2011?
13      A.   We've always been in the basement since
14  we've been at 39th and Iron.
15      Q.   Okay.  In 2012, did you work in a
16  cubicle in the basement of 39th and Iron?
17      A.   No.
18      Q.   Did you have your own desk?
19      A.   No.
20      Q.   Did you have a location where you would
21  keep any work or any records at 39th and Iron?
22      A.   No.
23      Q.   Did any water rate taker have a cubicle
24  in the basement of 39th and Iron?

Page 16

1      A.   No.
2      Q.   Did any water rate taker have a desk in
3  the basement of 39th and Iron?
4      A.   No.
5      Q.   Were all water rate takers in the
6  basement of 39th and Iron in 2012?
7      A.   No.  Some were on the first floor.
8      Q.   Approximately how many water rate takers
9  were on the first floor?
10      A.   Five.
11      Q.   Who were they?
12      A.   Pat Durrant, Bridget Jones, Rose O'Neil,
13  Jeff Sojka -- I think that's how you pronounce his
14  name -- Sharon Brown, and Jerry Robinson.
15      Q.   Robinson?
16      A.   Robinson.
17      Q.   Were there any other water rate takers
18  on the first floor besides those individuals in
19  2012?
20      A.   They have another one, Rios, but I don't
21  know Rios' last name.
22      Q.   Any other water rate takers besides them
23  on the first floor in 2012?
24      A.   No.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
17—20

Page 17

1    Q.    So besides who you have listed on the
2 first floor, all other water rate takers were in
3 the basement of 39th and Iron in 2012?
4    A.    Yes.
5    Q.    In 2012, did Tyrone Lewis have his own
6 office in 39th and Iron?
7    A.    He has a cubicle.
8    Q.    Where is Mr. -- where in 2012 was
9 Mr. Lewis' cubicle located?
10    A.    In the basement and he has a desk
11 upstairs on the first floor.
12    Q.    His cubicle in the basement of 39th and
13 Iron in 2012, was it in the middle of the floor?
14 Was it off in the corner?
15    A.    Off in the corner.
16    Q.    And you said he had a desk on the first
17 floor?
18    A.    Yes.  He goes back and forth.  After Len
19 Caifano retired, he took over his duties.  So he's
20 in the basement in the morning and then when we
21 leave out he goes upstairs to the desk on the first
22 floor.
23    Q.    In 2012, did Len Caifano have his own
24 office?

Page 18

1    A.    Yes.  He had a cubicle up on the first
2 floor.
3    Q.    As a water rate taker in -- well,
4 currently as a water rate taker, what are your job
5 duties?
6    A.    We read water meters for the City of
7 Chicago so the customers can get billed.
8    Q.    Do you have any other job duties as a
9 water rate taker besides reading meters in the
10 City of Chicago so customers can get billed?
11    A.    We do charitable accounts.  Those are
12 the police station and firehouses where they send
13 us out just to see how much water is being used.
14 And we post properties that have the water shut off
15 for non-payment.
16    Q.    Besides reading water meters, doing
17 charitable accounts, and posting properties, are
18 there any other job duties you do as a water rate
19 taker?
20    A.    When the meters stop working, they send
21 us out to SEO 1s to check to see why the meter
22 hasn't moved in X amount of months.
23    Q.    What's SEO 1?
24    A.    Small examination orders.

Page 19

1    Q.    Are there any other job duties as a
2 water rate taker?
3    A.    No, that's it.
4    Q.    I'd like to turn your attention to
5 Exhibit 1, what we'll mark as Exhibit 1, please.
6         (WHEREUPON, a certain document was
7          marked Cage Deposition Exhibit
8          No. 1, for identification, as of
9          04-29-2015.)
10 BY MR. JOHNSON:
11    Q.    Do you recognize Exhibit 1?
12    A.    I've never seen this copy before.
13    Q.    Have you seen a copy of a similar
14 document before?
15    A.    One sheet when I first applied for the
16 job.
17    Q.    Does this appear to be the class title
18 water rate taker job description provided by the
19 City of Chicago?
20    A.    Yes.
21    Q.    Can you please review this exhibit.
22    A.    This has been updated.  We were not
23 required to have a driver's license when I came on
24 the job because you drove your own car and you

Page 20

1 walked to the location.  So they did not require
2 us to have a driver's license.
3    Q.    When did they start requiring you to
4 have a driver's license?
5    A.    Well, this copy here has been updated
6 maybe five times.  Like I said, when I first got
7 it, it was one statement and it was just a general
8 statement telling you what the responsibilities
9 were for water rate taker.  They did not have
10 education, training, or experience on that.
11 This licensure and certification was not on there.
12    Q.    Under the heading "Characteristics of
13 this Class" -- excuse me -- "Characteristics of the
14 Class" and the next heading "Essential Duties,"
15 does the information listed here -- in addition to
16 what you testified to, reading water meters for the
17 City, charitable accounts, posting properties, shut
18 off notices, and when meters stop working doing
19 SEO orders, in addition to those, does what's
20 listed under the first two headings state all of
21 the job duties for a water rate taker currently?
22    A.    Yes.
23    Q.    Were your job duties as a water rate
24 taker different in any way in 2011 and 2012?



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
21–24

Page 21

1    A.    No.
2    Q.    Do you know how many water rate takers
3  are in the department right now, in the water
4  department?
5    A.    Less than 25.
6    Q.    Do you know how many water rate takers
7  were in the City water department in 2011 and 2012?
8    A.    Probably less than 20.
9    Q.    In 2011 and 2012, would you say 15 water
10  rate takers?
11    A.    Yes.
12    Q.    What are your typical hours -- excuse
13  me.
14        What were your typical hours in 2011 and
15  2012?
16    A.    7:00 to 3:30.
17    Q.    At any time as a water rate taker with
18  the City of Chicago water department did you ever
19  work different hours besides 7:00 to 3:30?
20    A.    No.
21    Q.    In 2011 to 2012, did you have to swipe
22  in at the beginning of the day?
23    A.    Yes.
24    Q.    When you say your typical hours in 2011

Page 22

1  and 2012 were 7:00 to 3:30, is that 7:00 a.m. to
2  3:30 p.m.?
3    A.    Yes.
4    Q.    In 2011 to 2012, did you have to swipe
5  out at the end of the day?
6    A.    Yes.
7    Q.    And by swiping in and swiping out, is
8  that with a plastic card swiped into some sort of
9  electronic reader?
10    A.    Yes.
11    Q.    And in 2012, did you swipe in and out at
12  the station at 39th and Iron?
13    A.    Yes.
14    Q.    In 2011 and 2012, were you required to
15  swipe in and out?
16    A.    Yes.
17    Q.    How were you informed of this
18  requirement?
19    A.    They had passed a memo around and before
20  we were at 39th and Iron that's how they recorded
21  our documents at all the stations, even before they
22  closed the other three down.
23    Q.    When did you receive a memo about the
24  requirement to swipe in and out in 2011 and 2012?

Page 23

1    A.    When they changed the system to Kronos.
2  So I don't know what year they changed the system
3  to Kronos.
4    Q.    Was it before 2011 that you received
5  this memo?
6    A.    Yes.
7    Q.    Was it before 2009?
8    A.    Could be.  I'm not sure.
9    Q.    Do you know who wrote the memo?
10    A.    It came from personnel.
11    Q.    In addition to this memo that was
12  circulated prior to 2009 from personnel, was there
13  any other way you were informed of the requirement
14  to swipe in and out?
15    A.    No.
16    Q.    In 2011 and 2012, were there any
17  exceptions to the requirement of swiping in and
18  out at the station?
19    A.    What do you mean any exceptions?
20    Q.    So were there times where a water
21  rate taker was allowed to not swipe in and out?
22    A.    They weren't allowed to, but it was
23  done.
24    Q.    Which water rate takers didn't swipe in

Page 24

1  and out in 2011 and 2012?
2    A.    If a rate taker didn't have any problem
3  with the supervisor and they left their ID at home
4  or lost it or was running late, they were allowed
5  to fill out an edit sheet.
6    Q.    Do you recall individual water rate
7  takers who fall into this category of not swiping
8  in and out in 2011 and 2012 and filling out an
9  edit sheet instead?
10    A.    Pat Durrant, Bridget Jones, Rose O'Neil.
11  Those are the three I can think of right offhand.
12    Q.    So as you sit here today, besides Pat
13  Durrant, Bridget Jones, and Rose O'Neil, you cannot
14  recall any other water rate takers who would not
15  swipe in and out each day in 2011 and 2012?
16    A.    No.
17    Q.    Do you recall whether Pat Durrant,
18  Bridget Jones, and Rose O'Neil would not swipe in
19  and out every day?
20    A.    Yes, it was on a daily basis.
21    Q.    And how are you aware that on a daily
22  basis these three individuals would not swipe in
23  and out?
24    A.    Well, the supervisor would give them an



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
25–28

Page 25

1   edit sheet. And if you're standing there by the
2   desk, you see the edit sheet because they come in.
3   If I get there at, which I do now, 5:45 in the
4   morning, I see the people that comes in and out.
5       Q.   Did you arrive at 5:45 in the morning in
6   2011 and 2012 each day?
7       A.   I still do.
8       Q.   In 2011 and 2012 you did, as well?
9       A.   Yes.
10      Q.   And did you always every day stand by
11  the desk where the edit sheets would be placed?
12      A.   No. Once I swipe in, I can either
13  go back to my car and sit or I can come into the
14  station. And I'm sitting in my car and I'm
15  seeing them coming in late.
16      Q.   So did you ever see in 2011 and 2012 the
17  edit sheet for Pat Durrant, Bridget Jones, or
18  Rose O'Neil?
19      A.   Yes, I did.
20      Q.   How many times did you see the edit
21  sheet in the morning for Pat Durrant?
22      A.   On a daily basis, three to four times a
23  week.
24      Q.   And you saw it at the desk where the

Page 26

1   edit sheet was placed?
2       A.   Yes. The supervisor gives them the edit
3   sheet. Then they turn them in.
4       Q.   And how did you see the edit sheet for
5   Bridget Jones and Rose O'Neil?
6       A.   Because I'm standing there by the desk
7   as they're coming in and asking the supervisor for
8   the edit sheet.
9       Q.   With Bridget Jones, was it also three to
10  four times per week?
11      A.   Yes. And what Bridget would do, if she
12  didn't have time to get to her location, which was
13  at 39th and we were at 49th and Western, she would
14  come over there to try and swipe in to keep from
15  being late.
16      Q.   About what years did that take place?
17      A.   Before we left 49th and Western. I
18  don't know what year, but she did it. Jeff Soj- --
19  I don't know how to pronounce his name -- he did
20  it. Those two would do it on a regular basis.
21      Q.   Jeff, and his last name starts with an
22  S, would that be Jeff Sojka?
23      A.   I don't know how to pronounce his last
24  name.

Page 27

1       Q.   Do you know approximately how to spell
2   it?
3       A.   S-o- -- I have it here on the --
4           Jeff, last name is spelled S-o-j-k-a.
5   It's Jeffrey A., however you pronounce his last
6   name, J-e-f-f-r-e-y, middle initial A.
7       Q.   And is that individual Jeff, who I think
8   is Sojka, S-o-j-k-a, the person you were referring
9   to when you listed the water rate takers who in
10  2011 and 2012 were located on the first floor --
11      A.   Yes.
12      Q.   -- of 39th and Iron?
13          What did you refer to when you just
14  looked up Jeff's name?
15      A.   This is called a department seniority
16  report and it has on there everybody's date that
17  they started working.
18      Q.   And how did you obtain this document?
19      A.   I kept asking Leo Lillard, who is the
20  assistant director for seniority lists. I had to
21  ask for about a year before we finally got one and
22  that's how I obtained it.
23      Q.   When did you ask Leo Lillard for a
24  seniority report?

Page 28

1       A.   We were at 49th and Western. Almost a
2   year before. I guess he contacted someone in
3   personnel and we ended up -- we got here Department
4   of Human Resources records management. That's how
5   we got this. When he obtained it, he made a copy
6   for everybody to get one.
7       Q.   So you got this seniority report from
8   Leo Lillard before 2011?
9       A.   Yes.
10      Q.   And was Rose O'Neil in 2012 also allowed
11  three to four times per week to not swipe in and
12  out of the station?
13      A.   Yes. She still does.
14      Q.   In 2011 and 2012, if you took breaks
15  while you were working as a water rate taker,
16  either for lunch or otherwise, did you record
17  when you took a break?
18      A.   No.
19      Q.   Was there a requirement for whether you
20  should record whether you took a break?
21      A.   No.
22      Q.   What time did you arrive in the parking
23  lot each morning in 2011 and 2012?
24      A.   When we were at 49th and Western, they



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
29–32

Page 29

1  had a lockbox on the gate.  So I was always the
2  first one to the station.  I would get there at
3  like I said between 5:30 and before 6:00 and I
4  would open up the doors so that when everybody else
5  came they didn't have to put the code in because I
6  was already in the office.
7      Q.   And what time did you arrive in the
8  parking lot each morning in 2012 when you were at
9  39th and Iron?
10     A.   Same time I go now, 5:00 -- it was 5:45.
11  It's now 5:30 because we have a thing on the door
12  and it was broken.  They fixed it.  They had to
13  fix it or you can only get in there after 6:00.
14  But after they fixed the door, it started working
15  at 5:30.
16     Q.   I understand that in 2011 and 2012 there
17  were different types of assignments a water rate
18  taker might do, is that correct?
19     A.   Yes.
20     Q.   In 2011 and 2012, what were the
21  different types of assignments?
22     A.   Some of the rate takers like myself did
23  postings, which we're doing now.  We read
24  charitable accounts and we read water meters.  And

Page 30

1  you had people like Pat Durrant, Rose O'Neil, and
2  Bridget before she retired, they would do like
3  SEO 1s.
4      Q.   Besides reading meters, posting, doing
5  charitable accounts, and SEO 1 assignments, were
6  there any other assignments water rate takers
7  were assigned in 2011 and 2012?
8      A.   I don't think so, no.
9      Q.   Were there full payment certificates in
10  2011 and 2012?
11     A.   Yes.  They have a rate taker called Rudy
12  Esposito doing those along with Nancy Smith.
13     Q.   Are you sure that's Rudy Esposito?  Is
14  his last name Esposito?
15     A.   Yes.
16     Q.   Were there service orders as a type --
17  besides SEOs, were there service orders --
18     A.   Yes.
19     Q.   -- as a type of assignment --
20     A.   Yes.
21     Q.   -- in 2011 and 2012?
22     A.   Yes.
23     Q.   What is a service order?
24     A.   That's when a customer has a dispute

Page 31

1  with their bill and they send a rate taker out
2  there with the paperwork to read the meter to see
3  if the reading that the City has billed them for
4  is accurate or if the meter is damaged or if
5  there's some problem with the meter the reason
6  their bill is so high.
7      Q.   In 2011 and 2012, was AMR a type of
8  assignment water rate takers would get?
9      A.   That's a little position that they have
10  for those in their little clique.
11     Q.   Who is they?
12     A.   Lenny Caifano.
13     Q.   And what do you mean by clique?
14     A.   Those are the rate takers that he favor,
15  so he give them the easiest work there is.
16     Q.   Who were the water rate takers who Lenny
17  Caifano favored in 2011 and 2012?
18     A.   Well, he has a rate taker now,
19  John Vasquez.  When he came back from having his
20  heart attack, they didn't put him in the field.
21  They put him on the AMR truck.  And that's what
22  he's doing right now.  They have another rate
23  taker, Daryl Tigner.  He drives the AMR truck.  Ben
24  Williams before he retired, he was driving the

Page 32

1  AMR truck.  They have Jeanette.  I can't think of
2  Jeanette's last name.  She's on the AMR truck.  And
3  they have another guy.  I think his name is John
4  Vasquez.  He drive the AMR truck.  And they have
5  another one.  What's his name.  Byron Lewis, he
6  drives the AMR truck.
7      Q.   Besides John Vasquez, Daryl Tigner,
8  Ben Williams, Jeanette, and Byron Lewis, are there
9  any other water rate takers who in 2011 and 2012
10  were in Len Caifano's clique?
11     A.   Jeff Sojka.  That's his right-hand man.
12     Q.   And when you say these water -- was
13  there anyone else in the clique --
14     A.   Yeah --
15     Q.   -- in 2011 and 2012?
16     A.   -- Rose O'Neil.
17     Q.   I'm sorry.  Strike that.
18          Is there anyone else that was in
19  Lenny's clique, Len Caifano's clique in 2011 and
20  2012?
21     A.   Yes, Rose O'Neil, Pat Durrant,
22  Bridget before she retired, Jeff, his right-hand
23  man, Rudy.  John Vasquez, we got him down.  Rios.
24  I can't think of Rios' last name.  I got it on the



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
33–36

Page 33

1 paper down here. Rios and Ed Rodriguez.
2    Q.   Besides John Vasquez, Daryl Tigner,
3 Ben Williams, Jeanette, Byron Lewis, Jeff Sojka,
4 Rose O'Neil, Pat Durrant, Bridget Jones, Rudy,
5 Rios, and Ed Rodriguez, were there any other water
6 rate takers in Len Caifano's clique in 2012?
7    A.   Yes, but Ben Williams and Jeanette, they
8 weren't in the clique. They just happened to be on
9 it because they had the time, they had the
10 seniority.
11    Q.   Who else was in the clique?
12    A.   That's it.
13    Q.   What do you mean when you say the
14 members of Len Caifano's clique were favored?
15    A.   Them and me, he would give me the
16 hardest work he could working on the north side, in
17 the dunes if he could. And Pat and Bridget and all
18 these other peoples, in the course of eight hours
19 they did less than 20 of whatever it is they were
20 doing a day.
21    Q.   How do you know that these others
22 would do less than 20 of whatever they did per
23 day?
24    A.   Because I questioned Lenny about the

Page 34

1 work that he was giving them and the work he
2 was giving me.
3    Q.   When did you question Lenny?
4    A.   I started questioning Lenny 2000 -- way
5 before 2011. 2010, '11, and '12. And I was, you
6 know, telling Lenny, why is it, you know, you had a
7 north side crew, rate takers that were supposed to
8 be reading meters on the north side. Bridget and
9 Pat tells you they don't know their way around.
10 You throw me up there. I said I have just as much
11 time as Bridget and Pat do and you giving Pat and
12 Bridget the less work of anybody.
13    Q.   In this conversation comparing the
14 work that you did with the work that Bridget did
15 when you were questioning Lenny about it, this is
16 a specific conversation?
17    A.   Yes.
18    Q.   When did that specific conversation
19 occur?
20    A.   Me and Lenny had conversations like
21 this on a weekly basis because he was giving
22 them every -- five days a week.
23    Q.   And this was on a weekly basis from 2010
24 through 2011, through 2012?

Page 35

1    A.   Up until he resigned and left or
2 whatever.
3    Q.   And when you had these conversations
4 with Len Caifano on a weekly basis, did you discuss
5 the performance of water rate takers besides Pat
6 Durrant and Bridget Jones?
7    A.   And Rose O'Neil, yes.
8    Q.   Besides Ms. Durrant, Ms. Jones, and
9 Ms. O'Neil, did you discuss on a weekly basis with
10 Len Caifano other water rate takers' performance?
11    A.   Yes. I discussed Rudy Esposito's
12 performance, Rios' performance.
13    Q.   Did you discuss with Lenny on a weekly
14 basis the performance of all the water rate takers
15 we previously listed as a part of his clique?
16    A.   Yes, I did.
17    Q.   When you would ask Lenny Caifano in
18 these weekly conversations about the performance
19 of other water rate takers compared to your
20 assignments, what would he say in response?
21    A.   Lenny was very arrogant. He would jump
22 on the defensive and accuse you of questioning his
23 authority. He had a statement that he always used,
24 I am the chief. So I do, you know, what I want to

Page 36

1 do. I'm the chief. I'm your boss. You're not
2 mine.
3         And I told him you know I do more work
4 than they do because you see it every day on a
5 daily basis.
6         He turned around and walked away.
7    Q.   Do you recall a specific instance where
8 he accused you of questioning his authority?
9    A.   Yes. In January of '12, we had a -- it
10 wasn't heated, but it was a verbal discussion about
11 those allegations there. And that's when
12 Mr. Caifano proceeded to call me out of my name.
13    Q.   What do you mean call you out of your
14 name?
15    A.   Well, he said I was an old nigger bitch
16 and I need to get out of his office. You know,
17 don't come in here telling him his job. He's my
18 boss. I'm not his.
19    Q.   Do you remember the date in January,
20 2012, when Mr. Caifano made this comment?
21    A.   January 24th.
22    Q.   Was anyone else present when Mr. Caifano
23 on January 24th called you an old N word bitch?
24    A.   No.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
37–40

Page 37

1    Q.    Was there any other specific
2 conversation you remember where Len Caifano
3 would accuse you of questioning his authority?
4    A.    Yes.  We had a discussion in March.
5 March of 2012 we had a discussion about my work
6 again, about Lenny constantly suspending me for
7 little, small infractions.  And the majority of
8 those names that I gave you, I have more seniority
9 than them and have been on the job longer than
10 them and you keep singling me out.
11    Q.    Going back to your weekly conversations
12 between 2010 and 2012 with Mr. Caifano about the
13 performance of water rate takers in his clique,
14 did he ever confirm that they were given more
15 favorable assignments than you?
16    A.    I saw the work.  When we do whatever
17 it is we doing, we bring it in, like this here, and
18 you put it on the desk.  Well, if I get back,
19 everybody's work is there.  So you can see
20 everybody's work, what they have did for the whole
21 day.  So I'm looking at everybody's work along with
22 mine and you see what their production was for that
23 day.
24    Q.    Did you see the results of -- all the

Page 38

1 water rate takers that we listed in Lenny's clique,
2 did you see the results of their work every day?
3    A.    Yes, I did.
4    MR. JOHNSON:  Okay.  Can we take a break?
5        (WHEREUPON, a recess was had from
6             11:03 to 11:23 a.m.)
7    MR. JOHNSON:  Back on the record.
8 BY MR. JOHNSON:
9    Q.    So, Ms. Cage, the conversation you had
10 with Len Caifano on January 24th, 2012, where
11 exactly were -- the conversation where he called
12 you -- you believe he called you an old nigger
13 bitch, where exactly were you when this comment was
14 made?
15    A.    In 39th and Iron, they have a room
16 called the conference room that's across the
17 hallway from where his desk is.
18    Q.    What floor is that on?
19    A.    First floor.
20    Q.    What time of day, what exact time was
21 it?
22    A.    It was before I started my shift.  So
23 around 8 o'clock.
24    Q.    Why does that date January 24th stand

Page 39

1 out in your mind?
2    A.    Because of a suspension he had given me
3 prior to that.
4    Q.    What suspension?
5    A.    I had so many.  A suspension where I
6 couldn't get into some locked buildings on the
7 north side.
8    Q.    After this conversation on January 24th,
9 2012, where Mr. Caifano made that comment, did you
10 tell anyone about the comment?
11    A.    Yes, I told Mike Duda.
12    Q.    When did you tell Mike Duda?
13    A.    When I came back in that evening from my
14 route.
15    Q.    What time was that?
16    A.    2:30.
17    Q.    Where exactly were you when you told
18 Mike Duda at 2:30?
19    A.    In the office, in his office.
20    Q.    And where is Mike Duda's -- in Mike
21 Duda's office?
22    A.    He don't have an office.  It's a room.
23    Q.    And he has a desk in that room?
24    A.    Yes, two desks in there.

Page 40

1    Q.    Wasn't Tyrone Lewis your supervisor in
2 January, 2012?
3    A.    Yes, he was.
4    Q.    Was Mike Duda also your supervisor in
5 January, 2012?
6    A.    They said he was, yes.  So him and
7 Tyrone like split the duties.  Normally Mike Duda
8 just took over.  Tyrone was just sitting there.  He
9 just sit there and Mike Duda runs the office.
10    Q.    Why did you tell Mike Duda about the
11 conversation with Len Caifano?
12    A.    Because I wanted him to give me some
13 paperwork so that I could file charges.
14    Q.    Why didn't you tell Tyrone Lewis?
15    A.    Tyrone Lewis was just -- like I said, he
16 is just there in the office.  The majority of the
17 time he gets up and Mike takes care of the rate
18 takers and whatever else it is they need to have
19 done.  Mike Duda just takes over.
20    Q.    What exactly did you say to Mike Duda in
21 that conversation at 2:30 on January 24th?
22    A.    I asked could I speak to him.  He said I
23 could.  Tyrone was not in the office or in the
24 vicinity.  And I told him what Lenny had said to



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
41–44

1   me, how he had called me an old nigger bitch, and I
2   need the paperwork to file some charges.  And he
3   said I'll look into it.
4       Q.    Did Mike Duda say anything else?
5       A.    No.
6       Q.    Did Mike Duda give you paperwork to file
7   charges?
8       A.    Never.
9       Q.    Did you tell anyone else about this
10  January 24th conversation with Len Caifano?
11      A.    No, just one of my co-workers.
12      Q.    Which co-worker?
13      A.    Jessie Greenwood.
14      Q.    When did you tell Jessie Greenwood?
15      A.    That day.
16      Q.    What time?
17      A.    When we were getting off from work.
18      Q.    When you were finishing work for the
19  day?
20      A.    Yes.
21      Q.    So about what time?
22      A.    3:30 because we were going to our car.
23      Q.    So you had this conversation with
24  Jessie Greenwood in the parking lot?

1       A.    Yes.
2       Q.    When you had the conversation with
3   Mike Duda about the comment that Len Caifano made
4   on January 24th, was anyone else present?
5       A.    No.
6       Q.    Did you have any other conversation with
7   Mike Duda about the comment that Len Caifano made
8   on January 24th?
9       A.    No, just the time when I reported it to
10  him and told him I needed the paperwork to file
11  charges.
12      Q.    Did you ever follow up with Mike Duda
13  about getting paperwork to file charges?
14      A.    I asked him -- after that incident on
15  the 24th, I had asked him a week later.  Still no
16  paperwork.  He said I'm trying to locate the
17  paperwork.
18      Q.    A week later.  Do you remember what date
19  you followed up about paperwork?
20      A.    The 24th, so it would have to be a week
21  after the 24th of 2012.
22      Q.    And what was Mike Duda's response?
23      A.    I'm trying to locate the paperwork.
24      Q.    Did you follow up with Mike Duda about

1   getting paperwork to file charges again after that?
2       A.    No.
3       Q.    Why not?
4       A.    It was obvious I wasn't going to get
5   the paperwork.  If I was, it wasn't going to come
6   from Mike Duda.  Then I just decided just to leave
7   it alone because I'm trying to retire and get out
8   of there and the more waves I make for Lenny the
9   harder he makes it for me.
10      Q.    So did you ever complain about the
11  comment Lenny made on January 24th?  Did you ever
12  complain about it to the personnel section in the
13  water department?
14      A.    No.  I decided to leave it alone because
15  like I said I was trying to retire to get out of
16  there.  And it looked like every time I did
17  something I always ended up getting suspended
18  behind it.
19      Q.    Did you ever complain to the City of
20  Chicago Department of Human Resources?
21      A.    No.
22      Q.    Did you ever file a union grievance
23  about the comment Len Caifano made on January 24th?
24      A.    No.

1       Q.    Did you ever file an administrative
2   charge with the IDHR about the comment Len made
3   on January 24th?
4       A.    Can you rephrase that?
5       Q.    I'm sorry.  Did you ever file an
6   administrative charge with the Illinois Department
7   of Human Rights?
8       A.    No.
9       Q.    Did you ever file a charge with the
10  Equal Employment Opportunity Commission about
11  Len Caifano's statement on January 24th?
12      A.    No.
13      Q.    Why did you decide not to go to the
14  Illinois Department of Human Rights or the Equal
15  Employment Opportunity Commission about this
16  comment?
17      A.    When I went to the EEOC before about
18  suspensions Len Caifano had given me, and I filed a
19  lot of them, the results were always the same, lack
20  of substantial evidence.  So it was obvious they
21  weren't going to do anything.  If they didn't do
22  anything about the suspensions, they weren't going
23  to do anything about this.  So I said let it go,
24  just do your time and get out of there with your



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
45–48

Page 45

1 pension.
2 Q. All right. I want to go back and talk
3 about posting in 2011 and 2012.
4 When you were posting in 2011 and 2012,
5 did you typically work alone or with a partner?
6 A. The majority of the time I worked alone
7 until the time when one of my rate takers came to
8 work and didn't have a car. They gave us each
9 postings, but we only did mine because we didn't
10 have time to do hers. And we did this on three
11 separate occasions. And Len Caifano seemed to
12 find it okay that she did no work for eight hours,
13 that we only did mines.
14 Q. Who was this other water rate taker?
15 A. Leslie Travis Cook.
16 Q. And when exactly did you go together on
17 a route?
18 A. It was in 2011. It was three separate
19 occasions she came to work with no car.
20 Q. Do you remember the dates in 2011?
21 A. I'm going to say maybe the 8th, the 9th,
22 and the 10th of January, 2012.
23 Q. And you said that you only did one
24 assignment, is that correct?

Page 46

1 A. Yes. They gave us both routes that
2 day -- those days, but she didn't have a car. So
3 she rode with me. We only had time to do one route
4 in eight hours. So we ended up bringing her routes
5 back on all three days undid.
6 Q. Who gave you both routes?
7 A. The supervisor at the time, which was
8 Mike Duda.
9 Q. And when you came back from the route on
10 January 8th with Leslie Travis Cook, what did you
11 do?
12 A. We turned in my route, my paperwork, and
13 we turned -- she turned her route back in undid.
14 Q. Who did you turn your route back in to?
15 A. Mike Duda.
16 Q. Did Mike Duda say anything to you about
17 your route?
18 A. No.
19 Q. Did he say anything to Ms. Cook about
20 her route?
21 A. No.
22 Q. On January 9th, who gave you both
23 routes?
24 A. Mike Duda.

Page 47

1 Q. And after you came back from the routes
2 on January 9th, who did you turn the assignment
3 back in to?
4 A. Mike Duda.
5 Q. Did he say anything about your results
6 of that route?
7 A. No.
8 Q. Did he say anything about Ms. Cook's
9 route?
10 A. No.
11 Q. On January 10th, who gave you both
12 routes?
13 A. Tyrone Lewis.
14 Q. And on January 10th when you finished
15 the route, who did you turn the route back in to?
16 A. Tyrone Lewis.
17 Q. Did Mr. Lewis say anything to you
18 about the results of your route on January 10th?
19 A. No.
20 Q. Did he say anything to you about the
21 results of Ms. Cook's route?
22 A. No.
23 Q. Did he say anything to Ms. Cook about
24 the results of her route?

Page 48

1 A. No.
2 Q. On January 8th, where was your route
3 located?
4 A. All I remember is it was on the south
5 side. What area I couldn't tell you because we do
6 so many areas.
7 Q. On January 8th, where was Ms. Cook's
8 route located?
9 A. It was in the same ward as mines, but
10 not close to my route.
11 Q. What do you mean same ward?
12 A. They assign us routes by wards, the
13 sixth ward, the eighth ward, the fifteenth,
14 twelfth. We were in the same ward but not at
15 the same location. If I was on 63rd and Ashland,
16 her route may have been around 63rd and Western.
17 Q. So on January 8th, was Ms. Cook's route
18 also on the south side?
19 A. Yes.
20 Q. On January 9th -- I'm sorry. Strike
21 that.
22 On January 8th, do you recall
23 approximately how far driving distance it was
24 between your route and Ms. Cook's route?



Page 49

1    A.    I don't know exactly, but they were not
2   like close together.  They were not like I was on
3   one street and she was three streets over.  It
4   wasn't like that.  She would be like I said maybe
5   farther east and I was maybe farther south.
6    Q.    Was it a five-minute drive away?
7    A.    No.
8    Q.    Ten-minute drive away?
9    A.    No.
10   Q.    Was it a 15-minute drive away?
11   A.    Maybe 15 to 20 minutes.
12   Q.    On January 9th, where was your route
13  located?
14   A.    Same area.
15   Q.    What do you mean by same area?
16   A.    Same area I was in on the 9th.  They
17  give you an area and you do it until you just about
18  finish it up.  So if they assign me an area on the
19  8th, when I come back to work on the 9th, I'm in
20  that same area.  When I come back -- that week,
21  they have me over there for a whole week in the
22  same location, just different streets.
23   Q.    And you were doing posting on
24  January 9th?

Page 50

1    A.    Yes.
2    Q.    And you were doing posting on
3   January 8th?
4    A.    Yes.
5    Q.    You were doing posting on January 10th?
6    A.    Yes.
7    Q.    On January 9th, where was Ms. Cook's
8   route located?
9    A.    I didn't even look at her book because
10  we did mine.  We wouldn't normally look at the book
11  until we finished mines and go to hers.  We never
12  got to hers.  All three days we never did her
13  postings.  We only did mines.
14   Q.    Did you look at Ms. Cook's book on
15  January 8th?
16   A.    No, because when we got in the car, she
17  would throw it in the back seat so as not to mix
18  the two routes up.
19   Q.    How do you know where Ms. Cook's route
20  was on January 8th?
21   A.    She looked at it, but I didn't.
22   Q.    And when she looked at it, she shared
23  with you where her route was located?
24   A.    No.  She said we're not going to be able

Page 51

1   to get to mine, so we're going to do yours.
2    Q.    Did she say why you weren't going to be
3   able to get to hers?
4    A.    We only have eight hours.  It takes me
5   eight hours to do mines.  So after we finish my
6   route, go to lunch, and come back, it's time to
7   come back into the station.
8    Q.    On January 9th, did Ms. Cook look at her
9   own book?
10   A.    Yes, she looks at it when they give it
11  to her in the morning.
12   Q.    Did she talk to you about her book after
13  she looked at it?
14   A.    No.
15   Q.    Did she indicate to you whether you
16  would be able to get to both routes?
17   A.    No.
18   Q.    On January 10th, where was your route
19  located?
20   A.    The same area I was on the 8th and the
21  9th.
22   Q.    Doing postings?
23   A.    Yes.
24   Q.    Where was Ms. Cook's route located?

Page 52

1    A.    She didn't tell me.
2    Q.    Did she indicate on January 10th whether
3   you would be able to get to both your route and her
4   route?
5    A.    No.
6    Q.    When you were doing your route on
7   January 8th and Ms. Cook was with you, did
8   Ms. Cook help you complete your route?
9    A.    Yes, she did.
10   Q.    How did she help you?
11   A.    I drove.  She wrote out on stickers
12  and got out and put it on the building.  All I did
13  was drive.
14   Q.    That's how the two of you worked
15  together the entire day on January 8th?
16   A.    Yes.
17   Q.    Did that allow you to get your route
18  done faster?
19   A.    Yes, it did.
20   Q.    Was there any requirement regarding
21  whether you could work on a route with a partner?
22   A.    No.
23   Q.    Did you ask permission about -- did you
24  ask permission about whether you could work on a



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
53–56

Page 53

1  route with a partner?
2  A.  No.
3  Q.  On January 8th, did Mike Duda say
4  anything about the fact that you had worked with a
5  partner on the route?
6  A.  It was their idea.
7  Q.  When did -- they meaning Mike Duda?
8  A.  Yes.
9  Q.  Did anyone else -- was it anyone else's
10  idea?
11  A.  No.  I've never done that before.
12  Q.  When did Mike Duda give you the idea to
13  work with a partner on January 8th?
14  A.  That morning he said, Ms. Cage, Leslie
15  will be with you today.
16  Q.  On January 9th, did Ms. Cook help you
17  complete your route?
18  A.  Yes.
19  Q.  How did she help you complete your route
20  on January 9th?
21  A.  She put the stickers on the premise.
22  Q.  And what did you do?
23  A.  Drive.
24  Q.  Was that how you worked together the

Page 54

1  entire day?
2  A.  Yes.
3  Q.  Did you ask permission to work
4  together on the route on January 9th?
5  A.  No.
6  Q.  Did Mike Duda at the end of the day
7  say anything about you working together on
8  January 9th?
9  A.  No.
10  Q.  Was it someone's idea, someone else
11  besides you and Ms. Cook -- was it someone else's
12  idea for you to work with Ms. Cook on January 9th?
13  A.  Ms. Cook may have told them when she
14  came in that morning that she didn't have a
15  vehicle.  So I don't know whose idea it was for her
16  to work with me, but she ended up with me.
17  Q.  Did you personally hear Ms. Cook
18  tell someone that she didn't have a vehicle on
19  January 9th?
20  A.  Yes, when she came into the office that
21  morning.
22  Q.  Who did you hear Ms. Cook tell?
23  A.  She told Tyrone Lewis and Mike Duda.
24  She said I don't have a car today.  Would it be

Page 55

1  okay if I work with Ms. Cage.
2  Q.  And what, if anything, did Tyrone Lewis
3  say in response?
4  A.  They said okay.
5  Q.  They meaning?
6  A.  Tyrone Lewis and Mike Duda both agreed
7  that she could work with me that day, but they also
8  gave her a route, just like they gave me a route.
9  Q.  Why did they give you a route in
10  addition to giving her a route if the plan was
11  for you to work together on your route?
12  A.  Well, I guess they thought that we would
13  be able to finish up and do some of her route.  We
14  never did.
15  Q.  On January 9th working together, you
16  driving and Ms. Cook posting the stickers, did
17  you get your route done faster than you would?
18  A.  A little bit faster, almost the same
19  because like I said we went to lunch and we
20  finished up with lunch.  If we had any left over,
21  we finished that up.  We came back into the station
22  at the end of the day.  My route was completed.
23  Q.  On January 10th, did Ms. Cook help you
24  do your route?

Page 56

1  A.  Yes.
2  Q.  How did she help you?
3  A.  She -- I drove and she put the stickers
4  on the building.  So when I pull up to a location,
5  she write it out.  She get out.  She take the
6  sticker, peel it off, stick it on the building, and
7  come back to the car and ask me what is the next
8  stop.
9  Q.  Is that how you worked together on your
10  route the entire day?
11  A.  Yes.
12  Q.  Did you ask permission to work together
13  on your route on January 10th?
14  A.  No.
15  Q.  At the end of the route when you turned
16  in the results to Tyrone Lewis, did he say anything
17  about the fact that you had worked together on the
18  route?
19  A.  No.
20  Q.  In the morning, was it someone else's
21  idea on January 10th for you to work together on
22  the route?
23  A.  Well, Ms. Cook came in again and told
24  them she didn't have a vehicle.



1    Q.   Told who?
2    A.   The supervisor.
3    Q.   Who were?
4    A.   Tyrone Lewis.
5    Q.   Was there any other supervisor
6  Ms. Cook told that she didn't have a vehicle on
7  January 10th?
8    A.   No.
9    Q.   And what was Tyrone Lewis' response?
10    A.   He said then you'll have to work with
11  Cage again.
12    Q.   Was there any other time in 2011 or 2012
13  when you worked with a partner doing posting?
14    A.   No.
15    Q.   In 2011 and 2012 when you were reading
16  meters, did you typically work alone or with a
17  partner?
18    A.   Alone.
19    Q.   Was there ever a time in 2011 or 2012
20  when you read meters with a partner?
21    A.   No.
22    Q.   In 2011 and 2012 for posting, who made
23  the assignments?
24    A.   The assignments are made by the

1  supervisor.
2    Q.   So in 2011, who was that?  Who was
3  giving you the assignments?
4    A.   Mike Duda I think.
5    Q.   And was there ever a time in 2011
6  when someone besides Mike Duda gave the
7  assignments?
8    A.   Yes.  When Mike wouldn't be there or he
9  had to go downtown, Tyrone Lewis would give us our
10  assignments.
11    Q.   Do you recall specific instances
12  where Tyrone Lewis gave you assignments in 2011?
13    A.   No.
14    Q.   In 2011, would Mike Duda give
15  assignments to all of the water rate takers?
16    A.   Yes.
17    Q.   And in 2011 with -- I'm sorry.  Strike
18  that.
19       In 2011 with reading meters, who would
20  give the assignments?
21    A.   Mike Duda or Tyrone Lewis, whoever was
22  in the office.
23    Q.   In 2012 with posting, who would give the
24  assignments?

1    A.   Tyrone Lewis.
2    Q.   And was there ever a time in 2012
3  when someone besides Tyrone Lewis gave assignments?
4    A.   I don't think so, no.
5    THE WITNESS:  Excuse me.  Can I go to the
6  washroom?
7    MR. JOHNSON:  Sure.
8         (WHEREUPON, a recess was had from
9         11:47 to 11:53 a.m.)
10    MR. JOHNSON:  Back on the record.
11  BY MR. JOHNSON:
12    Q.   In 2011 and 2012 when you were assigned
13  postings, do you recall how many postings you would
14  be assigned in a single day?
15    A.   It varied.  You didn't have the same
16  amount -- well, you didn't turn in the same amount.
17  Sometimes you turned in more.  Sometimes you turned
18  in less.
19    Q.   What about the number that you were
20  assigned?
21    A.   In 2011, I think the amount was 50,
22  I think.
23    Q.   And in 2012, how many posts were you
24  assigned like that?

1    A.   It went up to maybe 60 or 70.
2    Q.   In 2011, were you told how many posts
3  out of that 50 you were expected to successfully
4  complete?
5    A.   No.
6    Q.   In 2012, out of the 60 or 70, were you
7  told how many posts you were expected to
8  successfully complete?
9    A.   No.
10    Q.   When reading meters in 2011, how many
11  meters were you typically assigned in a single
12  day?
13    A.   The supervisor, either Mike Duda or
14  Tyrone Lewis, would sometimes put in two rounds
15  and sometimes they may put in three, depending on
16  how many stops is in a particular book.  One book
17  may have 20 stops in it.  They'll load that route
18  into the G5 and then they'll give you another route
19  that may have less than that.
20    Q.   So how many meters total on a single day
21  in 2011?
22    A.   It varied because no two books were the
23  same.  These were meters that they hadn't put the
24  automatic reading device on.  So these were meters



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
61–64

Page 61

1 that you still had to like go into houses. Or if
2 they were charitables, you were going into the
3 police stations and the firehouses and the schools
4 to read. So each book had not the same amount of
5 meters in each book.
6    Q.    Can you provide a range of about how
7 many meters you would be assigned in a single day
8 in 2011?
9    A.    Sometimes 24, sometimes 30.
10    Q.    And what's a G5?
11    A.    A machine that we have that they load
12 the routes into, the supervisor does, and it has a
13 route number. And when you open it up with your
14 ID, it tells you how many stops is in that
15 particular book. If I open it up, the book may
16 have 15 stops in it. And if I go to the next book,
17 it may have 20 stops in it.
18    Q.    In 2011, were you ever assigned more
19 than 30 meters to read in a single day?
20    A.    Yes.
21    Q.    What's the most that you were assigned
22 to read in a single day in 2011?
23    A.    Maybe 40.
24    Q.    In 2012, how many meters were you

Page 62

1 assigned to read in a single day?
2    A.    Water meters, like I said, it varies
3 from day-to-day.
4    Q.    Can you give a range of how many meters
5 you --
6    A.    Between 20 and 40.
7    Q.    In 2011, were you told how many
8 successful reads you were expected to make?
9    A.    No.
10    Q.    In 2011, were you told how many
11 stops -- when you were reading meters, how many
12 stops you were expected to get to?
13    A.    No.
14    Q.    In 2012, were you told when reading
15 meters how many stops you were expected to get to?
16    A.    No.
17    Q.    In 2012 when reading meters, were you
18 told how many successful reads you were expected
19 to make?
20    A.    No.
21    Q.    The G5 is a piece of equipment that
22 the City water department provides you with?
23    A.    Yes.
24    Q.    And they provided it to you in 2011?

Page 63

1    A.    Yes.
2    Q.    And they provided it to you in 2012?
3    A.    Yes.
4    Q.    And this was a device that the
5 supervisors would enter the assignment into for
6 what meters you needed to read?
7    A.    Yes.
8    Q.    Was there any other equipment you
9 were given in 2011 to help you read meters?
10    A.    They assigned us an iPad, but that's
11 what we started doing the postings with.
12    Q.    Were you given any other equipment
13 when you were assigned to read meters in 2011?
14    A.    No.
15    Q.    When you were assigned to read meters in
16 2011, were you given a City phone?
17    A.    The City phone was given maybe back in
18 2008 or '7.
19    Q.    And was it the same phone -- were you
20 personally given a City phone in 2008?
21    A.    Yes.
22    Q.    And did you keep that same City phone
23 through 2011 and 2012?
24    A.    No. The City changed companies, so they

Page 64

1 gave us another phone.
2    Q.    At all times during 2011 and 2012 while
3 working as a water rate taker, did you have a City
4 phone?
5    A.    No.
6    Q.    When did you not have --
7    A.    I reported that to Mr. Caifano 2007,
8 2008.
9    Q.    In 2011, did you always have a City
10 phone?
11    A.    No.
12    Q.    When did you not have a City phone in
13 2011?
14    A.    I didn't have a City phone for the
15 entire year of 2011, for the entire year 2012.
16    Q.    Were you supposed to have a City phone
17 in 2011 --
18    A.    Yes.
19    Q.    -- and 2012?
20       Did you tell anyone that you did not
21 have a phone?
22    A.    Yes, I told my supervisor first and
23 then I reported it to Lenny that I did not have --
24 I forget what they called it -- the City phone.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
65–68

Page 65

1    Q.    You told your supervisor first.  Which
2  supervisor was that?
3    A.    Mike Duda.
4    Q.    When, in 2011?
5    A.    Yes, in 2011.
6    Q.    And you also told Len Caifano?
7    A.    Yes.
8    Q.    What did Mike Duda say when you told him
9  you didn't have a phone?
10    A.    He told me he would let Lenny know
11  and they would see if they could get me a phone.
12    Q.    Was this a single conversation you
13  had with Mike Duda about not having a phone?
14    A.    Yes.
15    Q.    When was that conversation?
16    A.    Probably January of 2011.
17    Q.    Do you remember what date in
18  January, 2011?
19    A.    No.
20    Q.    Did you ever in 2011 follow up with
21  Mike Duda about getting a City phone?
22    A.    No.
23    Q.    Why not?
24    A.    Because he had told me previously that

Page 66

1  when they found the phone they would let me know.
2  They would give me a City phone when they found
3  one.  So I'm assuming they never found one because
4  I never received one.
5    Q.    In 2012 when you told the supervisor you
6  did not have a phone, what supervisor was that?
7    A.    I told him in 2011.  I didn't tell him
8  in '12.
9    Q.    So in 2012, did you ever follow up with
10  any supervisor about not having a phone?
11    A.    No.
12    Q.    Why not?
13    A.    Because like I said I assumed they
14  couldn't find one or they didn't have any spares.
15    Q.    Did you have any device in 2011 that
16  allowed GPS tracking?
17    A.    They said Nextel had a -- the G5 had a
18  tracking device in it, but I don't know.
19    Q.    Who said that the G5 had a tracking --
20    A.    The supervisor did.
21    Q.    Which supervisor?
22    A.    Mike Duda.
23    Q.    Did any other supervisor say that the
24  G5 in 2011 had a tracking device in it?

Page 67

1    A.    And Tyrone Lewis.
2    Q.    Did you have the G5 device when you were
3  assigned posting?
4    A.    No.
5    Q.    Did you have any device with you in
6  2011 when you were assigned posting that allowed
7  for GPS tracking?
8    A.    They claimed the iPad that we now use
9  has a tracking device in it.
10    Q.    Who is they?
11    A.    The supervisors.
12    Q.    Which supervisors in 2011?
13    A.    Tyrone Lewis.
14    Q.    When you were posting in 2011, did you
15  always have an iPad?
16    A.    Yes, because we went from pen and pencil
17  to the iPad.
18    Q.    In 2012, did you always have a G5 when
19  you were reading meters?
20    A.    In 2000?
21    Q.    '12 reading meters.
22    A.    What meters, the charitables, the ones
23  in the G5 or --
24    Q.    Is there a difference between the

Page 68

1  charitables and the ones in the G5s?
2    A.    Yes.  The charitables is the police
3  stations and the firehouses and the other ones are
4  the meters in people's houses.
5    Q.    When you're reading meters in people's
6  houses in 2012, did you always have a G5?
7    A.    If they assign me one, yes, because I
8  can only get it when the supervisor puts the routes
9  in it and give it to you.
10    Q.    Was there ever a time reading meters in
11  2012 where you didn't have a G5?
12    A.    Yes.  When we went to the iPad, they did
13  it like in sections.  During the spring before it
14  gets warm out, they give you the G5 to read the
15  charitables.  When they run out of the charitables,
16  then they give you the iPad to do the posting.
17    Q.    Did you have an iPad to help you read
18  meters?
19    A.    No.  iPad is only for posting.
20    Q.    So when you were reading meters --
21    A.    I have a G5.
22    Q.    -- in people's houses in 2012, was there
23  ever a time when you did not have a G5?
24    A.    No.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
69–72

Page 69

1     MR. JOHNSON:  I was thinking we'd take a lunch
2  break around 12:30.  Is that all right?
3     MR. GOMBERG:  Whatever works.
4  BY MR. JOHNSON:
5     Q.   Did you file a charge with the Equal
6  Employment Opportunity Commission on April 24th,
7  2012?
8     A.   Yes.
9     Q.   Did anyone assist you in drafting that
10  Equal Employment Opportunity Commission charge --
11  for short, I'm going to call it EEOC -- did anyone
12  assist you in drafting the EEOC charge you filed
13  on April 24th, 2012?
14     A.   The investigator at EEOC.
15     Q.   Do you remember that investigator's
16  name?
17     A.   No.
18     Q.   Besides the investigator at EEOC, did
19  anyone else assist you in drafting the EEOC charge
20  that you filed on April 24th, 2012?
21     A.   No.
22     MR. JOHNSON:  Could you please mark this as
23  Exhibit 2 and pass it to the witness?
24

Page 70

1          (WHEREUPON, a certain document was
2              marked Cage Deposition Exhibit
3              No. 2, for identification, as of
4              04-29-2015.)
5  BY MR. JOHNSON:
6     Q.   Do you recognize Exhibit 2?
7     A.   Yes.
8     Q.   What is Exhibit 2?
9     A.   A charge I filed with the EEOC.
10     Q.   I believe Exhibit 2 is the complaint
11  you filed in the Illinois District Court for the
12  Northern District of Illinois, is that correct?
13     A.   Yes.
14     Q.   And are there any exhibits attached to
15  this complaint?
16     A.   Yes.
17     Q.   Can I please turn your exhibit -- excuse
18  me.  Strike that.
19          Can I please turn your attention to
20  Exhibit A within Exhibit 2.  Are you there?
21     A.   Yes.
22     Q.   Is this the EEOC charge that you filed
23  on April 24th, 2012?
24     A.   Yes.

Page 71

1     Q.   Is that your signature on the bottom of
2  the page?
3     A.   Yes.
4     Q.   Actually this charge, although it says
5  EEOC at the top in the second row of boxes, did
6  you, in fact, file this charge with the Illinois
7  Department of Human Rights, for short IDHR?  At the
8  very top under agency, do you see where there's a
9  box for IDHR or EEOC?
10     A.   Yes.
11     Q.   And is the box for IDHR checked?
12     A.   Yes.
13     Q.   And the box for EEOC is empty?
14     A.   Yes.
15     Q.   So did you file this charge with the
16  IDHR?
17     A.   Illinois Department of Human Rights?
18     Q.   Correct.
19     A.   And EEOC?
20     Q.   Did you file it with the Illinois
21  Department of Human Rights?
22     A.   I thought I filed it with the
23  Department of EEOC.
24     Q.   Can you please review the exhibit,

Page 72

1  Exhibit A that you're looking at.  This page within
2  Exhibit 2, is this a true and accurate copy of the
3  charge you filed with the Illinois Department of
4  Human Rights on April 24th, 2012?
5     A.   Yes.
6     Q.   Did you receive a right to sue letter
7  associated with this charge?
8     A.   Yes.
9     Q.   Can you please flip to Exhibit B within
10  Exhibit 2.  It's two pages -- one, two, three, four
11  pages because they're front and back.
12          Are you on Exhibit B within Exhibit 2?
13     A.   Yes.
14     Q.   Is this a copy of the right to sue
15  letter associated with your charge from April 24th,
16  2012?
17     A.   Yes.
18     Q.   Does this appear to be a true and
19  accurate copy of the right to sue letter?
20     A.   Yes.
21     Q.   Did you tell any City employee that you
22  had filed this administrative charge with the IDHR
23  on April 24th, 2012?
24     A.   No.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
73–76

Page 73

1    Q.   Why not?
2    A.   I didn't mention it to anyone.  I kept
3  it to myself.
4    Q.   So meaning at any time after April 24th,
5  2012, did you tell anyone at the City about filing
6  the charge?
7    A.   No.
8    Q.   Did you file an EEOC charge -- strike
9  that.
10       Did you file a charge with the IDHR on
11  February 1st, 2013?
12    A.   Yes.
13    Q.   Did anyone assist you in drafting that
14  IDHR charge?
15    A.   No, just the investigator that took the
16  charge.
17    Q.   Do you remember the investigator's name?
18    A.   No.
19    Q.   Did anyone besides the investigator that
20  took the charge assist you in drafting the IDHR
21  charge you filed on February 1st, 2013?
22    A.   No.
23    Q.   If you could please flip to Exhibit C
24  within Exhibit 2.  Are you there?

Page 74

1    A.   Yes.
2    Q.   Is this the charge you filed with the
3  IDHR on February 1st, 2013?
4    A.   Yes.
5    Q.   Is that your signature at the bottom of
6  the page?
7    A.   Yes.
8    Q.   You signed on February 1st, 2013?
9    A.   Yes.
10    Q.   If you look at the stamp, and I know
11  it's a little faded, in the middle of the page, do
12  you see where it says February 5th, 2013, received?
13  So above the word "For."  In capital letters,
14  there's the word "For."
15    A.   On the notary stamp?
16    Q.   Yes, I believe that's a notary stamp --
17  no, I'm sorry.  Strike that.
18       In the very middle of the page, it says,
19  "Feb 05, 2013."  Right underneath that date, it
20  says, "Received."
21    A.   Yes.
22    Q.   So was this charge -- although you
23  signed it on February 1st, 2013, does it appear
24  this charge was filed on February 5th, 2013?

Page 75

1    A.   Yes.
2    Q.   Does this appear to be a true and
3  accurate copy of the charge you filed with
4  IDHR that was filed on February 5th, 2013?
5    A.   Yes.
6    Q.   Did you receive a right to sue letter
7  associated with this charge?
8    A.   Yes.
9    Q.   Can you please flip to Exhibit D within
10  Exhibit 2.  Is this a true and accurate copy of the
11  right to sue letter associated with your IDHR
12  charge from February 5th, 2013?
13    A.   Yes.
14    Q.   At any point after this charge was
15  filed on February 5th, 2013, did you tell any
16  City employee that you had filed this
17  administrative charge?
18    A.   No.
19    Q.   Why not?
20    A.   I didn't tell anyone.  I kept it to
21  myself.
22    Q.   In 2012, did you file a grievance
23  regarding being -- your belief that you were
24  discriminated or retaliated against?

Page 76

1    A.   Repeat that.
2    Q.   I'm sorry.  So I'll rephrase.
3       In 2012, did you ever file a grievance
4  relating to your belief you were discriminated
5  against?
6    A.   Yes.
7    Q.   What grievance did you file in 2012?
8    A.   I filed a grievance with the union.
9    Q.   Do you remember what date?
10    A.   It was within five days after I got the
11  suspension.  So I was on suspension when I filed
12  the grievance with the union.
13    Q.   What suspension?
14    A.   I think this -- the one from January,
15  2012.
16    Q.   What date did you receive the suspension
17  in January, 2012?
18    A.   I don't know the date.  I just know the
19  month and the year.
20    Q.   And you filed a grievance with the union
21  about your belief that you were discriminated
22  against five days after receiving --
23    A.   Well --
24    Q.   -- the suspension in January, 2012?



OPHELIA CAGE

April 29, 2015

CAGE vs. CITY OF CHICAGO

77–80

Page 77

1     A.   Yes.  According to this, it had to be in
2  March because the charge was on the 24th, but the
3  suspension didn't happen until March 19th.
4     Q.   I'm sorry.  According to what?
5     A.   This paper here.  It's right here.
6     Q.   Exhibit 2?
7     A.   Yes, on Page 7.
8     Q.   What are you referring to on Page 7 of
9  Exhibit 2?
10    A.   The date the suspension started.
11    Q.   Where exactly on the page are you
12  referring to?
13    A.   36.
14    Q.   Can you read the portion of
15  Paragraph 36?
16    A.   "On March 19, 2012, plaintiff was
17  informed that she was being issued a five-day
18  disciplinary suspension by Chief Water Rate
19  Taker Len Califano (non-African American), for her
20  allegedly 'poor' job performance on January 24th,
21  2012."
22    Q.   So five days before you filed a
23  grievance with the union about your belief that
24  you were discriminated against, which of these

Page 78

1  dates in Paragraph 36 of Exhibit 2 was what you
2  were referring to when it was five days before
3  you filed the union grievance?
4     A.   March 19th.
5     Q.   So it was March 19th, 2012.  Five days
6  after that you filed a union grievance about being
7  discriminated against?
8     A.   Yes.
9     Q.   Was it exactly five days after
10  March 19, 2012?
11    A.   It was during that time because they
12  only give you five days to file.  Once you get a
13  suspension, you have five days to file a grievance
14  against it.
15    Q.   What, if anything, did the union do in
16  response to you filing a grievance?
17    A.   Nothing.
18    Q.   Did you receive any correspondence
19  after you filed a grievance about five days after
20  March 19th, 2012?
21    A.   No.
22    Q.   Did you inquire as to why you had not
23  received any correspondence after filing this
24  union grievance?

Page 79

1     A.   Yes, I did.
2     Q.   When did you inquire?
3     A.   After the five days were up, I called
4  the union and asked them what had happened because
5  they have to sign off on it and then you take the
6  copy back to Len Caifano.  He said they never got a
7  response from the City.
8     Q.   Who is he?
9     A.   The union steward.
10    Q.   Who was the union steward at that time?
11    A.   Tom Durkin I think.
12    Q.   And is that who you called five days
13  after you filed the grievance with the union?
14    A.   Yes.
15    Q.   And Tom Durkin in response to your
16  question said that the City had not filed a
17  response?
18    A.   Right.
19    Q.   Did you have any follow-up
20  correspondence with Tom Durkin about this union
21  grievance that you filed about five days after
22  March 19th, 2012?
23    A.   No, no.
24    Q.   Did you have any follow-up

Page 80

1  correspondence with anyone at the City regarding
2  this union grievance?
3     A.   No.
4     Q.   Did you have any follow-up
5  correspondence with anyone after this conversation
6  with Tom Durkin, any follow-up correspondence with
7  anyone at the union about this union grievance?
8     A.   No.
9     Q.   Why didn't you inquire further after
10  Tom Durkin told you that the City had not filed a
11  response?
12    A.   It seemed to be a pattern.  I have filed
13  a lot of grievances with the union.  You file the
14  papers.  You get the union's signature on it.  You
15  in turn take it back to Lenny.  And it disappears
16  after that.  You never hear from him.  Nobody even
17  recalls seeing it from the City side.  The union
18  has a copy.  I have a copy.  But that's it.
19    Q.   Did you tell any of your supervisors
20  at the City water department that you had made this
21  union grievance about five days after March 19th,
22  2012?
23    A.   Yes, I did because I have to get the
24  forms from them.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
81–84

Page 81

1    Q.    Who did you tell?
2    A.    Tyrone Lewis.
3    Q.    Did you tell him before or after you had
4    filed the union grievance?
5    A.    When I received the paper from him, I
6    asked him for a grievance form and he gave me the
7    grievance form.
8    Q.    Was this before you filed the union
9    grievance?
10   A.    Yes.  You get the paperwork from him,
11   then you fill it out, and then you take it to the
12   union.
13   Q.    Before filing this union grievance, did
14   you speak with anyone else employed by the City
15   water department about your intention to file a
16   union grievance?
17   A.    No.
18   Q.    Did you tell anyone -- after you filed
19   the union grievance, did you tell anyone at the
20   City water department that you had filed the
21   union grievance?
22   A.    No.
23   Q.    Why not?
24   A.    Lenny had a copy.

Page 82

1    Q.    How do you know Lenny had a copy?
2    A.    I gave it to him.  I hand delivered it.
3    Q.    You hand delivered a copy of --
4    A.    Of the grievance from the union with the
5    union signature.  I took it back to Lenny and gave
6    it to Lenny.
7    Q.    Besides Lenny and Tyrone, are you aware
8    of anyone else who knew about you having filed
9    this union grievance about five days after
10   March 19th, 2012?
11   A.    No.
12   Q.    Is there any other union grievance --
13   excuse me.  Strike that.
14          Is there any other grievance that you
15   filed in 2012 about your belief of being
16   discriminated against besides this one shortly
17   after March 19th that we've already discussed?
18   A.    I don't think so, no.
19   Q.    In 2012 -- strike that.
20          In 2012, did you ever file a grievance
21   claiming that you were retaliated against?
22   A.    This grievance here, the one in January,
23   2012.
24   Q.    I'm sorry.  Do you mean January, 2012,

Page 83

1    or March, 2012, the grievance we just talked about?
2    A.    That one in January.  I done filed so
3    many I'm not sure if I filed one in March.  I know
4    about the one in January.  But the one in March is
5    for the one in January.
6    Q.    The union grievance that we discussed a
7    minute ago --
8    A.    Is this.
9    Q.    -- was filed five days after March 19th,
10   2012, is that correct?
11   A.    Right.
12   Q.    Is there another union grievance that
13   you filed claiming that you had been discriminated
14   against that you filed in January, 2012, separate
15   from this one in March of 2012?
16   A.    No.
17   Q.    Did you also state that you had been
18   retaliated against in this union grievance you
19   filed about five days after March 19th, 2012?
20   A.    Yes.
21   Q.    Did you make any other complaints in
22   this union grievance that you filed about five days
23   after March 19th, 2012, besides your belief that
24   you had been discriminated against and besides your

Page 84

1    belief that you had been retaliated against?
2    A.    No.
3    Q.    Did you file any other grievance in
4    2012 besides this one in March complaining that
5    you believe you were retaliated against?
6    A.    Yes.  I think I filed one in November.
7    Q.    When you say "filed one," where did you
8    file it with?
9    A.    The union.
10   Q.    When in November exactly?
11   A.    The end of November.
12   Q.    Do you remember the exact date?
13   A.    Not the exact date.  I just remember the
14   month and the year.
15   Q.    Did you get any correspondence from the
16   union after filing this complaint at the end of
17   November?
18   A.    No.
19   Q.    Did you inquire with the union -- did
20   you ask about the status of your grievance after
21   filing it?
22   A.    Not from the union.  From Lenny.
23   Q.    What did you ask Lenny?
24   A.    What happened to my grievance.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
85–88

Page 85

1    Q.    When did you ask that to Lenny?
2    A.    After the five days.
3    Q.    Was this in person?
4    A.    Yes.
5    Q.    Where were you when you asked Lenny
6  after five days about the grievance?
7    A.    39th and Iron.
8    Q.    What, if anything, did Lenny say?
9    A.    He said he don't know what happened to
10  it. He'll look into it.
11   Q.    And did you have any correspondence or
12  conversation with Lenny after that about the end
13  of November grievance you had filed?
14   A.    No.
15   Q.    Did you follow up with any City employee
16  besides Lenny about the grievance you filed at the
17  end of November?
18   A.    No.
19   Q.    Why not?
20   A.    Because I knew what happened to it.
21   Q.    What happened to it? What did you
22  believe happened to it?
23   A.    The same thing that happened to all the
24  other ones. Once I walked out, it hit the garbage

Page 86

1  can. That's why nobody has any record of it but
2  me and the union.
3    Q.    Did you follow up with Tom Durkin after
4  you had filed this grievance with the union at the
5  end of November, 2012?
6    A.    Yes. I asked him -- well, Tom Durkin
7  wasn't the union steward then. He had retired.
8  They had another man there. And for some reason
9  nobody can find any files.
10   Q.    Is that what Tom Durkin told you?
11   A.    Well, Tom Durkin had gotten ill, so he
12  had left the union hall. They had another man,
13  Mr. Tierney, and he didn't see any record of it
14  anywhere.
15   Q.    Did you speak with Mr. Tierney?
16   A.    Yes.
17   Q.    After speaking with Mr. Tierney, did you
18  follow up again with anyone representing the union
19  about the grievance you filed at the end of
20  November?
21   A.    No.
22   Q.    After you had filed this grievance
23  with the union claiming that you believe you were
24  retaliated against which you filed in the end of

Page 87

1  November, 2012, after that, did you tell anyone at
2  the City Law Department that you had made this
3  grievance?
4    A.    No.
5    Q.    Why not?
6    A.    Because according to the grievance form,
7  once you give it to Lenny, Lenny is supposed to
8  send it through the proper channels.
9    Q.    Did you personally hand the grievance
10  form to Lenny regarding the grievance at the end of
11  November, 2012?
12   A.    Yes, I did.
13   Q.    Did you hand a copy of the grievance
14  to anyone else?
15   A.    Just the union and to Lenny.
16   Q.    Did you send via mail or email the
17  grievance to anyone else?
18   A.    No. Lenny is supposed to do that.
19   Q.    In 2012, did you ever complain to the
20  personnel section of the water department about
21  being discriminated against?
22   A.    No.
23   Q.    In 2012, did you ever complain to the
24  personnel section of the water department about

Page 88

1  being retaliated against?
2    A.    No.
3    Q.    In 2012, did you ever complain to the
4  City of Chicago Department of Human Resources about
5  being discriminated against?
6    A.    No.
7    Q.    In 2012, did you ever complain to the
8  City of Chicago Department of Human Resources about
9  being retaliated against?
10   A.    No.
11   Q.    In 2012, besides notifying Tyrone Lewis
12  and Len Caifano about your union grievance in
13  March, 2012, and November, 2012, did you complain
14  to any other City employee about being
15  discriminated against in 2012?
16   A.    No.
17   Q.    Besides notifying Tyrone Lewis and
18  Len Caifano about the union grievance in March,
19  2012, and November, 2012, did you complain to
20  any City employee about being retaliated against?
21   A.    No.
22   MR. JOHNSON: I think this is a good place to
23  take a lunch break.
24   MR. GOMBERG: Okay. Let's take a break.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
89–92

Page 89

1          (WHEREUPON, a lunch recess was had
2          from 12:31 to 1:39 p.m.)
3 BY MR. JOHNSON:
4     Q.    So, Ms. Cage, when we left off before
5 the break we were talking about grievances you
6 filed with the union, correct?
7     A.    Yes.
8     MR. JOHNSON:  All right.  Can we please mark
9 these as Group Exhibit 3?
10          (WHEREUPON, a certain document was
11          marked Cage Deposition Group
12          Exhibit No. 3, for identification,
13          as of 04-29-2015.)
14 BY MR. JOHNSON:
15    Q.    Can you please review Group Exhibit 3?
16          (WHEREUPON, there was a short
17          interruption.)
18 BY MR. JOHNSON:
19    Q.    Are you finished reviewing Group
20 Exhibit 3?  Are you finished reviewing the
21 documents?
22    A.    Yes.
23    Q.    Do you recognize these documents in
24 Group Exhibit 3?

Page 90

1     A.    Yes, I do.
2     Q.    What do you recognize them as?
3     A.    These are grievances I filed with the
4 union.
5     Q.    On page Bates No. 454 -- the Bates
6 numbers are on the bottom right-hand corner of each
7 page -- is that your signature in the middle of the
8 page?
9     A.    Yes.
10    Q.    And is it correct that you signed it on
11 April 1st, 2014?
12    A.    Yes.
13    Q.    On Bates Page 456, is that your
14 signature on the middle of the page?
15    A.    Yes.
16    Q.    Is it correct that you signed it on
17 June 7th, 2012?
18    A.    Yes.
19    Q.    On Bates Page 458, is that your
20 signature in the middle of the page?
21    A.    Yes.
22    Q.    Is it correct that you signed on
23 March 21st, 2012?
24    A.    Yes.

Page 91

1     Q.    And on Bates No. 460, is that your
2 signature in the middle of the page?
3     A.    Yes.
4     Q.    And you signed it on September 9th,
5 2009?
6     A.    Yes.
7     Q.    Just to be clear, these are union
8 grievances that you filed between July -- I'm
9 sorry.  Excuse me -- that you signed between
10 September, 2009, and April, 2014, correct?
11    A.    Yes.
12    Q.    Aside from the grievances reflected
13 in this group exhibit, did you file any other
14 union grievances between 2005 and 2014?
15    A.    No.
16    Q.    After filing these union grievances,
17 did you tell anyone at the City that you had filed
18 the grievance?
19    A.    No, not about these grievances, no.
20    Q.    Can you please turn back to Exhibit 2,
21 which is the complaint filed by plaintiff in the
22 United States District Court for the Northern
23 District of Illinois.
24          On Page 10, the top of Page 10,

Page 92

1 Paragraph 47, do you see where it says -- I'll
2 wait.  Sorry.
3     A.    Okay.
4     Q.    It says, "On September 1st, 2005,
5 plaintiff engaged in protected activity when she
6 filed a charge of discrimination (2005CF0603) with
7 the Illinois Department of Human Rights," is that
8 correct?
9     A.    Yes.
10    Q.    Do you remember filing Charge
11 No. 2005CF0603 with the Illinois Department of
12 Human Rights?
13    A.    Yes, I do.
14    Q.    Between 2005 and 2012, did you file
15 any other complaints with the Illinois Department
16 of Human Rights?
17    A.    Yes.
18    Q.    What other complaints did you file?
19    A.    The one on April 24th of 2012 and
20 October 26th, 2012.
21    Q.    These are the charges mentioned.  So
22 for the April 24th, 2012, that's referring to the
23 charge mentioned in Paragraph 51 of the complaint?
24    A.    Yes.



Case: 1:14-cv-06818 Document #: 41-1 Filed: 12/21/15 Page 24 of 51 PageID #:777

OPHELIA CAGE                                    April 29, 2015
CAGE vs. CITY OF CHICAGO                        93–96

Page 93

1    Q.    And October 26, 2012, is referring to
2  the charge mentioned in Paragraph 51 of the
3  complaint?
4    A.    Yes.
5    Q.    I'm sorry.  Strike that.
6           Paragraph 52 of the complaint
7  mentions -- sorry.
8           What charge did you file on October 26,
9  2012?
10   A.    It says here for a seven-day suspension.
11   Q.    On the next page, Page 11 of Exhibit 2,
12  Paragraph 53 of the complaint, it says, "On
13  February 1st, 2013, plaintiff engaged in protected
14  activity when she filed yet another charge of
15  discrimination (No. 2013CF1663) with the Illinois
16  Department of Human Rights alleging that defendant
17  had retaliated against her" -- sorry -- "alleging
18  that defendant had retaliated against when it
19  suspended her on October 26th, 2012, in retaliation
20  for filing her April 24th, 2012 charge of
21  discrimination.  See Exhibit C attached hereto."
22          So is the charge filed with the Illinois
23  Department of Human Rights on February 1st, 2013,
24  relating to the suspension you received on

Page 94

1  October 26th, 2012?
2    A.    Yes.
3    Q.    Are there any other charges that you
4  filed with the Illinois Department of Human Rights
5  between 2005 and 2013?
6    A.    No.
7    Q.    Are there any EEOC charges that you
8  filed between September 1st, 2005, and April 24th,
9  2012?
10   A.    No.
11   Q.    And for any of the IDHR charges you
12  filed between 2005 and 2012, did you complain --
13  strike that.
14          Did you tell anyone at the City that you
15  had filed the charge?
16   A.    No.
17   MR. JOHNSON:  Can we please mark this as
18  Exhibit 4?
19          (WHEREUPON, a certain document was
20           marked Cage Deposition Exhibit
21           No. 4, for identification, as of
22           04-29-2015.)
23  BY MR. JOHNSON:
24   Q.    Can you please review Exhibit 4.  On

Page 95

1  Bates Page 1970, is that your signature at the
2  bottom?
3    A.    Yes.
4    Q.    And did you sign on April 23rd, 2012?
5    A.    Yes.
6    Q.    Is this the questionnaire that you
7  filled out with the Illinois Department of Human
8  Rights on April 23rd, 2012?
9    A.    Yes.
10   Q.    And if you look at the top of Page 1969,
11  Bates 1969, under 6-A, it says, "Suspension for
12  five days," is that correct?
13   A.    Yes.
14   Q.    And date of action, it's January 24th,
15  2012, is that correct?
16   A.    Yes.
17   Q.    So was this questionnaire related to
18  the suspension you received for five days on
19  January 24th, 2012?
20   A.    Yes.
21   Q.    And was this questionnaire filled
22  out as part of the process of filing Charge
23  No. 2012CA3088 with IDHR which you signed that
24  charge on April 24th, 2012?

Page 96

1    A.    Yes.
2    MR. JOHNSON:  Can you please mark Exhibit 5?
3          (WHEREUPON, a certain document was
4           marked Cage Deposition Exhibit
5           No. 5, for identification, as of
6           04-29-2015.)
7  BY MR. JOHNSON:
8    Q.    Please review Exhibit 5.  On Bates
9  Page 2956, is that your signature at the bottom of
10  the page?
11   A.    Yes.
12   Q.    Did you sign on December 6th, 2012?
13   A.    Yes.
14   Q.    And if you look at the top of Bates
15  Page 2955 under 6-A, it says, "Suspension
16  10-26-2012," is that correct?
17   A.    Yes.
18   Q.    And under date of action, it says,
19  "October 26, 2012," is that correct?
20   A.    Yes.
21   Q.    So is this the questionnaire you filled
22  out with IDHR in connection with the charge that
23  was filed with IDHR on February 5th, 2013?
24   A.    You said February the 5th?  Did you say



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
97—100

Page 97

1   February the 5th?
2       Q.   Yes.
3       A.   Yes.
4       Q.   Did you file any internal complaints
5   with the City of Chicago between 2005 and 2012?
6       A.   Yes, I did with personnel.
7       Q.   What complaint did you file with
8   personnel?
9       A.   I think it was discrimination.
10      Q.   When did you file this complaint with
11  personnel?
12      A.   I remember the year 2012.  I don't
13  remember the date or the month.
14      Q.   What discrimination were you complaining
15  about in that 2012 internal complaint with
16  personnel?
17      A.   The way Lenny Caifano was treating
18  younger rate takers than myself.
19      Q.   Did you file any other internal
20  complaints between 2005 and 2012?
21      A.   I don't know if you would call it a
22  complaint.  Personnel called me downtown and I went
23  down there and gave a statement.
24      Q.   When did this happen?

Page 98

1       A.   2012.
2       Q.   Do you remember why they called you
3   downtown?
4       A.   I forget now.  I just know the person
5   that called me.
6       Q.   Was this for a complaint that you raised
7   with personnel?
8       A.   I think so, yes.
9       Q.   And this is different from the
10  complaint you raised with personnel in 2012 for
11  discrimination?
12      A.   I only went down there one time.  So it
13  was in 2012.
14      Q.   Was this -- in 2012, the complaint with
15  personnel, was this with department of water
16  personnel or City of Chicago personnel?
17      A.   City of Chicago personnel.
18      Q.   Was there any other internal complaint
19  that you filed with the City of Chicago between
20  2005 and 2012?
21      A.   No.
22      Q.   You testified earlier that on
23  January 24th, 2012, Len Caifano referred to you
24  as an old nigger bitch, is that correct?

Page 99

1       A.   Yes.
2       Q.   Why didn't you mention that comment
3   in any of your complaints with the IDHR, the EEOC,
4   personnel of the City of Chicago, personnel of the
5   water department, or union grievance?
6       MR. GOMBERG:  I'm going to object to the
7   question.  You're assuming facts that are not in
8   evidence.  You don't know that she did or didn't.
9   So your question is presuming she didn't.
10  BY MR. JOHNSON:
11      Q.   Did you mention that comment, old nigger
12  bitch, from January 24th, 2012, in any of your
13  charges with Chicago personnel department, water
14  department personnel, IDHR, EEOC, or union
15  grievance?
16      A.   In the statement that I gave back to the
17  City, I left it open.  I put derogatory remarks.
18      Q.   I'm sorry.  What statement that you gave
19  back to the City?
20      A.   The papers that they sent me when I
21  filed this charge and my answers to the
22  derrogatories (sic).
23      Q.   For which charge?
24      A.   The one for 1/24/12.

Page 100

1       Q.   The charge for 1/24/12 that you filed
2   where?
3       A.   With the -- with the City.
4       Q.   Are you referring to your IDHR charge?
5       A.   No.  It was with the City.  It was on a
6   form like this here where they had sent me -- the
7   City had sent me a statement like this and I had to
8   give my answers.  I think it was about 23 questions
9   on there.
10      Q.   Are you referring to the
11  interrogatories --
12      A.   That's it.
13      Q.   -- as a part of this lawsuit?  Is that a
14  yes?
15      A.   Yes.
16      Q.   And was that the only -- in your belief,
17  was that the only time you mentioned the old nigger
18  bitch comment in any of the complaints that you
19  filed either with City of Chicago Department of
20  Human Relations, the personnel department of water
21  department, IDHR, EEOC, or union grievance?  Was
22  that the only time in the interrogatory answers?
23      A.   That was the only question I put that
24  answer to.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
101–104

Page 101

1    Q.    Was that the only time you mentioned the
2  old nigger bitch comment?
3    A.    Yes.
4    MR. JOHNSON:  Can you please mark this as
5  Exhibit 6?  Thank you.
6        (WHEREUPON, a certain document was
7        marked Cage Deposition Exhibit
8        No. 6, for identification, as of
9        04-29-2015.)
10  BY MR. JOHNSON:
11    Q.    Can you please review Exhibit 6.  Do you
12  recognize Exhibit 6?
13    A.    Yes.
14    Q.    Is Exhibit 6 your answers to
15  plaintiff's -- strike that.
16        Is Exhibit 6 your answer to defendant's
17  first set of interrogatories?
18    A.    Yes.
19    Q.    If you flip to the very back of this
20  document, on the page that says "Verification," the
21  absolute back, is that your signature?
22    A.    Yes.
23    Q.    And you signed it on March 11, 2015?
24    A.    Yes.

Page 102

1    Q.    And you believe that in these
2  interrogatory answers you stated that Len Caifano
3  called you a, quote, "old nigger bitch," is that
4  right?
5    A.    Yes.
6    Q.    Where exactly in this document did you
7  state that?
8    A.    The words aren't written as stated.
9  Discriminating comments.
10    Q.    So did you state that exactly anywhere
11  in this document?
12    A.    Not the exact words, no.
13    Q.    Why didn't you state those exact words,
14  that comment made by Len Caifano?  Why didn't you
15  include that in your answers to this interrogatory?
16    A.    Because I could have elaborated on it
17  later, elaborate exactly what was said.  That's why
18  I put down discriminating comments.
19    Q.    And why didn't you report that comment
20  made by Len Caifano, quote, "old nigger bitch," in
21  any other complaint or charge that you filed since
22  2005?
23    A.    As I said earlier, I was trying to get
24  out of there to retire and everything I said was

Page 103

1  always taken out of context and Lenny always took
2  it the wrong way.  He wrote reports that
3  substantiated what he said, not what I said, and
4  I'd end up getting suspended again.
5    Q.    We'll come back to Exhibit 6 in a little
6  while.
7        Did you serve a five-day suspension from
8  March 19th to March 26th, 2012?
9    A.    Yes.
10    Q.    Do you know who initiated this
11  discipline?
12    A.    Mike Duda wrote it up and Lenny signed
13  off on it.
14    Q.    How do you know Mike Duda wrote it up?
15    A.    Because I think the paper that I had, he
16  asked me to sign it and I wouldn't sign.
17    Q.    What paper that you had?
18    A.    Whenever they give you a suspension,
19  they give you a paper and you can either sign it or
20  not sign it saying you agree with the charges that
21  they're suspending you for.
22    MR. JOHNSON:  Can you read back the witness'
23  answer to the last two questions, please?
24

Page 104

1        (WHEREUPON, the record was read
2        by the reporter as requested.)
3  BY MR. JOHNSON:
4    Q.    How do you know Lenny signed off on it?
5    A.    Lenny is Mike's supervisor.  So anything
6  that Mike writes up Lenny has the last say-so.
7    Q.    How do you know that anything Mike
8  writes up Lenny has last say-so?
9    A.    He takes it to Lenny to be approved.
10    Q.    And when you say "it," what are you
11  referring to?
12    A.    Any papers that have to deal with
13  suspension, anything that has to do with your work.
14    Q.    How do you know -- and this is in 2012?
15    A.    Yes.
16    Q.    How do you know that in 2012 Mike Duda
17  took anything that had to do with suspension or
18  anything having to do with being written up to
19  Len Caifano?
20    A.    Because when you go into the
21  pre-disciplinary hearing, Len Caifano's signature
22  is on the documents.
23    Q.    Is there any other basis for your
24  belief that Mike Duda initiated the five-day



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
105—108

Page 105
1  suspension from March 19th to March 26th, 2012?
2     A.   I don't understand the question.
3     Q.   So you indicated that -- I asked how
4  you know that Mike Duda initiated the discipline
5  and you said that you know because Mike Duda wrote
6  it up.  So I'm asking besides Mike Duda writing it
7  up is there anything else that's the basis for your
8  belief that Mike Duda initiated the discipline?
9     A.   I still don't understand the question.
10 You say is there any --
11    Q.   Is there any other way that you know
12 how -- excuse me.  Strike that.
13        Is there anything else besides Mike Duda
14 writing it up that leads you to believe that Mike
15 Duda initiated the discipline?
16    A.   Well, Mike Duda was the supervisor at
17 that time.  So when you bring the work back in,
18 Mike Duda sees it and he in turn sends it down,
19 down to 39th and Iron to Lenny.
20    Q.   Is there any other reason why you
21 believe that Lenny initiated the discipline
22 besides your belief that Lenny signed off on it?
23    A.   That Lenny initiated the --
24    Q.   The discipline, the five-day suspension

Page 106
1  March 19th to March 26th, 2012.
2     MR. GOMBERG:  Hang on.  Can you read the
3  question back, please?
4        (WHEREUPON, the record was read
5         by the reporter as requested.)
6     MR. GOMBERG:  You are mischaracterizing her
7  testimony.  She didn't say Lenny initiated.  She
8  said Duda initiated and Lenny signed off on it.
9  That's what she said.
10    MR. JOHNSON:  I believe when I asked do you
11 know who initiated this discipline, her compound
12 answer was Mike Duda wrote it up and Lenny signed
13 off on it.
14    MR. GOMBERG:  Yeah, but that's not what your
15 last question was.  You used the word "initiated."
16 So that's a little confusing if you want to
17 straighten it out.
18    MR. JOHNSON:  Sure.
19 BY MR. JOHNSON:
20    Q.   Do you believe that Len Caifano
21 initiated your discipline, discipline meaning the
22 five-day suspension from March 19th to March 26th,
23 2012?
24    A.   I believe he conferred with Mike Duda

Page 107
1  and they both.  Mike Duda may have suggested it or
2  told Lenny what he thought was happening and
3  Lenny agreed with it.
4     Q.   You stated earlier that Mike Duda was
5  your supervisor at the 79th and Lakefront station,
6  is that correct?
7     A.   Yes.  When we would be assigned over
8  there and when they closed up some of the stations
9  and put us all at 79th before they transferred us
10 back to 49th Street.
11    Q.   And this was in 2011?
12    A.   I think so, yes.
13    Q.   For how long was Mike Duda your
14 supervisor at 79th and Lakefront?
15    A.   The entire time that I was at 79th
16 Street.  I don't know how long that was because it
17 was rate takers assigned over there before I went
18 over there to that station.
19    MR. JOHNSON:  Can we take a short break,
20 please?
21        (WHEREUPON, a recess was had from
22        2:15 to 2:25 p.m.)
23 BY MR. JOHNSON:
24    Q.   Ms. Cage, what station were you located

Page 108
1  at in 2011?
2     A.   I think it may have been 49th and
3  Western, but I'm not positive.
4     Q.   And in 2011, were you at 49th and
5  Western the entire year?
6     A.   Yes.
7     Q.   What station were you located at in
8  2012?
9     A.   I think 49th and Western, also.
10    Q.   In 2012, were you at 49th and Western
11 the entire year?
12    A.   I was there until they transferred us to
13 39th and Iron.
14    Q.   Which happened when?
15    A.   I have no idea.
16    Q.   Isn't it true that Mike Duda was not
17 your supervisor after 2009?
18    A.   I'm not sure when Mike left there.
19    Q.   Isn't it true that Mike Duda was only
20 your supervisor when you were at 79th and Lakefront
21 station?
22    A.   No.  When they closed that station down,
23 Mike came over to 49th and Western.
24    Q.   Did you have a disagreement with



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
109–112

Page 109

1 Mike Duda when you were at 79th and Lakefront
2 station?
3     A.    Yes, I did.
4     Q.    When was that?
5     A.    It was on one of the charges in here,
6 6/7/12.  It had to be around June of 2012.
7     Q.    So around June of 2012 is when you had
8 a disagreement with Mike Duda at the 79th and
9 Lakefront station?
10    A.    Yes.
11    Q.    Didn't you testify that for all of 2012
12 you were at the 49th and Western station?
13    A.    This statement with Mike I think
14 occurred at 49th and Western.  When I wrote this
15 grievance, I was probably at 49th and Western.
16    Q.    What grievance are you referring to?
17    A.    456.
18    Q.    Did you have a disagreement with
19 Mike Duda in 2009?
20    A.    I'm not sure.
21    Q.    When you mentioned the June, 2012
22 disagreement with Mike Duda, you were looking at a
23 document.  You said that was Bates No. 456, is that
24 correct?

Page 110

1     A.    Yes.  This is the one that I filed with
2 the union.
3     Q.    You testified that when you were
4 suspended for five days, March 19th to March 26th,
5 2012, Mike Duda wrote up the paper that you had,
6 is that correct?
7     A.    Yes.
8     Q.    What paper are you referring to that
9 Mike Duda wrote up?
10    A.    I don't know the name of it, but there's
11 a form that they write up when you have to go to a
12 pre-disciplinary hearing.
13    Q.    Is it a notice of suspension and
14 discipline?
15    A.    No.
16    Q.    Notice of progressive discipline?
17    A.    No.  It's a pre-disciplinary hearing
18 form.
19    Q.    Do you have a copy of that form?
20    A.    No.
21    MR. JOHNSON:  Would you please mark this as
22 Exhibit 7?
23
24

Page 111

1            (WHEREUPON, a certain document was
2            marked Cage Deposition Exhibit
3            No. 7, for identification, as of
4            04-29-2015.)
5 BY MR. JOHNSON:
6     Q.    Do you recognize Exhibit 7?
7     A.    Yes.
8     Q.    Is this the pre-disciplinary hearing
9 form you were referring to when you say that
10 Mike Duda wrote it up?
11    A.    Yes.
12    Q.    And do you see Mike Duda's name on this
13 form?
14    A.    No.  I see Tyrone Lewis.
15    Q.    So does this change your recollection
16 as to whether Mike Duda wrote it up on this form
17 regarding your five-day suspension March 19th to
18 March 26th, 2012?
19    A.    Yes, it was Tyrone Lewis.
20    Q.    Did you ever receive a notice of
21 progressive discipline regarding the five-day
22 suspension March 19th to March 26th, 2012?
23    A.    Yes.
24    Q.    What was stated as the reason for the

Page 112

1 five-day suspension?
2     A.    I had so many it would be impossible for
3 me to recognize which one it was for.
4     Q.    Is there something that would refresh
5 your recollection as to the stated reason on the
6 notice of progressive discipline for your
7 five-day suspension?
8     A.    Yes.
9     Q.    What would refresh your recollection?
10    A.    The form has on there the day you have
11 been suspended and at the top of it it has why you
12 being suspended this time and then it has
13 progressive discipline.
14    MR. JOHNSON:  Can you please mark Exhibit 8?
15 Thank you.
16            (WHEREUPON, a certain document was
17            marked Cage Deposition Exhibit
18            No. 8, for identification, as of
19            04-29-2015.)
20 BY MR. JOHNSON:
21    Q.    Do you recognize Exhibit 8?
22    A.    Yes.
23    Q.    Is this the notice of progressive
24 discipline you received regarding your five-day



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
113–116

Page 113

1  suspension from March 19th to March 26th, 2012?
2      A.   Yes.
3      Q.   On the first page under the box that
4  says "Category," do you see that there is a box,
5  it's the third row down, and the words next to the
6  box are "Conduct involving job performance or
7  substandard work performance," is that correct?
8      A.   It has poor performance on here.
9      Q.   So on the first page, there's a
10  horizontal box that says, "Category." Do you
11  see that in the middle of the page?
12     A.   Yes.
13     Q.   And then the third row down on the
14  left says, "Conduct involving job performance or
15  substandard work performance," is that correct?
16     A.   Yes.
17     Q.   And the box next to that phrase is
18  checked with an X?
19     A.   Yes.
20     Q.   On the next page, this is Bates No. 105,
21  under the box that says "Incident Description and
22  Supporting Details," the text entered in that box
23  says, "Employee was listed as following:
24  Ms. Cage was given a pre-disciplinary hearing on

Page 114

1  January 30th, 2012, for issues related to poor
2  performance and document falsification for
3  January 24th, 2012," is that correct?
4      A.   Yes.
5      Q.   On the bottom of that page Bates 105, do
6  you recognize the signature under signature of
7  supervisor issuing notice?
8      A.   Yes.
9      Q.   Whose signature is that?
10     A.   Tyrone Lewis.
11     Q.   And he signed on March 13th, 2012?
12     A.   Yes.
13     Q.   Is that your handwriting above that that
14  says, "Refused to sign"?
15     A.   No, that's his.
16     Q.   Did you attend a pre-disciplinary
17  hearing on January 30th, 2012, before you were
18  given the notice of suspension?
19     A.   Yes, I did.
20     Q.   And is Exhibit 7 the memorandum
21  scheduling -- informing you of the schedule for
22  when the pre-disciplinary hearing would take
23  place?
24     A.   Yes.

Page 115

1      Q.   If you look under where it says
2  "Contact Jurdine Rutledge," do you see it says,
3  "The subject of the hearing is job performance and
4  misrepresentation," is that correct?
5      A.   That's what they put down, but that's
6  not correct.
7      Q.   Who else besides you was in attendance
8  at the pre-disciplinary hearing on January 30th,
9  2012?
10     A.   The union representative, myself, and
11  Tyrone Lewis.
12     Q.   What's the name of your union
13  representative who was in attendance?
14     A.   I think at that time it was
15  Michael Tierney.
16     Q.   Was anyone else in attendance at the
17  pre-disciplinary hearing?
18     A.   Lenny came in.
19     Q.   What do you mean Lenny came in?
20     A.   Well, we were in a -- the little room
21  that they have up there and Lenny wasn't there when
22  we all got there. So we had to wait for him to
23  come to the room.
24     Q.   Did Lenny miss the beginning of the

Page 116

1  hearing?
2      A.   No, it hadn't started.
3      Q.   Was there anyone else present at the
4  hearing?
5      A.   No, just the people I named.
6      Q.   On Exhibit 7, if you look back, where
7  it says, "The subject of the hearing is job
8  performance and misrepresentation," why do you
9  believe that's incorrect?
10     A.   Because I didn't misrepresent anything.
11  This is a day that I had the north side and of the
12  buildings I had to get into you needed a janitor or
13  maintenance guy. You're only allowed five minutes
14  to wait. No one came. So that was one of the
15  routes that I tell you they put in your G5. I
16  couldn't get into any of the buildings on the north
17  side because I didn't know where the janitor or the
18  maintenance guy was.
19          After I finished that route, I proceeded
20  to the second route that was loaded into my G5.
21  And in the second book, I did obtain some readings.
22  But they claimed the tracker showed me on the south
23  side at 1 o'clock. At 1 o'clock, I was on Addison
24  and I don't know what street, but the Jewel's still



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
117–120

Page 117

1  sitting there. I was in that Jewel store talking
2  to the manager about getting in to read the meter
3  there.
4      Q.   I'm sorry. If you could please focus on
5  the question that I asked.
6          So why is it incorrect that the
7  subject of the hearing is job performance and
8  misrepresentation?
9      MR. GOMBERG: Objection; asked and answered.
10  She just answered your question.
11  BY MR. JOHNSON:
12     Q.   You testified that you did not
13  misrepresent anything, is that correct?
14     A.   That's correct.
15     Q.   What did they say? What did somebody
16  say at the hearing that was a misrepresentation?
17     MR. GOMBERG: Objection.
18     MR. JOHNSON: Sorry. Strike that.
19  BY MR. JOHNSON:
20     Q.   What, if anything, did Mr. Lewis say at
21  the hearing?
22     A.   Nothing.
23     Q.   What, if anything, did Mr. Caifano say
24  at the hearing?

Page 118

1      A.   That I did not get into the buildings to
2  obtain readings from the water meters.
3      Q.   Did Mr. Caifano say anything else at the
4  hearing?
5      A.   No.
6      Q.   What, if anything, did Michael Tierney
7  say at the hearing?
8      A.   Nothing.
9      Q.   Did Mr. Lewis submit documents at the
10  hearing?
11     A.   Yes, he did.
12     Q.   What documents did Mr. Lewis submit at
13  the hearing?
14     A.   They had printed out the route for
15  that day and he brought that to the hearing.
16     Q.   When you say "route for that day," what
17  day are you referring to?
18     A.   January 24th, 2012.
19     Q.   At the pre-disciplinary hearing, did
20  Mr. Caifano also mention your work results from a
21  different day in January?
22     A.   No.
23     Q.   Did Mr. Lewis submit any other documents
24  besides your route for that day on January 24th,

Page 119

1  2012?
2      A.   Yes, he did.
3      Q.   What other documents did Mr. Lewis --
4      A.   The second route that I went into.
5      Q.   What do you mean second route you went
6  into?
7      A.   The route that had the Jewel store on
8  it. That was the second book.
9      Q.   Was that second book also on
10  January 24th, 2012?
11     A.   Yes, it was.
12     Q.   Were there any other documents
13  Mr. Lewis submitted at that hearing?
14     A.   No.
15     Q.   Did either Mr. Lewis or Mr. Caifano say
16  at the hearing that your age was the reason for
17  this five-day suspension in March, 2012?
18     A.   No.
19     Q.   Did either Mr. Lewis or Mr. Caifano say
20  anything about your age?
21     A.   No.
22     Q.   To your knowledge, did Mr. Lewis or
23  Mr. Caifano ever say that your age was the
24  reason for this five-day suspension?

Page 120

1      A.   No.
2      Q.   To your knowledge, did any City employee
3  besides Mr. Lewis or Mr. Caifano ever say that age
4  was the reason for this five-day suspension?
5      A.   No.
6      Q.   Did either Mr. Lewis or Mr. Caifano say
7  at the hearing that your gender was the reason for
8  this five-day suspension?
9      A.   No. They wouldn't say that at the
10  hearing.
11     Q.   Did either Mr. Lewis or Mr. Caifano say
12  anything about your gender at the hearing?
13     A.   No.
14     Q.   To your knowledge, did Mr. Lewis or
15  Mr. Caifano ever say that your gender was the
16  reason for this five-day suspension?
17     A.   No.
18     Q.   To your knowledge, did any City employee
19  besides Mr. Lewis or Mr. Caifano ever say that your
20  gender was the reason for this five-day suspension?
21     A.   No.
22     Q.   Did either Mr. Lewis or Mr. Caifano say
23  at the hearing that your race was the reason for
24  this five-day suspension?



OPHELIA CAGE
April 29, 2015
CAGE vs. CITY OF CHICAGO
121–124

Page 121

1    A.    No.
2    Q.    Did either Mr. Lewis or Mr. Caifano say
3  anything about your race at the hearing?
4    A.    No.
5    Q.    To your knowledge, did Mr. Lewis or
6  Mr. Caifano ever say that your race was the reason
7  for this five-day suspension?
8    A.    No.
9    Q.    To your knowledge, did any City employee
10  besides Mr. Lewis or Mr. Caifano ever say that your
11  race was the reason for the suspension?
12    A.    No.
13    Q.    Did either Mr. Lewis or Mr. Caifano
14  say at the hearing that your previous filing of
15  complaints and/or charges was the reason for this
16  five-day suspension?
17    A.    No.
18    Q.    Did either Mr. Lewis or Mr. Caifano say
19  anything about your previous filing of complaints
20  and/or charges at the hearing?
21    A.    No.
22    Q.    To your knowledge, did Mr. Lewis or
23  Mr. Caifano ever say that your previous filing of
24  complaints and/or charges was the reason for this

Page 122

1  five-day suspension?
2    A.    No.
3    Q.    To your knowledge, did any City employee
4  besides Mr. Lewis or Mr. Caifano ever say that your
5  previous filing of complaints and/or charges was
6  the reason for this five-day suspension?
7    A.    No.
8    Q.    Do you know who made the final decision
9  with respect to this five-day suspension?
10    A.    No.
11    Q.    Did you serve a seven-day suspension
12  from October 29th to November 5th, 2012?
13    A.    Yes.
14    Q.    Do you know who initiated that
15  suspension?
16    A.    It was the supervisor at that time.  I
17  don't know if it was Tyrone.  What was the dates?
18    Q.    For the seven-day suspension?
19    A.    Yeah.
20    Q.    October 29th to November 5th, 2012.
21    A.    Tyrone Lewis.
22    Q.    You believe that Tyrone Lewis initiated
23  that discipline?
24    A.    Well, he was the supervisor at that

Page 123

1  time.
2    Q.    But do you believe that he initiated the
3  discipline?
4    A.    I believe he was told to.
5    Q.    What's the basis for your belief that he
6  was told to initiate the discipline?
7    A.    Tyrone, for lack of a better word, is a
8  figurehead.  So whatever he's told to do, that's
9  what he does.  Even if he knows it's wrong, he'll
10  still do it.
11    Q.    Did you ever hear anyone tell Mr. Lewis
12  to initiate this discipline?
13    A.    No.
14    Q.    Did Mr. Lewis ever tell you that he was
15  told to initiate the discipline?
16    A.    No.  In 2011, I think Mr. Lewis had told
17  me that Lenny and -- Len Caifano and Mike Duda --
18  Lenny had called him and told him to watch my work
19  very carefully and he told me to be careful.
20    Q.    Who told you to be careful?
21    A.    Tyrone Lewis.
22    Q.    Did you ever see a document indicating
23  that Lewis was told -- Mr. Lewis was told to
24  initiate your seven-day suspension October 29th to

Page 124

1  November 5th, 2012?
2    A.    No.
3    Q.    Is there anything else that is the basis
4  for your belief that Mr. Lewis was told to initiate
5  this suspension?
6    A.    I believe he was told to scrutinize my
7  work very carefully and any little discrepancies he
8  reported it to Len Caifano.
9    Q.    But is there any other reason why you
10  believe that Mr. Lewis was told specifically to
11  initiate your seven-day suspension from
12  October 29th to November 5th, 2012?
13    A.    No.
14    Q.    Did you receive a notice of progressive
15  discipline regarding this seven-day suspension?
16    A.    Yes.
17    Q.    What was the stated reason on that
18  notice of progressive discipline as to why you
19  were being suspended?
20    A.    Same reason, poor job performance.
21    Q.    Was there anything else that you recall
22  as a stated reason?
23    A.    No.
24    Q.    Is there anything that could refresh



Page 125

1  your recollection?

2  A.  No.  I would need to see some documents.

3  MR. JOHNSON:  Could you please mark this as

4  Exhibit 9?  Thank you.

5          (WHEREUPON, a certain document was

6          marked Cage Deposition Exhibit

7          No. 9, for identification, as of

8          04-29-2015.)

9  BY MR. JOHNSON:

10  Q.  Do you recognize Exhibit 9?

11  A.  Yes.

12  Q.  Is this a true and accurate copy of

13  the notice of progressive discipline you were given

14  regarding your suspension for seven days from

15  October 29th to November 5th, 2012?

16  A.  Yes.

17  Q.  On the second page, so Bates No. 109, do

18  you recognize your signature in the box on the

19  bottom where it says, "Signature of supervisor

20  issuing notice"?

21  A.  Yes.

22  Q.  Whose signature is that?

23  A.  Tyrone Lewis.

24  Q.  And did he sign on October 26th, 2012?

Page 126

1  A.  Yes.

2  Q.  Is that your handwriting that says,

3  "Refused to sign.  Given copy"?

4  A.  No.

5  Q.  On the first page under the box that

6  says "Category," do you see the language, "Conduct

7  involving job performance or substandard work

8  performance"?

9  A.  Yes.

10  Q.  Is there an X next to the box?

11  A.  Yes.

12  Q.  On the second page on Bates 109, under

13  incident description and supporting details at the

14  top, entered into that box do you see the words,

15  "Employee was listed as following:  Ophelia Cage

16  for poor performance, inefficiency (Personnel

17  Rule XVIII, Section 1, Articles 38 and 39)," is

18  that correct?

19  A.  Yes.

20  Q.  You testified that you received a copy

21  of the personnel rules of the City of Chicago as

22  recently as five years ago, is that correct?

23  A.  Yes.

24  Q.  Did you review the personnel rules?

Page 127

1  A.  No.

2  Q.  Have you ever reviewed the personnel

3  rules of the City of Chicago?

4  A.  No.  I'm not even sure what this

5  statement is even referring to, but it's the same

6  thing.  Poor performance, inefficiency on what,

7  climbing the building, opening the door, what?

8  Q.  Did you attend a pre-disciplinary

9  hearing on October 18th, 2012, before you were

10  given this notice of progressive discipline?

11  A.  Yes.

12  Q.  Were you given a memorandum providing

13  you notice of when the pre-disciplinary hearing

14  would be held?

15  A.  Yes.

16  MR. JOHNSON:  Would you mark Exhibit 10,

17  please?

18          (WHEREUPON, a certain document was

19          marked Cage Deposition Exhibit

20          No. 10, for identification, as of

21          04-29-2015.)

22  BY MR. JOHNSON:

23  Q.  Do you recognize Exhibit 10?

24  A.  Yes.

Page 128

1  Q.  Is this the memorandum you received

2  giving you notice of a pre-disciplinary hearing

3  scheduled for October 18th, 2012?

4  A.  Yes.

5  Q.  And was this pre-disciplinary hearing

6  regarding your suspension from October 29th to

7  November 5th, 2012, your seven-day suspension?

8  A.  Yes.

9  Q.  Under contact Jurdine Rutledge, it says,

10  "The subject of this hearing is poor performance,"

11  is that correct?

12  A.  Yes.

13  Q.  Who else besides you was in attendance

14  at this pre-disciplinary hearing?

15  A.  Len Caifano, myself, Tyrone Lewis, and

16  the union representative.

17  Q.  Who was your union representative

18  present?

19  A.  I think Michael Tierney.

20  Q.  Was there anyone else present at the

21  hearing?

22  A.  No.

23  Q.  Did Mr. Lewis submit any documents at

24  the hearing?



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
129–132

Page 129

1      A.    No, he did not.  Mr. Caifano brought all
2  the documents in.
3      Q.    What documents did Mr. Caifano bring in?
4      A.    My route for this particular day.
5      Q.    What particular day?
6      A.    The date that they suspended me.  What
7  date did they have on -- the date of the incident,
8  which was 10/4/12 through 10/12/12.
9      Q.    Is that an incident continuously from
10  10/4/12 through 10/12/12 or incidents on 10/4/12
11  and 10/12/12?
12      A.    10/4/12 and 10/12/12.
13      Q.    And is that your understanding of the
14  incidents underlying your suspension?
15      A.    I understand the dates, but it still
16  doesn't give me a description of why like the
17  other one did.
18      Q.    And Mr. Caifano at the pre-disciplinary
19  hearing submitted documents of your route on both
20  of those days, October 4th, 2012, and October 12th,
21  2012?
22      A.    Yes.
23      Q.    Did Mr. Caifano submit any other
24  documents at the hearing?

Page 130

1      A.    No.
2      Q.    Did Mr. Tierney submit any documents at
3  the hearing?
4      A.    No.
5      Q.    Did you submit any documents at the
6  hearing?
7      A.    No.
8      Q.    What, if anything, did Mr. Lewis say at
9  the hearing?
10      A.    He didn't say anything.  Mr. Caifano did
11  all the talking.
12      Q.    What, if anything, did Mr. Caifano say
13  at the hearing?
14      A.    Statements to justify him giving me a
15  suspension.
16      Q.    Do you remember any of his statements?
17      A.    I can't remember the statements, but
18  this is what I call padding your personnel file
19  folder because there is no explanation on here.  He
20  just got a personnel rule.  Normally when they give
21  you a pre-dis, they put it on here like this one.
22  It notes on here why.
23      Q.    What do you mean padding your personnel
24  folder?

Page 131

1      A.    He puts enough suspensions in your
2  folder and then eventually you are fired.
3      Q.    Is it your understanding that -- strike
4  that.
5            Were you fired after being suspended
6  for seven days in 2012?
7      A.    No.
8      Q.    Do you know of a specific instance where
9  Mr. Caifano put enough suspensions in your folder
10  and eventually you were fired?
11      A.    It says on here progressive discipline,
12  increased amount of discipline and/or resulting in
13  termination.
14      Q.    Why do you believe Len Caifano gave you
15  the suspension, the seven-day suspension in
16  October, 2012?
17      A.    He's finding any little idiocy to
18  suspend me.  If I had to go to the washroom and
19  stay longer than anyone else, he finds a reason to
20  write me up for that.  And you've got employees
21  going home.
22      Q.    What's the basis of your belief that he
23  gives you more discipline than anyone else?
24      A.    My belief is no one has been suspended.

Page 132

1  They've been suspended, but for tardiness and
2  absenteeism.  No one has ever been suspended for
3  poor job performance.
4      Q.    What's the basis for your belief that
5  no one has ever been suspended for poor job
6  performance?
7      A.    I've asked every employee there.  Every
8  one of them said, no, I haven't been suspended.
9  And the ones that were suspended, they told me it
10  was for tardiness, coming in late.
11      Q.    When you say every employee there, where
12  is there?
13      A.    39th and Iron.
14      Q.    And when you say every employee --
15      A.    Every rate taker.
16      Q.    -- who specifically are you referring
17  to?
18      A.    All the rate takers that are still on
19  the City payroll.
20      Q.    What specific individual rate takers did
21  you ask whether they were suspended for poor job
22  performance?
23      A.    Ron Blankus, Demetrius Simms,
24  Rose O'Neil, Sharon Brown, Pat Durrant,



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
133–136

1  Bridget Jones.  What's his name, Lenny's
2  right-hand man.  I can't think of his name.  Carl
3  Burt.  It's two of them.  I can't think of their
4  name, but they're still on the City payroll and
5  they're rate takers.
6      Q.   Anyone else?
7      A.   It's about three, four more, but I can't
8  think of their names.
9      Q.   When did you ask Ron Blankus if he was
10  ever suspended for poor job performance?
11      A.   Before he went on duty disability and
12  he's been on duty disability now for about two,
13  maybe three years.
14      Q.   So approximately when did you ask
15  Mr. Blankus whether he had been suspended for poor
16  job performance?
17      A.   Well, he didn't come down to 39th and
18  Iron.  So when we were stationed on 49th and
19  Western.
20      Oh, put Curtis Johnson down.
21      Q.   Do you recall a specific conversation
22  with Ron Blankus regarding whether he had been
23  suspended for poor job performance?
24      A.   I asked him.

1      Q.   Do you remember what date you asked him?
2      A.   No.  Like I said, he's been on duty
3  disability for about two or three years now.  So
4  this is when we were still at 49th and Western
5  because he never came with us to 39th and Iron.  He
6  was on DD.
7      Oh, Jeff Sojka, however you pronounce
8  his last name, Jeff Sojka, whatever.  Jerry
9  Robinson, Oscar Diaz.  That's it.
10      Q.   Are there any other water rate takers
11  who you asked whether they had been suspended for
12  poor job performance?
13      A.   Leslie Travis Cook.
14      Q.   Anyone else?
15      A.   That's it.  That's it.
16      Q.   When did you ask Demetrius Simms whether
17  he had been suspended for poor job performance?
18      A.   He was with me at 23rd and Ashland.  So
19  I asked him right after I came back -- right after
20  I was reinstated in 2005.
21      Q.   Do you recall a specific conversation
22  that you had with him in 2005?
23      A.   I just asked him.  I just went up to him
24  and asked him.  We'd been working together a long

1  time.  I asked him had you ever been suspended for
2  poor job performance.
3      Q.   Do you remember the date of that
4  conversation?
5      A.   Well, I was reinstated in November.  So
6  it had to be December, 2005.
7      Q.   And when you asked him have you ever
8  been suspended for poor job performance, what did
9  Demetrius Simms tell you in December of 2005?
10      A.   No, I have not.
11      Q.   When did you ask Rose O'Neil whether
12  she had been suspended for poor job performance?
13      A.   Same time, November of 2005.
14      Q.   Do you remember the specific
15  conversation?
16      A.   I just asked.
17      Q.   And what did Rose O'Neil say in response
18  in November of 2005?
19      A.   No, I have not.  All the rate takers, I
20  asked them the same thing -- I didn't put it in any
21  nice way -- have you ever been suspended for poor
22  job performance.
23      Q.   With Demetrius Simms, besides the 2005
24  December conversation, had you ever -- did you ever

1  have a subsequent conversation with him asking
2  whether he had ever been suspended for poor job
3  performance?
4      A.   Before 2005, no.
5      Q.   After 2005.
6      A.   No.
7      Q.   After your November, 2005 conversation
8  with Rose O'Neil, did you ever ask her whether she
9  had been suspended for poor job performance?
10      A.   No.
11      Q.   When did you ask Sharon Brown whether
12  she had been suspended for poor job performance?
13      A.   The time that they had given her a
14  pre-disciplinary hearing, it was her, myself, and
15  Renny Simmons.  Out of that pre-dis, I'm the only
16  one that walked away with a suspension.
17      Q.   So when did you ask Sharon Brown whether
18  she had been suspended for poor job performance?
19      A.   Right before I started my suspension.  I
20  can't think of what year it was.  But they had
21  brought her down for the same thing they had
22  brought myself and Renny Simmons down.
23      Q.   But you don't remember what year?
24      A.   No.  I just know I'm the only one walked



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
137–140

Page 137

1 away with a suspension. All three of us was in a
2 pre-dis.
3    Q.   So you don't remember a specific
4 conversation with Sharon Brown regarding whether
5 she was suspended for poor job performance?
6    A.   Yes. After I got my suspension, I asked
7 her did you get suspended. She said no. And I
8 took her word against it. I knew how many stops
9 she had did that day because she couldn't come back
10 to the station so she asked me to bring her work
11 in. So I brought her work into the station.
12    Q.   But you don't recall when this specific
13 conversation happened?
14    A.   No. And right after that, they brought
15 her into the office. She's no longer in the field.
16    Q.   Do you know approximately when this
17 conversation happened with Sharon Brown?
18    A.   I would have to know when the suspension
19 was and I done had so many. I'd have to be an
20 Einstein to remember all the days they have
21 suspended me.
22    Q.   Was it before 2006?
23    A.   No, after. I think after.
24    Q.   Was it in 2006?

Page 138

1    A.   No, I don't think so.
2    Q.   Was it in 2007?
3    A.   Because Renny's deceased now, I'd say
4 maybe '10, 2010, and that's a guess because Renny
5 is dead and he's been dead now about two,
6 three years.
7    Q.   Did you ever have a subsequent
8 conversation -- after the one that was maybe in
9 2010 with Sharon Brown, did you ever have a
10 subsequent conversation about whether she had been
11 suspended for poor job performance?
12    A.   No.
13    Q.   You mentioned a pre-disciplinary
14 hearing -- strike that.
15       When did you ask Pat Durrant whether she
16 had been suspended for poor job performance?
17    A.   2011, January, 2011.
18    Q.   Do you remember the specific date?
19    A.   No. I just remember the month and the
20 year.
21    Q.   Do you remember the specific
22 conversation with her?
23    A.   Pat, have you ever been suspended for
24 poor job performance.

Page 139

1    Q.   And what was Ms. Durrant's response?
2    A.   She laughed and said no.
3    Q.   After January, 2011, did you ever have a
4 conversation with Pat Durrant regarding whether she
5 had been suspended for poor job performance?
6    A.   No.
7    Q.   When did you have a conversation -- when
8 did you ask Bridget Jones whether she had been
9 suspended for poor job performance?
10    A.   January, 2011, the same day.
11    Q.   The same day that you asked --
12    A.   Pat Durrant.
13    Q.   Do you remember the specific
14 conversation?
15    A.   She was right there when I asked Pat.
16 So when Pat said no, I asked Bridget have you ever
17 been suspended for poor job performance. She said
18 no.
19    Q.   After January, 2011, did you ever have a
20 subsequent conversation with Bridget Jones about
21 whether she had been suspended for poor job
22 performance?
23    A.   No.
24    Q.   When did you have a conversation with

Page 140

1 Carl Burt asking him whether he had been suspended
2 for poor job performance?
3    A.   The next day.
4    Q.   The next day after what?
5    A.   After I talked with Bridget and Pat.
6    Q.   In January, 2011?
7    A.   Yes.
8    Q.   Do you remember the specific
9 conversation?
10    A.   I asked them have you ever been
11 suspended for poor job performance. I asked them
12 all the same thing. Everybody's response was no,
13 but I knew that before I asked them.
14    Q.   How did you know that before you
15 asked Carl Burt -- how did you know before you
16 asked him whether he had been suspended for poor
17 job performance -- how did you already know that
18 he had never been suspended for poor job
19 performance?
20    A.   Because these are rate takers that I've
21 been working with since 1991. And whenever someone
22 gets suspended like me -- I'm down here today. If
23 you were to go to 39th, everybody down there know
24 where I am.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
141–144

Page 141

1    Q.   Prior to January, 2011, had Carl Burt
2  ever told you whether he was suspended or not for
3  poor job performance?
4    A.   No.
5    Q.   So how did you already know before
6  that conversation that he had never been suspended
7  for poor job performance?
8    A.   Because I see him every day.  You can't
9  be suspended and I'm seeing you five days a week
10  every week.  And the days that someone is off like
11  now, I'll ask where's so-and-so.  They'll say, oh,
12  they're on vacation.  They don't say, oh, they're
13  suspended.
14    Q.   Did you work with Carl Burt every day
15  from 1991 to January, 2011?
16    A.   Me and Carl Burt became rate takers the
17  same day.  We came into the station the same day,
18  June of 1991.
19    Q.   From June, 1991, to January, 2011, did
20  you always work at the same station as Carl Burt?
21    A.   Yes.
22    Q.   Were there ever days when you did not
23  report to work?
24    A.   When I was on vacation or took a sick

Page 142

1  day and suspended.
2    Q.   Do you know whether Carl Burt was
3  suspended on the days that you were not at work?
4    A.   When I got back to work, I would
5  ask -- like if I had a seven-day, when I come back,
6  I would ask, you know, was anybody suspended
7  besides me and everybody's sitting there looking
8  at everybody.
9    Q.   Do you remember asking Carl Burt when
10  you came back -- strike that.
11        After January, 2011, did you ever have
12  a conversation with Carl Burt asking him whether he
13  had been suspended for poor job performance?
14    A.   Yes.
15    Q.   When?
16    A.   When I came back off of suspension, I
17  asked Carl Burt have you ever been suspended like
18  they are suspending me.  He said no.
19    Q.   When you came back after a suspension,
20  what suspension?
21    A.   The suspension that I had for the
22  seven days.
23    Q.   Do you remember approximately what day
24  you had that conversation with Carl Burt?

Page 143

1    A.   No.  It probably was in the afternoon
2  after we had finished up our work, probably sitting
3  outside in the parking lot.
4    Q.   After that conversation, did you ever
5  ask Carl Burt whether he had been suspended for
6  poor job performance?
7    A.   Yes.
8    Q.   When?
9    A.   That day I asked him.  I haven't asked
10  him since then.
11    Q.   Okay.  When did you ask Curtis Johnson
12  whether he had been suspended -- I'm sorry.  Strike
13  that.
14        So when you got back from your seven-day
15  suspension and asked Carl Burt if he had ever been
16  suspended for poor job performance, what did he
17  say?
18    A.   No.
19    Q.   When did you ask Curtis Johnson whether
20  he had ever been suspended for poor job
21  performance?
22    A.   The same time I asked Carl Burt.
23    Q.   January, 2011?
24    A.   Yes.

Page 144

1    Q.   The exact same day?
2    A.   Yes.
3    Q.   During the same conversation?
4    A.   No, ten minutes later.
5    Q.   And do you remember the exact
6  conversation?
7    A.   Yes, have you ever been suspended for
8  poor job performance, no.
9    Q.   After that conversation with Curtis
10  Johnson in 2011, did you ever ask him whether he
11  had been suspended for poor job performance?
12    A.   No.
13    Q.   When did you ask Jeff Sojka whether he
14  had been suspended for poor job performance?
15    A.   January, 2011.
16    Q.   Do you remember exactly when in January,
17  2011?
18    A.   No, because Jeff was in and out.  He
19  comes to our station when he's trying to keep from
20  being docked.  He'll come over there and swipe in.
21  So he really doesn't stay very long.  Every now and
22  then he would come over there and have a
23  conversation with the supervisor.
24    MR. GOMBERG:  I'm going to need to take a



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
145–148

Page 145

1  break. Is it okay?
2      MR. JOHNSON: Sure.
3          (WHEREUPON, a recess was had from
4          3:17 to 3:24 p.m.)
5  BY MR. JOHNSON:
6      Q.  So you mentioned that in January, 2011,
7  you asked Jeff Sojka whether he had ever been
8  suspended for poor job performance, is that right?
9      A.  Yes.
10     Q.  Do you remember the specific
11  conversation?
12     A.  I asked him, Jeff, this is a dumb
13  question, but I'm gonna ask it anyway. Have you
14  ever been suspended for poor job performance. And
15  he said no.
16     Q.  Why did you say this is a dumb question?
17     A.  That's Lenny's right-hand man. When
18  Lenny takes off, he locks the computer so that no
19  one else can get into the computer to see what he
20  has in there. Jeff is the only one that knows the
21  code to get into the computer when Lenny is off.
22     Q.  How do you know that Lenny locks his
23  computer when he leaves?
24     A.  One time he had taken off and Mike Duda

Page 146

1  went up there in Lenny's desk because he was going
2  to be the supervisor for today and the computer was
3  locked and he couldn't get into it. And he asked
4  Jeff why is the computer locked. Jeff said I don't
5  know. He asked Jeff do you have the combination.
6  Jeff said no.
7      But he did. He had the code. We all
8  know he got the code. Mike just didn't know it.
9      Q.  You personally heard this conversation
10  between Mike Duda and Jeff Sojka?
11     A.  Yes, because you have to come from
12  downstairs upstairs to get your work. So I'm
13  standing up there waiting on Mike to give me
14  the work and he's trying to get into the locked
15  computer.
16     Q.  When did this conversation take place?
17     A.  Had to be in 2012.
18     Q.  Do you remember specifically within 2012
19  when it was?
20     A.  I would say June, 2012.
21     Q.  Do you remember the date in June?
22     A.  No.
23     Q.  How do you know -- strike that.
24      What's the basis for your belief that

Page 147

1  Jeff Sojka in 2012 knew the combination to unlock
2  Lenny's computer?
3      A.  He's Lenny's right-hand man. So Lenny
4  confides in Jeff. That's why Jeff can get away
5  with doing practically anything he wants to do
6  because Lenny's going to cover for him.
7      Q.  Aside from your belief that Jeff is
8  Lenny's right-hand man, what else is the basis for
9  your belief that Jeff in 2012 knew how to unlock
10  Lenny's computer?
11     A.  Not only did I know it, a couple other
12  rate takers also knew it because they made the
13  statement would you believe Lenny had locked the
14  computer and no one can get into it.
15      Then we have a sheet. As a matter of
16  fact, I filled out one, it's been a year ago, for
17  acting as a backup supervisor when the regular
18  supervisor is off. To this day they have not
19  called me yet, but every time that Tyrone takes off
20  Jeff comes upstairs and give out the work as their
21  backup.
22      We had a rate taker, he still works with
23  us, Oscar Diaz. And Lenny was off. And he went
24  upstairs. He couldn't get into the computer

Page 148

1  either. It was locked.
2      Q.  After the conversation in January, 2011,
3  when you asked Jeff Sojka whether he had ever been
4  suspended for poor job performance, did you ever
5  after that have a conversation asking whether
6  Jeff Sojka had been suspended for poor job
7  performance?
8      A.  2013.
9      Q.  When in 2013?
10     A.  May, 2013. I happen to go upstairs, I
11  don't know if this was the day he was by hisself or
12  what, and I just leaned over and asked him in his
13  ear, Jeff, have you ever been suspended. And he
14  said no. Why would you ask me that.
15     Q.  Those were your exact words, Jeff, have
16  you ever been suspended?
17     A.  Yes.
18     Q.  After May, 2013, did you ever ask
19  Jeff Sojka whether he had ever been suspended for
20  poor job performance?
21     A.  I asked him September of that year.
22     Q.  Do you remember the exact conversation?
23     A.  Jeff, have you ever been -- has Lenny
24  ever suspended you. And I knew he was going to say



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
149–152

Page 149

1 no. Lenny is not going to suspend Jeff.
2    Q.    What did he say in response to your
3 question?
4    A.    No.
5    Q.    After September, 2013, did you ever ask
6 Jeff Sojka whether he had been suspended for poor
7 job performance?
8    A.    No, no.
9    Q.    When did you ask Jerry Robinson whether
10 he had been suspended for poor job performance?
11    A.    During the same time I asked Jeff.
12    Q.    Around which time you asked Jeff?
13    A.    May, May, 2013.
14    Q.    Do you remember the specific dates in
15 May, 2013, when you asked Jerry Robinson?
16    A.    No. I just remember asking him had he
17 ever been suspended.
18    Q.    Were those your exact words?
19    A.    Those were my exact words.
20    Q.    And what was Jerry Robinson's response
21 in May, 2013?
22    A.    No, I have not.
23    Q.    Other than May, 2013, did you ever ask
24 Jerry Robinson whether he had been suspended for

Page 150

1 poor job performance?
2    A.    In June of that year.
3    Q.    Do you remember the exact day in June?
4    A.    No.
5    Q.    Do you remember the exact conversation?
6    A.    Jerry, are you sure you have never been
7 suspended for poor job performance. And he said
8 no.
9    Q.    Other than May, 2013, June, 2013, did
10 you ever ask Jerry Robinson whether he had been
11 suspended for poor job performance?
12    A.    I asked him again in September and the
13 reason I kept asking Jerry 'cause he's always
14 getting into arguments with Lenny.
15    Q.    September of what year?
16    A.    2013.
17    Q.    Do you remember the exact conversation
18 in September, 2013?
19    A.    Well, it was after the discussion he had
20 had with Lenny and I had asked him do you think
21 Lenny's going to suspend you. And he said, no,
22 he's not.
23    Q.    After what conversation Jerry had with
24 Lenny?

Page 151

1    A.    Him and Lenny had an argument about what
2 I don't know because when I came in the argument
3 was ending.
4    Q.    After September, 2013, did you ever ask
5 Jerry Robinson whether he was suspended for poor
6 job performance?
7    A.    No.
8    Q.    When did you ask Oscar Diaz whether he
9 had been suspended for poor job performance?
10    A.    I asked him in June of 2013.
11    Q.    Do you remember the exact day in June?
12    A.    No.
13    Q.    Do you remember the precise
14 conversation?
15    A.    Oscar, have you ever been suspended by
16 Lenny for poor job performance. He said no.
17    Q.    You specifically asked by Lenny?
18    A.    Yes.
19    Q.    Besides June, 2013, did you ever --
20 strike that.
21         After June, 2013, did you ever ask
22 Oscar Diaz whether he had been suspended for
23 poor job performance?
24    A.    In September, 2013.

Page 152

1    Q.    Do you remember the precise dates?
2    A.    No.
3    Q.    Do you remember the exact conversation
4 you had?
5    A.    Have you ever been suspended for poor
6 job performance.
7    Q.    Is that exactly what you said?
8    A.    Yes.
9    Q.    And what did he respond?
10    A.    No.
11    Q.    After September, 2013, did you ever ask
12 Oscar Diaz whether he had been suspended for poor
13 job performance?
14    A.    I asked him again in November of that
15 year.
16    Q.    Do you remember the date?
17    A.    Before Thanksgiving, before the
18 holidays.
19    Q.    More specifically, do you remember the
20 date?
21    A.    25th.
22    Q.    You asked him on November 25th?
23    A.    Yes.
24    Q.    Where did you ask him on November 25th?



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
153–156

Page 153

1    A.    In the parking lot.
2    Q.    Why does this date stand out to you?
3    A.    Because I was getting ready to go on
4 vacation.
5    Q.    Do you remember the exact conversation
6 you had on November 25th with Oscar Diaz?
7    A.    I just asked him had he ever been
8 suspended for poor job performance.  He said no.
9    Q.    After November 25th, 2013, did you ever
10 ask Oscar Diaz whether he had been suspended for
11 poor job performance?
12    A.    No.
13    Q.    When did you ask Leslie Travis Cook
14 whether she had been suspended for poor job
15 performance?
16    A.    I asked her in June of 2013.
17    Q.    Do you remember the exact date?
18    A.    No, just a month.
19    Q.    Do you remember the exact conversation?
20    A.    Leslie, have you ever been suspended for
21 poor job performance.  She said no.
22    Q.    Before June, 2013, had you ever asked
23 Leslie Travis Cook whether she had been suspended
24 for poor job performance?

Page 154

1    A.    Before or after?
2    Q.    Before.
3    A.    Yes, I did.  I used to ask Leslie all
4 the time because Leslie's very verbal.  So I asked
5 her in May.  I asked her in April.
6    Q.    May and April of what year?
7    A.    2013.
8    Q.    Before April, 2013, when was the last
9 time you asked Ms. Travis Cook whether she had been
10 suspended for poor job performance?
11    A.    I asked her again in November, 2013.
12    Q.    Before April, 2013, when, if ever, did
13 you ask Ms. Travis Cook whether she had been
14 suspended for poor job performance?
15    A.    February, 2013.
16    Q.    Before February, 2013, when, if ever,
17 did you ask her that?
18    A.    I didn't ask her before then.
19    Q.    After November, 2013, did you ever ask
20 Ms. Travis Cook whether she had been suspended for
21 poor job performance?
22    A.    No.
23    Q.    Do you remember her response each of
24 these instances, June, 2013, November, 2013, May,

Page 155

1 2013, April, 2013, February, 2013?
2    A.    Her response was no, no.  How did she
3 put it.  I wish they would suspend me.
4    Q.    Did Ms. Travis Cook ever say yes, that
5 she had been suspended for poor job performance?
6    A.    No.  She said no, she has not.
7    Q.    Aside from these conversations when you
8 asked fellow water rate takers whether they had
9 been suspended for poor job performance, is there
10 anything else that is the basis for your belief
11 that, quote, "No one has ever been suspended for
12 poor job performance except you"?
13    A.    They gave Ms. Cook a route around
14 O'Hare Airport.  This was before Ms. Greenwood
15 retired.  Ms. Greenwood retired July of 2012.  And
16 I guess they were trying to bring Ms. Cook in to
17 see if she knew the route.  Well, she brought the
18 route back in with less than ten stops and she
19 told our supervisor Tyrone Lewis that she couldn't
20 find the stops.  She didn't know where she was
21 going.  No pre-dis, no suspension, no nothing.
22 They in turn took what she brought back in and
23 gave it to Ms. Greenwood the next day to go out
24 and finish it.

Page 156

1    Q.    When you say Ms. Green, who are you
2 referring to?
3    A.    Jessie Greenwood.
4    Q.    How do you know that Ms. Travis Cook
5 only completed -- strike that.
6         How do you know that Ms. Travis Cook
7 brought a route in with less than 12 stops in June,
8 2012, with the route around O'Hare Airport?
9    A.    She showed it to me.
10    Q.    Do you remember the exact date?
11    A.    No.  I just know it was before
12 Ms. Greenwood retired because she had to take
13 it back out and complete it.
14    Q.    How do you know Ms. Travis Cook told
15 Tyrone that she couldn't find the stops?
16    A.    I was in the office when she brought the
17 route in.
18    Q.    So you heard her tell Tyrone that she
19 couldn't find the stops?
20    A.    Yes, I did.
21    Q.    How do you know there was no
22 pre-disciplinary hearing?
23    A.    Because I mentioned to her, I said if it
24 had been me, I'd be suspended by now.



OPHELIA CAGE                                              April 29, 2015
CAGE vs. CITY OF CHICAGO                                      157–160

Page 157

1    Q.    So how do you know that there was no
2 pre-disciplinary hearing?
3    A.    She told me she didn't -- I asked her, I
4 said, have you been scheduled for a pre-dis. She
5 said no. So you don't get suspended without a
6 pre-dis.
7    Q.    Did you ask her whether she had been
8 suspended?
9    A.    Yes, I did.
10   Q.    And what did she say?
11   A.    She said I see you every day. When did
12 they suspend me.
13   Q.    How do you know -- strike that.
14        When you say "they," who are you
15 referring to?
16   A.    Len Caifano. Well, it would have been
17 Tyrone Lewis that would have written her up like
18 they did me and he'd have sent it down to Lenny and
19 Lenny would have started the paperwork for a
20 pre-disciplinary hearing.
21   Q.    Do you know why Tyrone Lewis and
22 Lenny Caifano never gave a pre-disciplinary hearing
23 for Ms. Travis Cook regarding her turning in less
24 than 12 stops?

Page 158

1    A.    No.
2    Q.    You testified that they then gave the
3 route to Ms. Greenwood to finish it the next day,
4 is that correct?
5    A.    Yes.
6    Q.    When you say "they," who are you
7 referring to?
8    A.    Tyrone Lewis.
9    Q.    Are you referring to anyone else when
10 you say "they"?
11   A.    Well, he had to get the okay from Lenny
12 to give it to Ms. Greenwood, but he knew
13 Ms. Greenwood knew where it was because she was
14 familiar with that area.
15   Q.    How do you know Tyrone Lewis gave the
16 route to Ms. Greenwood to finish the next day?
17   A.    Because Ms. Greenwood came up to me
18 because Ms. Cook had written directions all over
19 the route and Ms. Greenwood showed it to me and
20 said whose handwriting is this. And I told her
21 that's Leslie's handwriting.
22   Q.    Aside from this incident where Ms. Cook
23 turned in less than 12 stops in June, 2012, is
24 there anything else that's the basis for your

Page 159

1 belief that no one besides you has ever been
2 suspended for poor job performance?
3    A.    Ron Blankus, before he went on DD, Ron
4 never did more than 20 stops a day.
5    Q.    How do you know that -- strike that.
6        When did Ron Blankus go on DD? What do
7 you mean by -- strike that. Sorry.
8        What do you mean by DD?
9    A.    Duty disability.
10   Q.    When did Ron Blankus go on duty
11 disability?
12   A.    I don't know the exact date, but he's
13 been on there for three years now.
14   Q.    And you said before Ron Blankus went on
15 duty disability how many?
16   A.    Less than 20 stops every day.
17   Q.    How do you know that he turned in less
18 than 20 stops every day?
19   A.    When he put his work on the desk you can
20 see it.
21   Q.    And by stops, do you mean posting?
22   A.    Yes. He puts the paperwork on the desk
23 that shows what he did and it's on there.
24   Q.    With Ms. Travis Cook in 2012, in June

Page 160

1 of 2012 when she turned in less than 12 stops, was
2 her route in the G5 at the time?
3    A.    Yes, it was.
4    Q.    So she was reading meters?
5    A.    Yes.
6    Q.    How do you know that her route was in
7 G5?
8    A.    Everybody gets a machine when they're
9 reading meters in the morning. Before they leave
10 out, you have to put in your code to unlock it.
11   Q.    So were the results from Ms. Cook's day
12 of work --
13   A.    Wait a minute. Wait a minute. I'm
14 getting mixed up. To show the work, it had to be
15 in the -- no, because Ms. Greenwood didn't do it.
16 So it was on paper.
17   Q.    What was on paper?
18   A.    The route was on paper. When
19 Ms. Greenwood showed it to me, that's how I was
20 able to tell her whose handwriting it was.
21   Q.    And this was reading meters?
22   A.    Yes.
23   Q.    So --
24   A.    You know, it had to be posting. It was



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
161–164

Page 161

1  posting.  We had posting on paperwork.  That was
2  before they came out with the iPads.
3      Q.    So in June, 2012, water rate takers were
4  not using iPads to track their posting?
5      A.    Right.  We had paper.
6      Q.    And the route where Ms. Travis Cook
7  turned in less than 12 stops was posting and it
8  was on paper?
9      A.    Yes.
10     Q.    You mentioned that before Ron Blankus
11  went on duty disability he never turned in more
12  than 20 stops, correct?
13     A.    Correct.
14     Q.    And you mentioned that you know this
15  because you saw --
16     A.    His paper route when he brought it back
17  into the station.
18     Q.    When exactly did you see his paper
19  route when he brought it into the station?
20     A.    When you come back to the station, you
21  put your work on your supervisor's desk so you can
22  put it in the computer what you did that day.
23     Q.    Which supervisor?
24     A.    Tyrone Lewis.

Page 162

1      Q.    What dates did you see Mr. Blankus'
2  results on Mr. Lewis' desk?
3      A.    Five days a week.
4      Q.    During what time period?
5      A.    I'm not sure what year he went on duty
6  disability, but it was before he stopped coming
7  to work.  But he had been doing that for at least
8  three years or more.
9      Q.    For how long -- for how long a stretch
10  of time -- for how many weeks, rather, for how many
11  weeks did you see Ron Blankus' results from the
12  stops he had made on Tyrone's desk five days a
13  week?
14     MR. GOMBERG:  I'm sorry.  I don't understand
15  the question.
16     MR. JOHNSON:  Yeah, I'll rephrase.
17  BY MR. JOHNSON:
18     Q.    You testified that you saw the results
19  of Ron Blankus' posting, is that correct?  Was it
20  posting that you saw on Tyrone Lewis' desk?
21     A.    Posting or whatever they had assigned
22  him to do that day, posting, SEO 1s.
23     Q.    The results of Mr. Blankus' work, is
24  that fair?

Page 163

1      A.    Right.
2      Q.    You saw it on Tyrone Lewis' desk five
3  days a week?
4      A.    Yes.
5      Q.    For what stretch of time did you see the
6  results of Mr. Blankus' work on Mr. Lewis' desk
7  five days a week?
8      MR. GOMBERG:  I thought that it was asked and
9  answered, but you can answer again.
10  BY THE WITNESS:
11     A.    Ron had been doing this at least, at
12  least three to four years before he went on DD.
13  BY MR. JOHNSON:
14     Q.    So is it fair to say that during those
15  three to four years every day of the workweek you
16  saw the results of Mr. Blankus' work on Tyrone's
17  desk?
18     A.    Yes.
19     Q.    Where exactly did the water rate takers
20  at that time put work on his desk at the end of the
21  day?  Was there a box?
22     A.    No.
23     Q.    Was there a bin?
24     A.    No.  Just come and his desk is there.

Page 164

1  You put it there.  I come.  I put mine.  The next
2  one comes, put theirs there.  Everybody when they
3  come in, they just put it on the desk.
4      Q.    The various water rate takers would put
5  their results from their work that day in a pile?
6      A.    Yes.
7      Q.    During that stretch of time for three to
8  four years was Mr. Blankus' work results always on
9  top of the pile?
10     A.    No.  It depended on when you got there.
11  If I got there before you did, my work is there.
12  You come in after me, you put your work there.  But
13  there's nothing to prevent me from getting up out
14  of my desk, coming and looking on the desk to see
15  what you did.  Or if the supervisor isn't there,
16  (indicating).
17     Q.    By that motion, do you mean looking
18  through the pile?
19     A.    You can look through everybody's work
20  that's been put on that desk.
21     Q.    And is that something you did in the
22  three to four years before Ron Blankus went on duty
23  disability?
24     A.    I did it every day.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
165–168

Page 165

1    Q.   During what years did you flip through
2 the results of other water rate takers' work on
3 Mr. Lewis' desk?  During what years did you do
4 that?
5    A.   From the time -- I did it when we was at
6 49th and Western, the time limit we was over there.
7 When they moved us down to 39th and Iron, Lenny's
8 cubicle was here and I did it there.
9    Q.   In 2008, did you regularly flip through
10 the result -- the stack of results of other water
11 rate takers' work on Tyrone Lewis' desk?
12    A.   Yes, I did.
13    Q.   In 2009?
14    A.   Yes.
15    Q.   In 2010?
16    A.   Yes.
17    Q.   2011?
18    A.   Yes.
19    Q.   2012?
20    A.   Yes.
21    Q.   In 2014?
22    A.   Yes.  I flipped through the work every
23 day I came in because I told you I got to work and
24 the lights was still off in the building.  So

Page 166

1 someone would turn the lights on and there's
2 nothing to prevent me from looking through the work
3 that the co-workers had did the day before.
4    Q.   Did Mr. Lewis know that you were
5 flipping through the stack of results of other
6 water rate takers' work?
7    A.   No.
8    Q.   Did he ever ask you whether you had been
9 flipping through the stack of results of other
10 water rate takers' work?
11    A.   No.
12    Q.   Did you ever think to tell him that you
13 were flipping through the stack of results of other
14 water rate takers' work?
15    A.   No.
16    Q.   Are you aware of a rule in place in the
17 water rate department regarding whether one water rate
18 taker could look at the work results of another?
19    A.   No.
20    Q.   Did you keep notes -- after flipping
21 through and looking at the stack of results of
22 other water rate takers' work, did you take
23 notes about what you had seen when flipping
24 through?

Page 167

1    A.   No.
2    Q.   Did you ever take notes about what you
3 had seen when flipping through?
4    A.   No.
5    Q.   So how do you remember the results that
6 you saw when flipping through?
7    A.   Because on certain days whatever route
8 he gave me -- like when he was putting me on the
9 north side, I looked to see if anyone else was up
10 there on the north side.  No one else was on the
11 north side.  Then I looked to see how many stops
12 they had did that day as compared to how many
13 stops I did that day.
14    Q.   When you say he put you on the north
15 side, who's he?
16    A.   Well, Tyrone Lewis was the super.  So he
17 assigned us to the north side.  But I recall asking
18 him, Tyrone, doesn't Lenny have a crew, because he
19 put us in crews, to work on the north side.  He
20 said, yes, he does.  I said, I thought the crew
21 consisted of Pat and Bridget and a couple of other
22 peoples.  He said you're right.  I said then how
23 did I get to the north side.  He said you know
24 Lenny makes the decisions.  So he snatched Pat and

Page 168

1 Bridget from the north side and put me up on the
2 north side.
3    Q.   When did you have this conversation with
4 Mr. Lewis?
5    A.   When they assigned me to go to the north
6 side.
7    Q.   When was that?
8    A.   I don't know.  We're all over certain
9 times of the month.  As a matter of fact, we just
10 left the north side two months ago.
11    Q.   Are you referring to a specific
12 conversation when you asked Mr. Lewis doesn't
13 Lenny have a crew that he sends to the north side?
14    A.   Yes.
15    Q.   When did that specific conversation
16 happen?
17    A.   That was at 39th and Iron, but I can't
18 recall -- I do recall.  It was around the time that
19 I did the stop 1/24/12.
20    Q.   You mean January 24th, 2012?
21    A.   Yes.
22    Q.   What does it mean for you to be sent --
23 for Tyrone to send you to the north side?
24    A.   I don't understand.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
169–172

Page 169

1    MR. GOMBERG:  Object to the --
2    MR. JOHNSON: Sure.
3    MR. GOMBERG:  -- question, form of the
4  question.
5    MR. JOHNSON: Sure.
6  BY MR. JOHNSON:
7    Q.   Tyrone sending you to the north side,
8  does that mean your assignment for that day was
9  on the north side of Chicago?
10    A.   Yes.
11    Q.   And in 2012, were there times when
12  Tyrone Lewis would send you to the north side to
13  do posting?
14    A.   Yes.
15    Q.   Were there times when he would send you
16  to the north side to do meter reading?
17    A.   Yes.
18    Q.   Were there times he would send you to
19  the north side to do other assignments?
20    A.   Those were the only two assignments he
21  sent me to the north side to do, either to post or
22  to read water meters.
23    Q.   Did you dislike going to the north side
24  on assignments?

Page 170

1    A.   I'm not as familiar with the north side,
2  then I wasn't, as I am the south side, but I
3  learned.
4    Q.   Did you complain to Mr. Lewis about him
5  sending you to the north side on assignments in
6  2012?
7    A.   No.  I recall making a statement to
8  him, well, why doesn't he send Pat and Bridget to
9  the north side since that's his north side crew.  I
10  wasn't the north side crew.  I was sent on the
11  south side.  But they told Lenny, they meaning Pat
12  and Bridget told Lenny they were not familiar with
13  the north side.  So he snatched them from up there
14  and put me up there.
15    Q.   Whose north side crew are Pat and
16  Bridget?
17    A.   Well, Lenny had crews and he had
18  assigned Pat Durrant and Bridget.  It was about
19  five different rate takers that he had scheduled to
20  work the north side and their assignments always
21  would have been on the north side.  After Pat and
22  Bridget told Lenny they were not familiar with the
23  north side, he pulled them from the north side and
24  sent me up on the north side.

Page 171

1    Q.   Was Mr. Lewis the first supervisor to
2  send you up to the north side on assignments?
3    A.   No.
4    Q.   Who before Mr. Lewis sent you up to the
5  north side on assignments?
6    A.   When we had four stations, whatever
7  station was short of rate takers that day, they
8  sent the rate takers from another station up there.
9  So I was scheduled to Station 2 when I first
10  started.  And if Station 1, which was on Wilson
11  Avenue, didn't have enough rate takers, they didn't
12  come into work that day, they would send the least
13  senior rate taker up there.  And at that time when
14  I first started I was the least senior rate taker.
15  So I ended up going up to Wilson Avenue,
16  Springfield and North Avenue.
17    Q.   What time was that?
18    A.   When I first started working in 1991.
19    Q.   Do you remember who your supervisor was
20  back then?
21    A.   Bob Kroll I think.
22    Q.   Besides Bob Kroll, did any other
23  supervisors send you up to the north side on
24  assignments?

Page 172

1    A.   No, because we had four stations.  So
2  everybody had their own station.
3    Q.   In 2012, did you know what assignment
4  each water rate taker was given by Tyrone Lewis on
5  a daily base?
6    A.   Only if I asked them.
7    Q.   If you asked who?
8    A.   The rate takers.  I would ask them, like
9  I do today, where are you scheduled to work.
10      And they would look on the back, well,
11  I'm on 63rd and Western or I'm on 79th and Oglesby.
12    Q.   In 2012, did you know how many stops on
13  an assignment each water rate taker was given on a
14  daily basis?
15    A.   If we were posting, we were all given
16  the yellow sheets and the sheets -- I think we was
17  doing sheets.  I don't think we had iPads then.
18  And you went out there and you did what you could.
19  Sometimes you finished.  Sometimes you didn't.
20    Q.   Did you always know the exact number of
21  posts that were given to another water rate taker
22  on assignment?
23    A.   Only after they came back into the
24  station and I looked at their cover sheet.



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
173–176

Page 173

1    Q.   And in 2012, how many times did you look
2  at the cover sheet of other water rate takers when
3  they came back in the station?
4    A.   Every day.
5    Q.   Did you look at the cover sheet of
6  other water rate takers -- of all of the other
7  water rate takers every day in 2012?
8    A.   Yes.  Those that submitted cover sheets
9  with their work, yes.
10    Q.   Did you take notes after looking at the
11  cover sheets of all the water rate takers in 2012?
12    A.   I never took notes.
13    Q.   Did you ever -- you mentioned that you
14  were sent to the north side in 1991 on assignments,
15  correct?
16    A.   Yes.
17    Q.   And you were sent to the north side in
18  2012 on assignments, correct?
19    A.   Yes.
20    Q.   Between 1991 and 2012, were you ever
21  sent to the north side on assignments?
22    A.   Yes.
23    Q.   What years?
24    A.   When I first became a water rate taker

Page 174

1  if the Station 1, which was operating at that
2  time -- if enough rate takers didn't come in, they
3  sent the least senior rate takers there.  In 1991,
4  I was the last one to come into the station.  So I
5  had to go to Station 1.  And this happened every
6  time they were short of rate takers.
7        The only time I stopped going to
8  Station 1 on the north side is when they hired
9  other rate takers and I had more seniority than
10  them at the time.  So then that's how Ms. Greenwood
11  ended up at Station 1 because she came in after I
12  did.  So they sent her up to Station 1 and she
13  liked it and the supervisor kept her up there.
14    Q.   Were you ever sent to the north side on
15  assignments in 1992?
16    A.   Yes.
17    Q.   What about 1993?
18    A.   Yes.
19    Q.   In 1994?
20    A.   Yes.
21    Q.   Was there a time every year from 1994 to
22  2012 where you were sent to the north side on
23  assignment?
24    A.   Yes.

Page 175

1    Q.   You mentioned that you would look at
2  all of the water -- in 2012 you would look at all
3  of the water rate takers' cover sheets after they
4  came back from assignment, is that correct?
5    A.   Yes.  If they came back to 39th and
6  Iron, yes.
7    Q.   When would you look at their cover
8  sheets?
9    A.   At the end of the day.
10    Q.   So about what time?
11    A.   If they came in at 2 o'clock, 2:15, 2:30
12  and put their work on the desk.  So it was after
13  their shift had ended.  They were coming back into
14  the station.
15    Q.   So if a water rate taker came in at 2:15
16  and dropped off their cover sheet, were you already
17  at the station?
18    A.   Yes.
19    Q.   In 2012 when you were doing postings,
20  were you usually back at the station by 2 o'clock?
21    A.   Sometimes.
22    Q.   When you were doing reading, meter
23  reading, household meter reading in 2012, were you
24  usually back at the station by 2 o'clock?

Page 176

1    A.   Sometimes I was.
2    Q.   You testified earlier that your hours
3  of work on -- strike that -- in 2012 were 7:00 a.m.
4  to 3:30 p.m., is that correct?
5    A.   Yes.
6    Q.   So the times when you would come in
7  back to the office at 2 o'clock, what would you do
8  until the end of the workday?
9    A.   You had paperwork that you had to fill
10  out because if you get mileage you have to put down
11  what area, what streets you was on in order to get
12  the mileage for the month.
13    Q.   Were you ever disciplined for coming
14  into the office too soon before the end of the
15  workday?
16    A.   What year?
17    Q.   In 2012.
18    A.   I'm not sure.  I don't think so because
19  everybody's coming back now at 2 o'clock because
20  they have to turn in keys, the trucks, and the
21  iPads.
22    Q.   In 2012, what time would you leave the
23  station at the end of the day?
24    A.   Leave the station at the end of the day?



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
177–180

Page 177

1    Q.   Right, to go home.
2    A.   3:30.
3    Q.   So was that every day in 2012?
4    A.   Yes.
5    Q.   So when you would look at the cover
6    sheets of other water rate takers in 2012, this
7    was between the time when you got back from your
8    assignment back to the station and when you left
9    the station at 3:30, is that correct?
10   A.   Yes.
11   Q.   On the days when you in 2012 were back
12   to the station by 2:00 p.m., had you finished all
13   of your assignment?
14   A.   I think so, yes.
15   Q.   Are there dates you can think of where
16   that was not the case?
17   A.   No, I can't think of any offhand, no.
18   MR. JOHNSON:  Could we take a short break?
19   MR. GOMBERG:  Let me ask a question.  How much
20   longer do you have?
21   MR. JOHNSON:  That's part of what I want to
22   take a break for was to discuss with my co-counsel.
23   I mean, I anticipate taking the full seven hours,
24   so...

Page 178

1    MR. GOMBERG:  We're not going beyond 5:00.
2    MR. JOHNSON:  Okay.
3    MR. GOMBERG:  So if you're not going to
4    finish by 5:00, it's okay with me to stop and we'll
5    come back.  It's up to you, but I'm not staying
6    beyond 5:00.
7    MR. JOHNSON:  Uh-huh.
8    MS. NAVE:  What time is it now?
9    MR. JOHNSON:  It's 4:08 -- 4:09.
10   Short break, ten minutes at most.
11   (WHEREUPON, a recess was had from
12   4:09 to 4:21 p.m.)
13   BY MR. JOHNSON:
14   Q.   Ms. Cage --
15   MR. GOMBERG:  Hang on a second.  How about
16   finishing our conversation?
17   MR. JOHNSON:  Oh, sure.  So, yeah, we can stop
18   at 5:00, but then we would like to finish out the
19   seven hours on a different day, get up to seven
20   hours.
21   MR. GOMBERG:  Yeah, I said that.  That's fine.
22   We can pick another day.  But my point was if
23   you're not going to finish -- maybe I didn't make
24   it clear.  If you're not going to finish anyway --

Page 179

1    how much more time of the seven hours, first of
2    all, do you think you have left?
3    MR. JOHNSON:  We still have a bit to get
4    through.  So I think when it's all said and done
5    I'm going to need the full seven hours.
6    MR. GOMBERG:  Not my question.  How much time
7    have we used so far?  Have you been keeping track?
8    Has anybody been keeping track?
9    (WHEREUPON, discussion was had off
10   the record.)
11   MR. GOMBERG:  My suggestion is we just
12   stop now because it's already 4:25 and start up
13   again when we start up again.
14   MR. JOHNSON:  I think -- correct me if I'm
15   wrong, but I think we'd rather get through some
16   more until 5:00 today.
17   MR. GOMBERG:  For what reason?  Do you have a
18   particular reason?
19   MR. JOHNSON:  That's what I prefer.
20   MR. GOMBERG:  I understand that.  I'm talking
21   to you like a person.
22   MR. JOHNSON:  Yeah, sure.
23   MR. GOMBERG:  Why do you prefer that?
24   MR. JOHNSON:  Because --

Page 180

1    MR. GOMBERG:  Because 5 o'clock is obviously
2    an arbitrary time, just like 4:25 is an arbitrary
3    time.  There's no particular reason when we're
4    going to start up again anyway.  What's the sense
5    of going until 5 o'clock?  That's my only question.
6    We're not going to be done today anyway.
7    MS. NAVE:  So we want to get as much done
8    today as we can.  So you set the deadline of
9    5 o'clock.  So we would prefer to get the seven
10   hours done in one day.
11   MR. GOMBERG:  I understand.  I'm just talking
12   to you.  What's the difference because you're going
13   to get it done anyway.  Just get it done on another
14   day.  Why go to the extreme of the time period?
15   MS. NAVE:  Well, I mean --
16   MR. JOHNSON:  Is it that big a deal that we go
17   another 35 minutes?
18   MR. GOMBERG:  To me it is.  To me it is
19   because I'm stopping at 5:00 for a reason.  I got
20   to be somewhere for a particular reason.  So it
21   would make it easier on me if we just stop at
22   4:30.  That's what it is now.  There's no real
23   reason to go to 5:00 except you want to get some
24   things done.  But you're going to get it done



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
181–184

Page 181

1  anyway. We're agreeing to come back. It just
2  makes my life easier.
3      MS. NAVE: Well, if you have no objection
4  going until 5:00, we would prefer to finish at
5  5:00.
6      MR. GOMBERG: Okay. I have an objection.
7      MS. NAVE: Then what is your objection?
8      MR. GOMBERG: What I just said.
9      MS. NAVE: But you said that we would have
10  until 5 o'clock today. So we would prefer to go
11  all the way up until 5:00, which is just an
12  additional half hour.
13      MR. GOMBERG: Just so you know, don't ask me
14  for any favors in the future. This is not even a
15  favor. This is just common sense. You want to
16  play that little game, fine. Let's go.
17      MS. NAVE: Counsel, it's not a game.
18      MR. GOMBERG: It is a game.
19      MS. NAVE: I mean, we're entitled to seven
20  hours in one day.
21      MR. GOMBERG: Look, go ahead.
22      MS. NAVE: You just are telling us today --
23      MR. GOMBERG: Forget about it. Go ahead.
24  Finish until 5:00.

Page 182

1      MS. NAVE: Okay. Thank you.
2      MR. GOMBERG: You'll get the same result from
3  me if you ever ask me for something.
4  BY MR. JOHNSON:
5      Q. Ms. Cage, can you please tell me in your
6  own words why you're suing the City of Chicago?
7      A. Because there were younger employees
8  than myself that are not black that were treated
9  better than I was and still are. They do less work
10  than I do and they're not reprimanded or suspended.
11  They practically do what they want to do and no one
12  says anything.
13          And Mr. Caifano is now gone. I'm doing
14  the same work with no suspensions. It's ironic how
15  all the sudden my work has improved now that he's
16  no longer with the City. When he was with the
17  City, everything I did was wrong.
18      Q. Is there any other reasons why you're
19  suing the City?
20      A. Yes, for the pain and suffering, the
21  aggravation, the lost wages, the seniority that I
22  have lost because every time you get suspended it
23  demotes your seniority.
24      Q. In the entire time that you worked for

Page 183

1  the City as a water rate taker have you ever
2  personally heard any City employees make a
3  derogatory comment regarding your age?
4      A. Mike Duda used to say all the time --
5  he would single out the senior rate takers, which
6  is -- well, Mrs. Williams is gone, but it would be
7  myself and he would say, older rate takers, you all
8  need to just retire. What are you hanging around
9  for. You need to just leave and open up the field
10  so a younger person can come in and do the job.
11      Q. Is there any other City employee who
12  you've personally heard make a derogatory comment
13  regarding your age while you've been a water rate
14  taker?
15      A. Hasn't been derogatory, but they have
16  said, you know, as a matter of fact the other day,
17  Ms. Cage, why don't you just go and retire
18  as old as you are.
19      Q. Who said that?
20      A. One of my fellow rate takers. I don't
21  want to get him in no trouble, so I won't mention
22  his name. But this was said yesterday, you need to
23  retire so that younger people can come in.
24      Q. Besides the fellow water rate taker who

Page 184

1  made a comment yesterday and Mike Duda, is there
2  any other City employee who's made a derogatory or
3  insensitive comment regarding your age as you've
4  been a water rate taker?
5      A. Len Caifano.
6      Q. Is there anyone else?
7      A. No, that's it.
8      Q. In the entire time you have worked for
9  the City water department as a water rate taker
10  have you ever personally heard any City employee
11  make a derogatory or insensitive comment about
12  your race?
13      A. Only Lenny to my knowledge.
14      Q. In the entire time that you've worked in
15  the City water department as a water rate taker
16  have you ever personally heard a City employee make
17  a derogatory or insensitive comment about your
18  gender?
19      A. Well, where I work at it's a lot of men.
20  I think it's me and one other lady in the section
21  where we work at. So men tend to be men. They
22  talk like it's all men there. So I hear it and I
23  don't hear it. So when they're cursing and making
24  statements, I hear and I don't hear.



Page 185

1    Q.   Are there specific comments that you've
2  heard during your time as a water rate taker made
3  by City employees that were insensitive about your
4  gender?
5    A.   No, no one other than Len Caifano.  For
6  the most part, most of them when they see a lady,
7  they say, oh, excuse me, Ms. Cage.
8    Q.   In the entire time you've been working
9  as a water rate taker in the City water department
10  have you ever heard Tyrone Lewis make a derogatory
11  or insensitive comment about your age?
12    A.   No.
13    Q.   Have you ever heard Mr. Lewis make a
14  derogatory or insensitive comment about your race?
15    A.   No.  We are the same race.
16    Q.   Have you ever heard Mr. Lewis make a
17  derogatory or insensitive comment about your
18  gender?
19    A.   No.
20    Q.   Your entire time working for the City
21  as a City water -- strike that -- as a water rate
22  taker have you ever heard a City employee make a
23  derogatory or insensitive comment about you having
24  filed a charge or a complaint in the past?

Page 186

1    A.   No.
2    Q.   You never heard Mr. --
3    A.   Just Lenny, just Lenny.  None of my
4  co-workers and not Mr. Lewis.
5    Q.   So besides Mr. Caifano, you never
6  personally heard another City employee make a
7  derogatory or insensitive comment about you
8  having filed a charge or a complaint in the past?
9    A.   No.
10    Q.   What comment did Mr. Caifano make about
11  your age?
12    A.   He made the statement that I was an old
13  nigger bitch.
14    Q.   And this was January 24th, 2012?
15    A.   Yes.
16    Q.   Is there any other comment Mr. Caifano
17  has ever made about your age that was derogatory or insensitive
18  about your age?
19    A.   One other time I had a meeting with him.
20  March, 2013, I think.
21    Q.   Did he make a derogatory or insensitive
22  comment about your age in March, 2013?
23    A.   No, but the statement he made after we
24  had had our discussion about him continuing to

Page 187

1  suspend me -- he's very arrogant and he said now
2  get the fuck out of my office, you motherfucker.
3    Q.   When did he say get the fuck out of my
4  office, you motherfucker?
5    A.   We had a discussion I think it was
6  3/8/13.
7    Q.   So that's March 8th, 2013?
8    A.   Yes.
9    Q.   How do you remember that exact date?
10    A.   Because them are the only two instances
11  that I remember talking to Lenny because normally I
12  try to avoid him.
13    Q.   On March 8th, 2013 -- strike that.
14         January 24th, 2012, and this instance
15  in March, 2013 -- strike that -- March 8th, 2013,
16  were the only two times you talked to Lenny
17  Caifano?
18    A.   I talked to him all the time, but those
19  were the only two times that I asked him -- talked
20  to him about being suspended.
21    Q.   And March 8th, 2013, when he said get
22  the fuck out of my office, motherfucker, was
23  anyone else around to hear that comment?
24    A.   No.

Page 188

1    Q.   When during the day did that comment
2  take place?
3    A.   When I came back in from the field.
4    Q.   So about what time?
5    A.   About 2:30.
6    Q.   Where were you when he made that
7  comment?
8    A.   39th and Iron in the conference room.
9    Q.   What comment did Mike Duda make that
10  was derogatory or insensitive about your age?
11    A.   The statement that Mike made when I
12  had asked him why he was following me and he didn't
13  follow any other rate taker.  And he told me I need
14  to shut up and be glad I still have a job and to
15  get back in the field before I get suspended.
16    Q.   Sorry.  Circling back real quick,
17  besides January 24th, 2012, and March 8th, 2013,
18  was there any other comment made by Mr. Caifano
19  about your age?
20    A.   Not to me.
21    Q.   When did Mike Duda say shut up and be
22  glad you have a job?
23    A.   I'm trying to think of the year because
24  one of my co-workers have filed a grievance on him



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
189–192

Page 189

1 about some derogatory remarks he made to her, so
2 this is in the same time frame. I just can't
3 recall the year.
4     Q. Was it before 2010?
5     A. No, no.
6     Q. Was it in 2011?
7     A. No. It may have been '12 because I had
8 had trouble and they was letting me use the City
9 truck to complete my route.
10     Q. When he said shut up and be glad you
11 have a job, where exactly were you when he made
12 that comment?
13     A. In the field.
14     Q. Was he with you in the field?
15     A. No. He had followed me to the location
16 I was at.
17     Q. So when he made the comment, it was
18 physically -- he was physically with you in your
19 presence? It was in person?
20     A. Yes.
21     Q. Was anyone else there to hear this
22 comment?
23     A. No.
24     Q. Do you remember about what time of day

Page 190

1 it was made, this comment?
2     A. 12 o'clock.
3     Q. Exactly 12 o'clock?
4     A. Exactly 12:00.
5     Q. How do you remember it was exactly
6 12:00?
7     A. Because when Mike follows you -- you
8 know, like I said, when he caught me, I was getting
9 ready to go to lunch and he pulled up in the back
10 of me.
11     Q. Besides this comment in about 2012
12 one day at noon when Mike Duda told you shut up and
13 be glad you have a job, is there any other comment
14 Mike Duda ever made that was derogatory or
15 insensitive about your age?
16     A. No.
17     Q. Which fellow employee had an issue with
18 statements made by Mike Duda?
19     A. Leslie Travis Cook.
20     Q. Anyone else?
21     A. A rate taker named Francisco Rios.
22     Q. Anyone else?
23     A. Well, this gentleman retired. His name
24 was Ed Bandera.

Page 191

1     Q. Anyone else?
2     A. Well, he called Bridget Jones a stupid
3 bitch.
4     Q. Did you hear him call Bridget Jones a
5 stupid bitch?
6     A. Yes. It was in the station. When Mike
7 say something, it's like this room. He doesn't
8 take you anywhere. He just says it out loud.
9     Q. When did he call Bridget Jones a stupid
10 bitch?
11     A. Bridget was back up -- it was back
12 around maybe '10 or '11, 2010, 2011.
13     Q. Do you remember who else besides you
14 heard the comment?
15     A. The entire station, every rate taker
16 that was at work that day.
17     Q. What time of day was the comment made?
18     A. In the morning after 7:00 a.m.
19     Q. Was there any other fellow water rate
20 taker you can think of that had an issue with
21 Mike Duda's comments?
22     A. No, that's it.
23     Q. The comment that Mike Duda made, quote,
24 "shut up and be glad you have a job," why do you

Page 192

1 believe that was age related?
2     A. Because I haven't heard him use that
3 statement or talk to any other younger rate taker
4 that way.
5     Q. Are you present every time Mike Duda
6 speaks with other water rate takers?
7     A. When he was a supervisor and we was
8 stationed at 79th Street, yes.
9     Q. Did Mike Duda visit other water rate
10 takers in the field?
11     A. I don't think he did because that was
12 the question, why are you following me and not
13 someone else.
14     Q. Did Mike Duda ever have private
15 conversations with other water rate takers?
16     A. No one liked Mike. They didn't even
17 like talking to Mike. Francisco Rios threatened to
18 beat him in the station because he was harassing
19 him so bad.
20     Q. You heard Francisco threaten to beat
21 Mike Duda up?
22     A. Yes, I did.
23     Q. What words did he use exactly? What
24 words did Rios use?



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
193–196

Page 193

1    A.   Mike, if you don't leave me alone, I'll
2  fuck you up.
3    Q.   Is there any other reason why you think
4  Mike Duda's comment in 2012 shut up and be glad I
5  have a job -- be glad you have a job was related to
6  your age?
7    A.   Yes.  The way Mike talks to you, it's
8  demeaning.  That's why I had filed a grievance with
9  the union that I didn't want to have any contact
10  with Mike at all.  And it went to Lenny, but
11  nothing happened.
12    Q.   Is there any other reason why you think
13  his comment shut up and be glad you have a job was
14  related to your age?
15    A.   No, just that.
16    Q.   Len Caifano's comment on March 8th,
17  2013, quote, "Get the fuck out of my office, you
18  motherfucker," why do you think that was related to
19  your age?
20    A.   Because I'm a black female.
21    Q.   Is there any other reason?
22    A.   No, that's the only reason.
23    Q.   So is there any other comment that
24  Mike Duda made that was insensitive or derogatory

Page 194

1  about your age besides that comment in about 2012,
2  shut up and be glad you have a job?
3    A.   Not to me, no.
4    Q.   You mentioned that Len Caifano has made
5  a comment that was insensitive or derogatory about
6  your race, is that right?
7    A.   Yes.
8    Q.   What comment did Len Caifano make
9  that was derogatory or insensitive about your race?
10    A.   I consider "nigger" derogatory.  The
11  word "nigger," I consider it derogatory.
12    Q.   And he said this to you?
13    A.   Yes.
14    Q.   When did he say this to you?
15    A.   1/24/12.
16    Q.   Did he ever say nigger to you on another
17  occasion besides January 24th, 2012?
18    A.   No.
19    Q.   Is there any other comment that
20  Lenny made to you that was derogatory or
21  insensitive about your race?
22    A.   No, not to me.
23    Q.   You mentioned that Len Caifano made a
24  comment to you that was derogatory or insensitive

Page 195

1  about your gender, is that correct?
2    A.   Yes.
3    Q.   What comment did Lenny make that was
4  derogatory or insensitive about your gender?
5    A.   You old nigger bitch.
6    Q.   When was that comment made?
7    A.   1/24/12.
8    Q.   Was there any comment besides that one
9  on 1/24/2012 that Len Caifano made insensitive or
10  derogatory about your gender?
11    A.   No.
12    Q.   And you testified that no one has ever
13  while you've been a water rate taker made a
14  derogatory or insensitive comment about you having
15  filed charges or complaints in the past?
16    A.   No, only Lenny.
17    Q.   So to be clear, Len Caifano has never
18  made a comment to you, a negative comment to you
19  about having filed charges or complaints in the
20  past?
21    MR. GOMBERG:  Object to the form of the
22  question.
23    MR. JOHNSON:  Sure.
24

Page 196

1  BY MR. JOHNSON:
2    Q.   Has Len Caifano ever criticized you for
3  making complaints or filing charges in the past?
4    A.   Yes.  The statement that we had on
5  1/24/12 when I asked him he know as well as I do I
6  do more work than the majority of the rate takers,
7  so why am I the only one being suspended.  And his
8  comment was as long as you keep filing charges,
9  I'll keep suspending you.
10    Q.   Those were his exact words?
11    A.   Those were his exact words.
12    Q.   And when did that conversation take
13  place?
14    A.   1/24/12.
15    Q.   Was it the same conversation in which he
16  called you an old nigger bitch?
17    A.   Same conversation.
18    Q.   And was anyone else present?
19    A.   No.
20    Q.   Besides that comment on January 24th,
21  2012, where Mr. Caifano said as long as you keep
22  filing charges, I'll keep suspending you, is there
23  any other time when Mr. Caifano criticized you for
24  filing charges or complaints?



OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
197–200

Page 197

1    A.   No, because the other conversation we
2 had was in March.  And when I asked him about am I
3 suspended then, he said it is what it is.  I'm the
4 chief.
5    Q.   Do you consider that to be critical of
6 you because you filed charges or complaints in the
7 past?
8    A.   Well, the way he said it, yes.
9    Q.   So is there any other time where
10 Mr. Caifano made critical comments of you
11 because you filed charges or complaints in the
12 past?
13    MR. GOMBERG:  Objection --
14 BY THE WITNESS:
15    A.   No.
16    MR. GOMBERG:  -- to the form of the question.
17 BY MR. JOHNSON:
18    Q.   Is there any other time besides
19 January 24th, 2012, and March when he said it is
20 what it is when Mr. Caifano criticized you because
21 you previously filed charges or complaints in the
22 past?
23    MR. GOMBERG:  Object to the form of the
24 question.

Page 198

1 BY MR. JOHNSON:
2    Q.   You can still answer.
3    A.   No.
4    Q.   So other than what we've discussed, are
5 there any other reasons why you're suing the City?
6    MR. GOMBERG:  Objection.
7 BY THE WITNESS:
8    A.   I can still answer that?
9 BY MR. JOHNSON:
10    Q.   Uh-huh.
11    A.   The only other reason is I wasn't
12 treated fairly.
13    Q.   What do you mean you weren't treated
14 fairly?
15    A.   I was not treated the way my fellow
16 co-workers were treated.  Those co-workers did far
17 less work than myself.
18    Q.   Who do you believe did not treat you
19 fairly?
20    A.   Len Caifano.
21    Q.   Is there anyone else you believe did not
22 treat you fairly?
23    A.   Well, Tyrone did what Lenny told him to
24 do.  So that's why he's involved in it.

Page 199

1    Q.   Is there anyone else who you believe did
2 not treat you fairly?
3    A.   Mike Duda.
4    Q.   Is there anyone else you believe did not
5 treat you fairly?
6    A.   That's it.
7    MR. JOHNSON:  I think we're good for today.
8 We're finished for today.  Thank you.  Thank you.
9    MS. NAVE:  Etran.
10    MR. GOMBERG:  I assume you're not through with
11 the deposition?
12    MR. JOHNSON:  Correct.
13    (Time Noted:  4:54 p.m.)
14    (WHEREUPON, the deposition was
15    adjourned sine die.)
16
17
18
19
20
21
22
23
24

Page 200

1  STATE OF ILLINOIS   )
2                      )  SS:
3  COUNTY OF DUPAGE    )
4       I, JULIE A. CONROY, CSR No. 84-2251, a
5  Notary Public within and for the County of DuPage,
6  State of Illinois, and a Certified Shorthand
7  Reporter of said state, do hereby certify:
8       That previous to the commencement of the
9  examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12       That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony
16  given and the proceedings had;
17       That the said deposition was taken
18  before me at the time and place specified;
19       That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24       IN WITNESS WHEREOF, I do hereunto set my

OPHELIA CAGE
CAGE vs. CITY OF CHICAGO

April 29, 2015
201–202

Page 201

1  hand of office at Chicago, Illinois, this 13th day

2  of May, 2015.

3

4  *Julie A. Conroy*

5

6      Julie A. Conroy, CSR No. 84-2251

7      Notary Public, DuPage County, Illinois.

8      My commission expires 6/6/17.

9      ┌─────────────────────────────┐
       │        OFFICIAL SEAL        │
10     │        JULIE A CONROY       │
       │  NOTARY PUBLIC - STATE OF ILLINOIS  │
11     │  MY COMMISSION EXPIRES:06/06/17   │
       └─────────────────────────────┘

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 202

1              I N D E X

2  WITNESS                    EXAMINATION

3  OPHELIA CAGE

4      BY MR. JOHNSON              3

5

6

7

8          E X H I B I T S

9  NUMBER                        PAGE

10 Cage Deposition

11     Exhibit No. 1              19

12     Exhibit No. 2              70

13     Group Exhibit No. 3        89

14     Exhibit No. 4              94

15     Exhibit No. 5              96

16     Exhibit No. 6             101

17     Exhibit No. 7             111

18     Exhibit No. 8             112

19     Exhibit No. 9             125

20     Exhibit No. 10            127

21

22

23

24

