Case: 1:14-cv-06818 Document #: 41-2 Filed: 12/21/15 Page 1 of 37 PageID #:805

OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
203–206

Page 203

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4
5    OPHELIA CAGE,              )
6              Plaintiff,       )
7    vs.                        )  No. 1:14-cv-6818
8    THE CITY OF CHICAGO, a     )
9    Municipal Corporation,     )
10             Defendant.       )
11
12         The continued deposition of OPHELIA
13   CAGE, called for examination, taken pursuant to the
14   Federal Rules of Civil Procedure of the United States
15   District Courts pertaining to the taking of
16   depositions, taken before MARILYN T. LaPORTE, a Notary
17   Public within and for the County of Cook, State of
18   Illinois, and a Certified Shorthand Reporter of said
19   state, at Suite 1040, Conference Room B, 30 North
20   LaSalle Street, Chicago, Illinois, on June 9, 2015, at
21   10:15 a.m.
22
23
24

Page 204

1    PRESENT:
2        BARRY A. GOMBERG & ASSOCIATES,
3        (53 West Jackson Boulevard, Suite 1350,
4        Chicago, Illinois  60604,
5        312-922-0550), by:
6        MR. BARRY A. GOMBERG,
7        gomberglaw@aol.com,
8              appeared on behalf of the Plaintiff;
9
10
11       OFFICE OF THE CORPORATION COUNSEL,
12       CITY OF CHICAGO,
13       (30 North LaSalle Street, Suite 1020,
14       Chicago, Illinois  60602,
15       312-744-5122), by:
16       MS. DEJA C. NAVE,
17       deja.nave@cityofchicago.org,
18       MS. MEIRA GREENBERG,
19       MR. CARL JOHNSON,
20             appeared on behalf of the Defendant.
21
22
23   REPORTED BY:  MARILYN T. LaPORTE, CSR, RPR
24             CSR CERTIFICATE NO. 84-2095.

Page 205

1         (WHEREUPON, the witness was duly
2    sworn.)
3    MS. NAVE:  The time now is 10:15 a.m. on
4    June 9th, 2015.  This is the continuation of Plaintiff
5    Ophelia Cage's deposition in the matter of Cage versus
6    City of Chicago, 14 C 6818.
7         This deposition is being taken pursuant
8    to notice and upon agreement of the parties.  It is
9    also taken pursuant to all applicable federal and
10   local rules.
11        OPHELIA CAGE,
12   called as a witness herein, having been duly sworn,
13   was examined and testified further as follows:
14        EXAMINATION (Resumed)
15   BY MS. NAVE:
16   Q.   Ms. Cage, before we get started I just
17   want to remind you of a few of the ground rules for
18   today.  Okay?
19   A.   Okay.
20   Q.   So, first, please remember that all of
21   your answers have to be verbal so that the court
22   reporter can take them down.  Okay?
23   A.   Okay.
24   Q.   And also you may anticipate my question,

Page 206

1    but please just allow me to finish asking my question
2    before you respond.  Okay?
3    A.   Okay.
4    Q.   And if you don't understand one of
5    questions, or you want me to reask it, just let me
6    know.  I can clarify or repeat the question for you.
7    Okay?
8    A.   Okay.
9    Q.   If you answer the question, I'm going
10   to assume that you understood it, and that you're
11   answering it to the best of your ability.  Okay?
12   A.   Okay.
13   Q.   Is there any reason today that your memory
14   might be impaired?
15   A.   No.
16   Q.   Is there any reason today that your
17   ability to answer my questions truthfully may be
18   impaired?
19   A.   No.
20   Q.   Did you speak with Jessie Greenwood about
21   your lawsuit prior to her deposition on May 1st, 2015?
22   A.   No.
23   Q.   Did you talk to her about being a witness
24   in your lawsuit?



OPHELIA CAGE

OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015

207–210

Page 207

1    A.   No.

2    Q.   Did you talk to her about her deposition

3  before she was deposed on May 1st?

4    A.   No.

5    Q.   When was the last time you spoke with

6  Ms. Greenwood?

7    A.   January, February of this year.

8    Q.   Was that by phone or in-person?

9    A.   By phone.

10    Q.   Did you call her?

11    A.   Yes.

12    Q.   What did you discuss?

13    A.   How she was doing on her retirement.

14    Q.   About how many times have you talked to

15  Ms. Greenwood since her retirement from the City?

16    A.   Maybe three times.

17    Q.   Is there a reason why you decided to call

18  her in January or February of this year?

19    A.   No.  No particular reason.

20    Q.   You also sat in on Ms. Greenwood's

21  deposition, correct?

22    A.   Yes.

23    Q.   Did you speak to Ms. Greenwood during

24  breaks at her deposition?

Page 208

1    A.   No.

2    Q.   When was the last conversation that you

3  had with Ms. Greenwood regarding Len Caifano?

4    A.   When she --

5    MR. GOMBERG:  Wait.  Wait.  Wait.  Wait.  Hang

6  on a second.  Can you repeat the question?

7        (WHEREUPON, the record was read by

8        the reporter as requested.)

9    MR. GOMBERG:  Objection.  You're assuming facts

10  not in evidence.

11  BY MS. NAVE:

12    Q.   You may answer my question.

13    A.   When she was still working for the City.

14    Q.   When is the last conversation that you had

15  with Ms. Greenwood regarding Mike Duda?

16    MR. GOMBERG:  Objection.

17  BY THE WITNESS:

18    A.   It's been a long time.  I don't know.

19  BY MS. NAVE:

20    Q.   Was it while you were working -- while she

21  was working for the City?

22    MR. GOMBERG:  Objection.

23  BY THE WITNESS:

24    A.   Yes.

Page 209

1  BY MS. NAVE:

2    Q.   Have you talked to Ms. Greenwood since her

3  deposition?

4    A.   No.

5    Q.   Do you know whether your attorney or

6  anyone from his office has contacted Ms. Greenwood

7  either before or after her deposition?

8    A.   No.

9    Q.   No?  You don't know?  Or, no?  They have

10  not contacted her?

11    A.   No.  I don't know.

12    Q.   Would you consider Ms. Greenwood to be a

13  friend?

14    A.   Yes.

15    MR. GOMBERG:  Objection.  Give me time to object

16  before you answer, if I want to object.

17  BY THE WITNESS:

18    A.   Okay.

19  BY MS. NAVE:

20    Q.   Did you socialize with Ms. Greenwood

21  outside of work when she was a water rate taker for

22  the City?

23    A.   Yes.

24    Q.   Has she met your family?

Page 210

1    MR. GOMBERG:  Objection.

2  BY THE WITNESS:

3    A.   Not all of 'em, no.

4  BY MS. NAVE:

5    Q.   But she has met some of your family

6  members?

7    A.   Two.

8    Q.   Who has she met?

9    A.   My granddaughter and my daughter.

10    Q.   Have you met any of Ms. Greenwood's

11  family?

12    A.   Yes.

13    Q.   Who have you met?

14    A.   Her two daughters and three grandchildren.

15    Q.   Where did you meet her family members?

16    A.   At her home.

17    Q.   Has Ms. Greenwood also been to your home?

18    A.   No.

19    Q.   Other than going to Ms. Greenwood's home,

20  what other types of activities did you do with

21  Ms. Greenwood outside of work when she was a water

22  rate taker?

23    MR. GOMBERG:  Objection.

24



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
211–214

Page 211

1  BY THE WITNESS:
2      A.   Her retirement party.
3  BY MS. NAVE:
4      Q.   Is that the only time that you socialized
5  outside of work with Ms. Greenwood?
6      A.   Yes.
7      Q.   And then when did you go to her home?
8      A.   Her daughter had a baby shower, and I went
9  there.
10     Q.   Was that when Ms. Greenwood was still
11  working for the City?
12     A.   Yes.
13     Q.   Other than the retirement party and the
14  baby shower, were there any other events that you
15  attended with Ms. Greenwood?
16     A.   No.
17     Q.   Have you socialized with Ms. Greenwood
18  since her retirement from the City?
19     A.   No.
20     Q.   When you were working at 49th and Western
21  in 2012, did you ever have the occasion to go to 39th
22  and Iron?
23     A.   Yes.
24     Q.   How many times in 2012 did you go to 39th

Page 212

1  and Iron?
2      A.   I think we were stationed there in 2012.
3      Q.   And we'll come back to that.  So then do
4  you believe that you were stationed at 49th and
5  Western in 2011?
6      A.   I'm not sure.
7      Q.   When do you believe you were stationed at
8  49th and Western?
9      A.   When they closed the other three stations.
10     Q.   Do you recall when that was?
11     A.   No.  'Cause they closed 'em at different
12  times.
13     Q.   When did they close the last station?
14     A.   I have no idea.
15     Q.   Would anything refresh your memory?
16     A.   No.
17     Q.   And the last station to close was 79th?
18     A.   Yes.
19     Q.   So when you were at 49th and Western, how
20  many times did you go to 39th and Iron during that
21  year?
22     A.   The only time I can recall is when they
23  closed up 49th and Western, and they stationed us at
24  39th and Iron.

Page 213

1      Q.   So when you were at 49th and Western,
2  you had no occasion to go to 39th and Iron?
3      A.   No.
4      Q.   When you were stationed at 49th and
5  Western, were there any water rate takers assigned
6  to 39th and Iron?
7      A.   Not from 49th and Western.
8      Q.   I just want to make sure that I have your
9  answer clear.
10          When you were stationed at 49th and
11  Western, were there any water rate takers at 39th
12  and Iron?
13     A.   Yes.
14     Q.   Which water rate takers were at 39th and
15  Iron when you were stationed at 49th and Western?
16     A.   Pat Durant.  Bridgette Jones.
17  Jerry Robinson.  Roze O'Neal.  Rios.  Francisco Rios.
18     Q.   Anyone else?
19     A.   Rudy Esposito.  Marcos, and I don't know
20  his last name.  John Vasquez.  Jeff Sojka.
21     Q.   Anyone else?
22     A.   No, that's it.
23     Q.   Were there any water rate assessors at
24  39th and Iron?

Page 214

1      A.   Yes.
2      Q.   Who were the water rate assessors do you
3  believe?
4      A.   Jerry Robinson, Roze O'Neal, Ed Rodriguez,
5  and Tom Russnak.
6      Q.   Any other water rate assessors assigned
7  to 39th and Iron when you were stationed at 49th and
8  Western?
9      A.   No.
10     Q.   Now, you also mentioned Robinson and
11  O'Neal as water rate takers.
12          Do you understand that there's a
13  difference between a water rate taker and a water rate
14  assessor?
15     A.   Only the title.  The pay is the same.
16     Q.   Do water rate assessors perform different
17  duties than the water rate takers?
18     A.   Yes.
19     Q.   And what is your understanding of the
20  duties that are performed by water rate assessors?
21     A.   SEO 1's, full payment certificates,
22  SEO 2's, and I think that's it.
23     Q.   You believe that those are the types of
24  assignments that water rate assessors have?



Case: 1:14-cv-06818 Document #: 41-2 Filed: 12/21/15 Page 4 of 37 PageID #:808

OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
215–218

Page 215

1    A.   Yes.
2    Q.   When you were at 49th and Western, was
3 Mike Duda stationed at 39th and Iron?
4    A.   He was at 79th and the lakefront until
5 they closed it, and then he came to 49th and Western.
6    Q.   How long was he at 49th and Western during
7 the time period that you were at 49th and Western?
8    A.   Until they transferred us to 39th and
9 Iron.
10    Q.   So was there ever a time period when
11 Mike Duda was at 39th and Iron while you were at
12 49th and Western?
13    A.   Yes.  When Mr. Califano (sic) would take
14 off, Mike would go down to 39th and Iron to assume his
15 duties until he returned.
16    Q.   When you were at 49th and Western, did you
17 report to Tyrone Lewis on a day-to-day basis?
18    A.   Yes.
19    Q.   When you were at 49th and Western, you did
20 not report to Mike Duda on a day-to-day basis?
21    A.   Mike Duda and Tyrone Lewis both shared the
22 office there.  So it depended on who decided to give
23 us the work that day.  Sometimes it would be Tyrone.
24 Sometimes it would be Mike Duda.

Page 216

1    Q.   But the majority of the time you received
2 your assignments from Tyrone Lewis when you were at
3 49th and Western, correct?
4    A.   Yes.
5    Q.   Now, when you were at 49th and Western,
6 Len Caifano was stationed at 39th and Iron, correct?
7    A.   Yes.
8    Q.   Were you ever assigned to the same station
9 as Len Caifano?
10    A.   When I first became a water rate taker.
11    Q.   And what station was that?
12    A.   Station 2.
13    Q.   What's the intersection or address of that
14 station?
15    A.   2352 South Ashland.
16    Q.   And for how long did you work at the same
17 station as Mr. Caifano when you first started as a
18 water rate taker?
19    A.   I started in 1991 as a water rate taker.
20 So from '91 until he assumed the title of chief water
21 rate taker.
22    Q.   When did Mr. Caifano assume the title of
23 chief water rate taker?
24    A.   It was a political move so I guess when he

Page 217

1 bought enough tickets.
2    Q.   Do you know the year that Mr. Caifano
3 became a chief water rate taker?
4    A.   No.
5    Q.   So after Mr. Caifano became a chief water
6 rate taker, did the two of you ever work out of the
7 same station together?
8    A.   No.
9    Q.   When you were assigned to 49th and
10 Western, was any water rate taker that you're aware
11 of assigned to work in the same neighborhood on a
12 daily basis?
13    A.   Yes.
14    Q.   Which water rate takers?
15    A.   I had a particular location, which was on
16 the South Side.  All of the rate takers had a
17 different part of the city because when Mr. Tyrone
18 Lewis came we had already been in those areas.  So he
19 just became the supervisor, but we already had our
20 routes.
21    Q.   What other water rate takers, in your
22 opinion, were primarily assigned to the South Side
23 under Tyrone Lewis?
24    A.   I know I had the South Side.  I'm trying

Page 218

1 to think.  He's a police officer now.  I used to sit
2 beside him.  He had the South Side.  I can't think
3 of his name.
4    Q.   Do you know the race of that individual?
5    A.   Hispanic.  Adolfo.  That's his name.
6 Adolfo Garcia I think his name is.
7    Q.   When you were at 49th and Western, were
8 any other water rate takers assigned to the South Side
9 primarily?
10    A.   I don't think so.
11    Q.   When you were at 49th and Western, were
12 there any water rate takers who were primarily
13 assigned to the North Side?
14    A.   The North Side rate takers came out of
15 Station 3.  When they closed down that station,
16 whatever rate takers was doing the North Side, they
17 continued to do the North Side.
18    Q.   Do you know which water rate takers those
19 were?
20    A.   Len Califano had a North Side crew that
21 consisted of Pat Durant.  Bridgette Jones.
22 Francisco Rios.  Khan does the North Side today
23 so he's been doing it all along.
24    Q.   Ianyat Khan?



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
219–222

Page 219

1    A.    Yes.
2    Q.    Anyone else?
3    A.    No.  Not that I know of.
4    Q.    Do you know whether any of those water
5  rate takers you just mentioned ever worked on the
6  South Side?
7    A.    Yes.
8    Q.    They have?
9    A.    Yes.
10    Q.    Other than the water rate takers you
11  mentioned, where were the other water rate takers
12  assigned, if you know, in terms of location within
13  the city?
14    A.    Demetrius Sims worked the West Side.  That
15  was his area.  Ms. Greenwood was like me.  She went
16  north or south.
17        Let's see.  Travis Cook was whichever side
18  they needed work done in.  We have two-man crews.
19  Those are the trucks, and they go all over.
20    Q.    So were there any other water rate takers
21  that were assigned primarily to a certain location
22  within the city?
23    A.    No.  I think just those.
24    Q.    So did you believe that you could not be

Page 220

1  assigned to any other location in the city other than
2  the South Side?
3    A.    No.
4    Q.    Did you understand that as a water rate
5  taker you could be assigned to any location within the
6  city?
7    A.    Yes.
8    Q.    I want to talk about your typical workday
9  in 2012.  So that's the time period that we're going
10  to focus on.  Okay?
11    A.    Okay.
12    Q.    What time did you typically arrive to work
13  in 2012?
14    A.    At 6:30.
15    Q.    What did you do when you arrived at the
16  station?
17    A.    I opened up the door.  We had a lockbox,
18  and they gave us the combination.
19    Q.    After you got into the station, what did
20  you do?
21    A.    I sat at my desk and waited for the
22  supervisor and the rest of the rate takers to come to
23  work.
24    Q.    What would you do at your desk?

Page 221

1    A.    I'd just sit there.  There was nothing
2  to do.
3    Q.    So why did you get to work so early?
4    A.    I allowed for the weather.
5    Q.    Was anyone else at the station when you
6  arrived at 6:30 usually?
7    A.    No.
8    Q.    When would you receive your work
9  assignment for the day?
10    A.    When the supervisors came in, they gave us
11  our work.
12    Q.    Now, let's say, "Tyrone Lewis."  When
13  would he usually arrive to work in 2012?
14    A.    A little after I did.
15    Q.    When you received your work assignment,
16  what would you do next?
17    A.    Depending on what it was, if it was
18  charitables, and they gave it to you on the iPad, you
19  would go -- I would go through the iPad to see what
20  area I was in.
21    Q.    So you believe that you were working on
22  the iPads in 2012?
23    A.    Yes.  Not the iPads.  The G5.
24    Q.    And what if you received a route?  What

Page 222

1  would you do once you received that assignment?
2    A.    Well, they always loaded more than one
3  route in the G5.  Sometimes you may have two, three,
4  maybe four routes.
5    Q.    So did you do anything to prepare to
6  undertake that assignment before you left the station?
7    A.    Yes.  I opened it up with my employee
8  number.  That's the only way you could open it up, and
9  I would go through the routes to see where they were
10  located, and that determined where I was going to go
11  when I left the station.
12    Q.    Now, did you do anything else to prepare
13  to complete your route?
14    A.    No.
15    Q.    What if you were assigned to do postings?
16  Did you do anything to prepare before you left the
17  station?
18    A.    When we started posting, we had paper and
19  pencil.  So at first they started putting the postings
20  in order for all the rate takers, and then for some
21  reason they stopped, and you had to sort 'em out.
22    Q.    So remember we're just focusing on 2012.
23  In 2012, were the postings sorted out for you?
24    A.    Yes.



OPHELIA CAGE                                          June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                      223–226

Page 223

1  Q.  Did you do anything to prepare before you
2  left the station to do your postings?
3  A.  After they stopped putting them in order,
4  we had to put them in order.
5  Q.  But in 2012 you said that they were
6  putting them in order for you, correct?
7  A.  They started, and then they stopped.
8  Q.  At the end of 2012 they stopped putting
9  them in order?
10  A.  I don't know when they stopped, but when
11  they stopped we had to do it.
12  Q.  Well, do you know if they stopped putting
13  them in order in 2012?
14  A.  No.  I'm gonna say, "they put 'em in order
15  in 2012."
16  Q.  Because they put them in order did you
17  do anything with the postings once you received that
18  assignment before you left the station in 2012?
19  A.  You made out your top sheet.
20  Q.  What is the top sheet?
21  A.  It has on there how many stops they have
22  assigned you.  You put your name, and your employee
23  number on there, and at the end of the day when you
24  bring it back in you put on there if you have some

Page 224

1  stops that you didn't get to, and you total that up
2  with the stops you have done.
3  Q.  Other than filling out the top sheet, did
4  you do anything else to prepare before you left the
5  station to do your postings?
6  A.  No.
7  Q.  Did you keep a street guide in your car in
8  2012?
9  A.  Yes.
10  Q.  Now, going back to meter readings or a
11  route, did you have a process or a routine that you
12  liked to follow when doing a route?
13  A.  I don't understand the question.
14  Q.  For example, did you like to park your car
15  in a certain location and then walk to addresses that
16  were close by?
17  Did you ring the doorbell?  Knock on the
18  door?  Things of that nature?  Did you follow any sort
19  of process or routine?
20  A.  Yes.  But it was up to the individual rate
21  takers.  In certain neighborhoods, you didn't leave
22  your car running.
23  In other neighborhoods, you could, you
24  know, leave it running, or keep it unlocked and walk

Page 225

1  the entire route.  But in certain areas you couldn't.
2  Q.  Okay.  So did you have a particular
3  routine that you liked to follow when you were doing
4  the meter readings?
5  A.  I would park on the block.  See how many
6  stops I had on the block.  Then get my tools together,
7  and then get out and proceed to knock on the doors or
8  read the meters that were in the vaults.
9  Q.  After you knocked on the door, how long
10  would you wait typically before you determined that
11  nobody was there?
12  A.  I would ring the bell.  If no one came
13  after about two minutes, and it was three bells, I
14  would then proceed to ring each bell until someone
15  answered.
16  Q.  And when you say, "ring each bell," what
17  are you referring to?
18  A.  The doorbells.
19  Q.  You mean at properties that had more than
20  one doorbell?
21  A.  Yes.
22  Q.  Did you always follow that process?
23  A.  Yes.
24  Q.  If no one answered and you couldn't gain

Page 226

1  entry, did you ever circle back to attempt to gain
2  entry later on in the day?
3  A.  At the end of the day, after lunch if I
4  had time, I would.
5  Q.  Now, again, focusing on 2012, what time
6  would you typically return to the station?
7  A.  It depend on how far my route was from the
8  station.  If it was right around the corner, I still
9  wouldn't get back until about 2:15.  2:30.
10  Q.  And your day ended at 3:30, correct?
11  A.  Yes.
12  Q.  So what would you do for that hour?
13  A.  I would do the paperwork that I had to do.
14  If you were getting mileage, you had to write down the
15  stops to turn in your mileage at the end of the month.
16  Q.  Did you do paperwork other than your
17  mileage sheets?
18  A.  The top sheet that we had to turn in for
19  the -- reading the meters.
20  Q.  Is that just a single page?
21  A.  Yes.
22  Q.  Did you do any other paperwork when you
23  returned to the office?
24  A.  Only if they had given you ME's.  You



OPHELIA CAGE June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO 227–230

Page 227

1 would have to turn the ME's in.
2    Q.    What type of paperwork would you have
3 to complete for the ME's?
4    A.    You have to put -- you're supposed to put
5 the reading on there.  The date.  If it was occupied.
6 Vacant.  Your ID.  Your signature.
7    Q.    How many pages did you have to complete?
8    A.    It's one page.
9    Q.    Did you have to complete any other
10 paperwork when you returned to the office in 2012?
11    A.    Like I said, if they gave you full payment
12 certificates to do besides your routes, you had that
13 paperwork to do.  Those were not in the G5.
14    Q.    Did you do any other type of paperwork
15 when you returned to the office?
16    A.    No.
17    Q.    What type of paperwork would you say took
18 you the longest to complete?
19    A.    If I had SEO 1's, those would take the
20 longest to complete.
21    Q.    How long would those take to complete?
22    A.    Maybe two to three minutes.
23    Q.    And what type of paperwork did you
24 complete for the SEO 1's?

Page 228

1    A.    It's a single sheet where the meter wasn't
2 registering, and you tried to get into the premise to
3 see if it was registering.  If you couldn't get in,
4 you had to lock it up.
5    Q.    Would you typically only complete one SEO?
6    A.    It depends --
7    Q.    One?
8    A.    It depends on how many they give you.
9    Q.    What was the most that you have ever
10 received?
11    A.    Five.  Maybe six.
12    Q.    After you completed your paperwork, what
13 would you do in the office at the end of your day?
14    A.    You would take it into the office and turn
15 it into the supervisor.
16    Q.    Did you do anything after that?
17    A.    No.
18    MS. NAVE:  Let's mark this as Exhibit No. 11.
19          (WHEREUPON, a certain document was
20          marked Cage Deposition Exhibit
21          No. 11, for identification, as of
22          06/09/2015.)
23 BY MS. NAVE:
24    Q.    Ms. Cage, do you recognize Exhibit No. 11?

Page 229

1    A.    This is a detailed route report.
2    Q.    Have you seen this MV-RS report before?
3    A.    I don't understand what you mean by M --
4    Q.    Do you see in the top left-hand corner
5 MV-RS?
6    A.    Okay.
7    Q.    So have you seen this type of printout
8 before?
9    A.    Yes.
10    Q.    Is this one of the documents that you
11 received during your January 30th, 2012,
12 predisciplinary meeting?
13    A.    Yes.  'Cause I see that they got CVS down
14 here.
15    Q.    Is this just one route reflected in
16 Exhibit 11?
17    A.    Yes.
18    Q.    Now, this is a route report for
19 January 5th, 2012.
20       Did you have any other routes on
21 January 5th, 2012?
22    A.    Yes.  The second route that they loaded
23 into the G5.
24    Q.    How many stops were in that route?

Page 230

1    A.    I'm not sure.
2    Q.    Would anything refresh your memory?
3    A.    The route.
4    Q.    If you turn to the second to the last
5 page, 2988, do you see that number --
6    A.    Yes.
7    Q.    -- in the lower corner?  Okay.  This shows
8 that this route contains 33 stops, correct?
9    A.    Yes.
10    Q.    And on this date you were working out of
11 49th and Western?
12    A.    Yes.
13    Q.    What time did you leave the station that
14 morning?
15    A.    Normally we'd leave the yard between 8:15
16 and 8:30.
17    Q.    You said, "we."  I'm just asking
18 specifically you.
19    A.    Rate takers.
20    Q.    What time did you leave?
21    A.    Between 8:15 and 8:30.
22    Q.    On January 5th, 2012, where did you go
23 after you left the station?
24    A.    When I'm doing the North Side, if I don't



OPHELIA CAGE

June 09, 2015

OPHELIA CAGE vs. CITY OF CHICAGO

231–234

Page 231

1 have enough gas, I go put gas in the car.

2     Q.   Is there a gas station that you typically

3 go to?

4     A.   Yes.

5     Q.   What gas station was that?

6     A.   The gas station at Food for Less.

7     Q.   On 47th Street?

8     A.   Yes.

9     Q.   Do you remember whether or not you got

10 gas on January 5th, 2012, after leaving the station?

11     A.   I always do, yes.

12     Q.   After you got gas, where did you go?

13     A.   Proceeded to go to the route.

14     Q.   How did you get to the route?

15     A.   I probably took Western.

16     Q.   Why did you take Western to get to the

17 North Side on January 5th, 2012?

18     A.   Whenever I'm on the North Side, I either

19 take Western or Kedzie 'cause those are through

20 streets.

21     Q.   Why do you always take Western or Kedzie

22 to get to the North Side?

23     A.   Those streets don't cut off. They go all

24 the way through.

Page 232

1     Q.   Did you ever take the expressway to get

2 to the North Side?

3     A.   I told Lenny, "I never take the

4 expressway."

5     Q.   How long did it take you to get to your

6 route on January 5th, 2012?

7     A.   Maybe an hour. Hour and a half. Maybe

8 longer.

9     Q.   Based on Exhibit 11, it looks that your

10 first stop was at 3101 to 13 North Sheridan Road,

11 correct?

12     A.   Yes.

13     Q.   Where did you park?

14     A.   I don't know 'cause it's hard to find

15 parking over there in that area.

16     Q.   Did you park when you got to this area?

17     A.   Yes. But I don't know where.

18     Q.   Did you get out of your car at 3101 to

19 13 North Sheridan?

20     A.   I had to get out of my car before I got

21 there 'cause there's nowhere to park in that area.

22     Q.   Did you walk to this location then? 3101

23 to 13 North Sheridan?

24     A.   Yes, I did.

Page 233

1     Q.   How long did it take you to walk from

2 your car to that address?

3     A.   It depend on where I parked.

4     Q.   Did you attempt to gain entry into that

5 address?

6     A.   Yes, I did.

7     Q.   What did you do to attempt to gain entry?

8     A.   They have doorbells there, and I tried to

9 find the doorbell for the maintenance guy or the

10 janitor.

11     Q.   Were you able to find a doorbell for the

12 maintenance or janitor?

13     A.   No.

14     Q.   Other than searching for the doorbell, did

15 you do anything else?

16     A.   There's nothing else to do.

17     Q.   That building didn't have an intercom?

18     A.   Yes, it did.

19     Q.   Did you attempt to contact someone through

20 the intercom system?

21     A.   No. I tried to find a janitor or

22 maintenance guy through the intercom system.

23     Q.   According to this report, you entered

24 locked at 8:56 and 49 seconds.

Page 234

1     Do you see that on the second line under

2 3101 to 13 North Sheridan?

3     A.   Yes.

4     Q.   Then you go to the second entry, which is

5 for 3115 to 31 North Sheridan.

6     Do you see that?

7     A.   Yes.

8     Q.   You entered locked at 8:57 and five

9 seconds, correct?

10     A.   Yes.

11     Q.   Did you actually go to 3115 to 31 North

12 Sheridan?

13     A.   Yes, I did.

14     Q.   Did you walk or drive there?

15     A.   I walked.

16     Q.   Did you attempt to gain entry?

17     A.   Yes, I did.

18     Q.   What did you do to attempt to gain entry?

19     A.   They have an intercom system. So you try

20 and find out if there's a janitor or maintenance guy

21 available 'cause that's who has the keys to let you

22 into where the meter is, not the residents.

23     Q.   Now, do you see that there were

24 approximately 16 seconds between your first entry and



Case: 1:14-cv-06818 Document #: 41-2 Filed: 12/21/15 Page 9 of 37 PageID #:813

OPHELIA CAGE                                      June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                  235–238

Page 235

1  your second entry?
2      A.   Yes.
3      Q.   So how did you walk to 3115 to 31 North
4  Sheridan, search for the maintenance or janitor, and
5  enter locked in 16 seconds?
6      A.   You don't have to search.  You're standing
7  at the front door.  You don't have to walk around the
8  building.
9          The intercom system is at the front door,
10 and these times I really have serious doubts about
11 'cause the G5 is not accurate.  Has never been
12 accurate since we've had 'em.
13     Q.   And what facts do you base that statement
14 on?
15     A.   I was on vacation one year, and I told
16 Mr. Califano that morning I was gonna start my
17 vacation at 11:00 o'clock.  At 11:00 o'clock I started
18 my vacation.
19         When I came back to work, Mr. Califano had
20 me scheduled for a pre-dis, and no one told me what it
21 was for.
22         When I went to the pre-dis and the union
23 representative was there, that's when I discovered
24 what the pre-dis was for.

Page 236

1          They claim the G5, the tracker, showed me
2  sitting somewhere for 30 minutes, and I wasn't even on
3  the clock.  I was on my way home, and that's not the
4  first instance the G5 has tracked me one place, and I
5  was somewhere else.
6      Q.   Is it your understanding that this shows
7  you being tracked?
8      A.   Yes.
9      Q.   And what is that understanding based on?
10     A.   What I just said.  The G5 has never been
11 accurate.  Not only myself, but other rate takers had
12 the same problem.
13         They tell you the tracker showed you
14 here -- on this date here, I think at the end they --
15 Lenny Califano said that the tracker showed me heading
16 back to the South Side, and I was on Addison Street in
17 Jewel.
18     Q.   Are you referring to the G5, or the MV-RS,
19 or are you referring to GPS?
20     A.   The GPS.  Whatever they use to track us
21 with.
22     Q.   Okay.  So do you understand that
23 Exhibit 11 is not a GPS report?
24     A.   No.  I didn't understand that.

Page 237

1      Q.   This report shows when you enter the
2  information into your handheld; is that correct?
3      A.   Yes.
4      Q.   So you entered locked for the first stop
5  at the time that we mentioned, 8:56 and 49 seconds,
6  and less than 20 seconds later you entered locked for
7  3115 through 31 North Sheridan Road, correct?
8      A.   That's what it says on here.
9      Q.   Okay.  And then going to the third stop,
10 less than a minute later you entered locked for
11 334 West Barry Avenue, correct?
12     A.   Yes.
13     Q.   Did you walk from 3115 through 31 North
14 Sheridan Road to 334 West Barry?
15     A.   I don't think so, no.
16     Q.   How did you get to that address?
17     A.   I probably went back to my car to try and
18 get to that stop.
19     Q.   So you went back to your car, got into
20 your car, and drove from 3115 to 31 North Sheridan to
21 334 West Barry in less than a minute?
22     A.   No.  That's what it says here.  That is
23 not what I did, but that's what it says on here.
24     Q.   Okay.  Did you attempt to gain entry at

Page 238

1  334 West Barry?
2      A.   Yes, I did.
3      Q.   What did you do to attempt to gain entry?
4      A.   These are all tall buildings on the
5  lakefront, and so you have to ring a bell to try and
6  get into the building.
7      Q.   So you believe that there was a doorbell
8  at 334 West Barry?
9      A.   I believe so.
10     Q.   How long did you attempt to look for the
11 maintenance or janitor at each of these locations?
12     A.   Well, if you can't get into the building,
13 you can't look for anyone.  You're standing outside.
14     Q.   Right.  And you said that you were
15 searching the intercom.
16         So I'm asking you how long did you
17 attempt, by searching through the intercom, to attempt
18 to locate the janitor or the maintenance.
19     A.   One to two minutes.  You hit the button.
20     Q.   For each of the locations reflected on
21 Exhibit 11 that are marked locked, you're stating that
22 you searched for one to two minutes to find someone to
23 open the door?
24     A.   Or if there was -- if you can get into the



OPHELIA CAGE

OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015

239–242

Page 239

1  building, the man at the desk would, you know, call
2  for maintenance, but you could only wait so long.
3      Q.   At what location were you able to see
4  someone at the front desk?
5      A.   I have no idea.
6      Q.   Do you know how many locations on
7  Exhibit 11 had a front doorman?
8      A.   No.
9      Q.   Do you know if you talked to anyone at any
10  of these locations?
11      A.   If there is a doorman there, I tell them
12  that I'm here to read the water meter, and he proceeds
13  to call someone.
14      Q.   But I'm asking you on this date,
15  January 5th, 2012, did you talk to anyone at any of
16  these locations?
17      A.   If there's a doorman there, I talk to 'em.
18      Q.   Do you remember if any of these locations
19  had a doorman?
20      A.   No.  I'm not familiar with this area, no.
21      Q.   Is there anything that would refresh your
22  memory as to whether you talked to anyone at any of
23  these locations on January 5th, 2012?
24      A.   If I was in front of the building.

Page 240

1      Q.   When you say that you're not familiar with
2  this location, had you ever been assigned to this area
3  before January 5th, 2012?
4      A.   No.
5      Q.   Is it your understanding that water rate
6  takers are expected to be familiar with the areas of
7  the city?
8      A.   No.  That was not the job description when
9  I applied for the job.
10      Q.   And we looked at the job description on
11  the first day of your deposition so we won't go back
12  to that.
13          So if you weren't familiar with this area,
14  did you map this area?  Do anything in order to
15  prepare to do your route on January 5th, 2012?
16      A.   No.
17      Q.   Now, let's go to 2985.  Do you see the
18  last entry on this page for 401 to 09 West Barry
19  Avenue?
20      A.   Yes.
21      Q.   And that was your 23rd entry, correct?  Do
22  you see that number?
23      A.   Yes.
24      Q.   And you stated, "cannot locate."  Did you

Page 241

1  actually go to 401 to 09 West Barry Avenue?
2      A.   Yes, I did.
3      Q.   Did you walk or drive from 421 to
4  33 West Barry?
5      A.   I had to drive.
6      Q.   What did you do to attempt to locate this
7  meter at 401 to 09 West Barry?
8      A.   Can't locate means that I either got into
9  the building and couldn't find the meter, or the door
10  where the meter was I couldn't gain access, and so I
11  put down can't locate.
12      Q.   What was located at 401 to 09 West Barry
13  Avenue?  What type of building?
14      A.   I can't recall.
15      Q.   Do you know how you gained entry into that
16  building?
17      A.   Not now, no.
18      Q.   Do you remember talking to anyone at
19  401 to 09 West Barry?
20      A.   No, I don't.
21      Q.   Would anything refresh your memory as
22  to whether or not you talked to someone at 401 to 09
23  West Barry?
24      A.   The building.

Page 242

1      Q.   And when you say, "the building," do you
2  mean actually seeing the building?
3      A.   Yes.
4      Q.   Now, going to the next page, 2986, it
5  looks as though less than a minute, or even a few
6  seconds after leaving 401 to 09 West Barry Avenue,
7  you entered locked for 2960 North Lake Shore Drive,
8  correct?
9      A.   Yes.
10      Q.   Did you actually go to 2960 North Lake
11  Shore Drive?
12      A.   Yes, I did.
13      Q.   Did you walk or drive there?
14      A.   I drove as close as I could get and then I
15  parked.
16      Q.   Did you attempt to gain entry?
17      A.   Yes, I did.
18      Q.   What did you do to attempt to gain entry?
19      A.   These are tall buildings, and they're on
20  the lakefront.  So you get into the building, if you
21  can, to find a maintenance or janitor.
22      Q.   What did you do to attempt to find a
23  maintenance or a janitor?
24      A.   They have the directories there.  So you



Case: 1:14-cv-06818 Document #: 41-2 Filed: 12/21/15 Page 11 of 37 PageID #:815

OPHELIA CAGE                                          June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                      243–246

Page 243

1  scroll down the directory and try and find someone if
2  they don't have a doorman at the front door as you go
3  in.
4      Q.    Going to the next page, 2987, your last
5  entry was at 9:28 and 33 seconds; is that correct?
6      A.    Yes.
7      Q.    And you entered locked for 550 West
8  Oakdale Avenue, correct?
9      A.    Yes.
10     Q.    Therefore, on January 5th, 2012, you
11 entered locked or could not locate for 33 properties
12 in fewer than 32 minutes; is that correct?
13     A.    That's what it says on here, but that's
14 not correct.
15     Q.    And what facts do you have to support that
16 statement that this is not correct?
17     A.    Because this is not the actual sheet.
18 This is the sheet that someone had copied.  So I have
19 serious doubts about the times that they have on here.
20     Q.    But do you have any facts that would
21 support your belief that the information in Exhibit 11
22 is inaccurate?
23     MR. GOMBERG:  Asked and answered.
24

Page 244

1  BY THE WITNESS:
2      A.    Yes.
3  BY MS. NAVE:
4      Q.    And what information do you have?
5      A.    I told you that if I have to drive that
6  there's no way I can drive from one address to the
7  other address on the North Side, and I wasn't familiar
8  with that area.  So that's what I'm saying.  I have
9  serious doubts about the times.
10     Q.    Okay.
11     A.    And the G5 that they gave us is not
12 accurate.
13     Q.    Other than that, do you have any facts to
14 support your belief that the information in Exhibit 11
15 is not accurate?
16     A.    Yes.  'Cause I know the time in our G5's
17 can be altered.
18     Q.    And what facts do you have to support your
19 belief?
20     A.    We have a rate taker that was telling
21 everybody, "You know you can change the time in the
22 machine?"
23     Q.    What water rate taker is that?
24     A.    Ron Blankus.

Page 245

1      Q.    When did he tell you that the times in the
2  G5 could be altered?
3      A.    When we first started using these
4  machines.
5      Q.    When did you first start using the
6  machines?
7      A.    I don't know what year it was.
8      Q.    Was it before 2012?
9      A.    Yes.
10     Q.    Was it before 2011?
11     A.    I'm not sure, but I know it was before
12 2012.
13     Q.    What station were you located at at the
14 time you started using the G5 or handheld?
15     A.    49th and Western.
16     Q.    Who do you believe would have altered the
17 times on Exhibit 11?
18     A.    Mr. Califano.
19     Q.    Do you have any facts to support your
20 belief that Mr. Caifano altered the times in
21 Exhibit 11?
22     A.    No.  I don't have any facts, but if anyone
23 could, you know, he could.
24     Q.    What did you do after you entered your

Page 246

1  last locked at approximately 9:29 a.m.?  What did
2  you do?
3      A.    Proceeded to the second route that was
4  loaded into the G5.
5      Q.    Where was the second route located?
6      A.    It was in close proximity, but I don't
7  know exactly where.
8      Q.    Do you remember how many stops that you
9  actually got to?
10     A.    No.
11     Q.    Did you read any meters on that route?
12     A.    I read quite a few meters on that route.
13     Q.    When you say, "quite a few," how many?
14     A.    I read maybe 20 before I went to lunch.
15     Q.    Did you read any after lunch?
16     A.    Yes.  I read maybe ten after lunch.
17     Q.    What time did you start heading back to
18 the station?
19     A.    Quarter to 2:00.
20     Q.    How long did it take you to get back to
21 the station?
22     A.    I don't know how long.  I know I got back
23 in time to turn in my work and to swipe out at 3:30.
24     Q.    Do you recall getting back to the station



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
247–250

Page 247

1 before 2:30 p.m. on January 5th, 2012?
2    A.    There was no way I could have gotten back
3 before 2:30.
4    Q.    I'm sorry?
5    A.    There was no way I could have gotten back
6 before 2:30.
7    Q.    Why is that?
8    A.    I was up north, and I travel the streets,
9 not the expressway.
10    Q.    Do you know of any water rate taker who
11 was not able to read a single meter in a route?
12    A.    Yes. I know quite a few of 'em.
13    Q.    Which water rate takers are those?
14    A.    Roze O'Neal, Pat Durant, and
15 Bridgette Jones.
16    Q.    Now, earlier you said that Ms. O'Neal is
17 a water rate assessor, correct?
18    A.    Yes.
19    Q.    So when was she assigned to read meters?
20    A.    It's at Lenny's discretion.
21    Q.    So when was Ms. O'Neal not able to read a
22 single meter on her route?
23    A.    When she was scheduled at Station 3.
24    Q.    What's the address of that station?

Page 248

1    A.    Springfield and North Avenue.
2    Q.    What year?
3    A.    I don't know. She was the backup
4 supervisor.
5    Q.    Do you recall the year?
6    A.    No.
7    Q.    How do you know that she was not able to
8 read a single meter?
9    A.    Because when something like that happens
10 word travels through every station.
11    Q.    So you only know based on what you heard
12 through gossip and rumor?
13    A.    Right. 'Cause I was not stationed at that
14 station.
15    Q.    Do you know how many stops Ms. O'Neal had
16 in her route on that occasion?
17    A.    No.
18    Q.    Was there any other occasion that you
19 believe Ms. O'Neal was not able to read a single meter
20 on a route?
21    A.    Well, this was an isolated -- this was not
22 an isolated incident.
23    Q.    Well, I'm asking for specifics. Do you
24 have any specifics?

Page 249

1    A.    I wasn't stationed at that station.
2    Q.    Okay. So you're not aware of any other
3 time where you believe Ms. O'Neal was not able to
4 read a single meter on a route?
5    A.    No.
6    Q.    With respect to Ms. Durant, when do you
7 believe that Ms. Durant was not able to read a single
8 meter on her route?
9    A.    What are you asking for? The year?
10    Q.    Yes.
11    A.    I'd say, "between '91 -- 1991 up until we
12 went to 49th and Western." Whatever year that was.
13    Q.    So you don't know the year?
14    A.    No. 'Cause she ended up at 39th, and I
15 went to 49th.
16    Q.    So why do you believe that Ms. Durant was
17 not able to read a single meter?
18    A.    I see Ms. Durant's work. We work out of
19 the same station.
20    Q.    And when you say, "you saw her work," what
21 are you referring to?
22    A.    At the end of the day when you would bring
23 work back in, you'd have to put it on the desk. So
24 she had paper routes like I did. I saw her work.

Page 250

1    Q.    So this was before you moved over to the
2 handheld devices?
3    A.    Yes.
4    Q.    How many stops did Ms. Durant have in her
5 route on the occasion that she was not able to read a
6 single meter?
7    A.    She had a route like everyone else, and so
8 it varied 'cause she always had the route around her
9 house.
10    Q.    Do you know why she always had the route
11 around her house?
12    A.    They gave it to her.
13    Q.    Who gave it to her?
14    A.    The supervisor.
15    Q.    What supervisor?
16    A.    Well, she's had about as many as I had.
17 He's dead now. I can't think of his name. Mulligan.
18    Q.    So you believe Mr. Mulligan assigned
19 Ms. Durant to a route around her house?
20    A.    No. I don't believe it. I saw it. I
21 pulled up behind her one day.
22    Q.    Okay. In what year do you believe that
23 Ms. Jones was not able to complete a single meter read
24 on her route?



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
251–254

Page 251

1    A.    During the same time her and Pat normally
2  worked together.
3    Q.    And when was that?
4    A.    I started in 1991 as a rate taker.  So
5  they were together from 1991 until Bridgette retired.
6    Q.    When did Ms. Jones retire?
7    A.    I think '11.  2011.
8    Q.    So why do you believe that Ms. Jones was
9  not able to complete?  How do you know that?
10    A.    I saw one of they (sic) routes, and the
11  supervisor, whoever had given them a route, and they
12  completed eight stops in eight hours, and that was on
13  the sheet, and that's when I saw.
14    Q.    When you say, "they," who are you
15  referring to?
16    A.    Bridgette and Pat.  They worked together.
17    Q.    Was this just one occasion where the both
18  of them were not able to complete a single meter read?
19    A.    This was every day.
20    Q.    So you believe every day neither
21  Ms. Durant nor Ms. Jones completed a single meter read
22  between 1991 and 2011?
23    A.    Yes, I do.
24    Q.    Do you have any facts to support that

Page 252

1  belief?
2    A.    The paperwork that I saw when they turned
3  it in at the end of the day.
4    Q.    Why were you reviewing their paperwork at
5  the end of the day?
6    A.    It's not reviewing.  It's on the desk.
7    Q.    Okay.  But why were you looking at their
8  paperwork?
9    A.    Because if I came in after they did I had
10  to put my work on top of theirs.
11    Q.    And you looked at their work, correct?
12    A.    Yes.
13    Q.    So other than Ms. O'Neal, Ms. Durant, and
14  Ms. Jones, were there any other water rate takers, in
15  your opinion, who were not able to complete a single
16  meter read on the route?
17    A.    Those are the only three, but we got rate
18  takers that don't complete their work.
19    Q.    Okay.  I'm just asking you about meter
20  reads.
21        Were there any other water rate takers,
22  you're aware of, who could not complete a single read
23  on their route?
24    A.    Those three.

Page 253

1    Q.    And only those three?
2    A.    Only those three.
3    Q.    Do you know whether or not any of those
4  people were disciplined?
5    A.    Rumor was, no.
6    Q.    Other than rumor, do you have any facts
7  to show that those individuals were not disciplined?
8    A.    Nothing on paper.
9    Q.    Did you have access to any water rate
10  takers' disciplinary records?
11    A.    No.
12    Q.    Did Tyrone Lewis talk to you about not
13  reading a single meter on this route on January 5th,
14  2012?
15    A.    No.
16    Q.    Do you recall him telling you that he
17  was going to forward the paperwork to Mr. Caifano
18  for a possible predisciplinary meeting?
19    A.    Yes.
20    Q.    So you did have a conversation with
21  Mr. Lewis about January 5th, 2012?
22    A.    No.  When I brought in the paperwork, and
23  he looked at it, that was his remark.  That, "I'm
24  gonna have to take this -- send this into Lenny."

Page 254

1    Q.    And when he said, "this," do you know what
2  he was referring to?
3    A.    The route that I had brought in that day.
4    Q.    Meaning Exhibit 11?
5    A.    This route here?
6    Q.    Yes.
7    A.    Yes.
8    Q.    Do you believe that Mr. Lewis falsified
9  the times in Exhibit 11?
10    A.    No.
11    Q.    You were assigned to the North Side again
12  on January 24th, 2012, to read meters, correct?
13    A.    Yes.
14    Q.    How many stops were on your route that
15  day?
16    A.    I have no idea.
17    Q.    Do you know how many readings you were
18  able to complete?
19    A.    No.
20    Q.    When did you leave the North Side on
21  January 24th, 2012?
22    A.    After lunch.
23    Q.    Where did you go after lunch?
24    A.    I headed back toward the station.



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
255–258

Page 255

1    Q.   What time did you head back toward the
2  station on January 24th, 2012?
3    A.   After lunch.
4    Q.   What time?
5    A.   A quarter to 2:00.
6    Q.   Do you take lunch at the same time every
7  day?
8    A.   Yes, I do.
9    Q.   And what time is that?
10   A.   From 1:00 o'clock to 1:30.
11   Q.   Did Mr. Lewis talk to you about your
12  performance on January 24th, 2012?
13   A.   Explain.
14   Q.   Did he tell you, for example, that he was
15  going to have to send your paperwork to Mr. Caifano
16  for a possible predisciplinary meeting?
17   A.   I'm not sure.
18   Q.   Did you know about your five-day
19  suspension before you received the notice on
20  March 13th, 2012?
21   A.   No.  They give you a pre-dis, and you
22  don't know what the outcome is until you come to work,
23  and the supervisor gives you the suspension notice.
24       MS. NAVE:  Let's mark this as Exhibit No. 12.

Page 256

1            (WHEREUPON, a certain document was
2            marked Cage Deposition Exhibit
3            No. 12, for identification, as of
4            06/09/2015.)
5  BY MS. NAVE:
6    Q.   Ms. Cage, do you recognize Exhibit No. 12?
7    A.   Yes, I do.
8    Q.   What is this document?
9    A.   This is the route that I had on this date.
10   Q.   And when you say, "a route," do you mean
11  postings?
12   A.   Yes.
13   Q.   And is this a document that you filled
14  out?
15   A.   Yes.
16   Q.   For example, you put your first initial
17  and last name at the top?
18   A.   Yes.
19   Q.   And then you wrote in the date of October
20  4th, 2012?
21   A.   Well, that's not my handwriting, but it's
22  on here.
23   Q.   So you're saying that the ten and the four
24  is not your handwriting?

Page 257

1    A.   And neither is the okay.  That's not how
2  I write my name.
3    Q.   You mean O. Cage?
4    A.   Yes.  That's my writing, but that's not my
5  handwriting.
6    Q.   Is the information under type and OCC your
7  handwriting?  Do you see that column?
8    A.   Yes.  Uh-huh.
9    Q.   Do you see that the first address at the
10  top of each page of this exhibit is the same?
11  105 South Menard?
12   A.   Yes.
13   Q.   Then you only completed six postings,
14  correct, on October 4th, 2012?
15   A.   Yes.
16   Q.   What time did you leave the station?
17   A.   8:30.
18   Q.   What route did you take to get to your
19  work area?
20   A.   Western I think.  Western.
21   Q.   You took Western to get to 105 South
22  Menard?
23   A.   Yes.
24   Q.   What street did you take to go west?

Page 258

1    A.   Madison.
2    Q.   Did you go directly to your work area
3  after leaving the station?
4    A.   Probably went and got gas and then
5  proceeded to go to the route.
6    Q.   Did you have the occasion to go to the
7  North Side on October 4th, 2012?
8    A.   This is the West Side.
9    Q.   Correct.  But did you go to the North Side
10  on October 4th, 2012?
11   A.   No.  I went to the West Side.
12   Q.   Did you go anywhere after leaving the
13  station?  Between leaving the station and going to
14  your work area.
15   A.   I left the station and went to the gas
16  station.  From the gas station, I proceeded to go to
17  the route.
18   Q.   Are you familiar with this area?
19   A.   A little.
20   Q.   Did you have any issues finding any of
21  the addresses in Exhibit No. 12?
22   A.   No.  I think I got turned around, but I
23  found my way back.  But what they don't tell you on
24  this is Lenny screwed up on this one.



OPHELIA CAGE

OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015

259–262

Page 259

1    Q.   What do you mean he screwed up?
2    A.   I had a wellness appointment that the
3  City makes you go to.  My wellness appointment was
4  11400 South Western.  This is on the other side of
5  the city.
6         That's why when we went to the pre-dis,
7  and Lenny walked into the room with the union steward,
8  and myself, and Tyrone Lewis, who he said he wasn't
9  there, that -- when Lenny opened up the door, the
10  first statement out of his mouth was, "Maybe I could
11  have scheduled this better," but they went on with the
12  pre-dis anyway.
13    Q.   Okay.  So what time did you arrive at your
14  work area on October 4th, 2012?
15    A.   Probably something to 10:00.
16    Q.   Did you get there about 10:15 a.m.?
17    A.   That -- probably, yes.
18    Q.   Why did it take you so long to go from the
19  station to this work area?
20    A.   The street.  I travel the street.  I don't
21  take the expressway.
22    Q.   So you believe that it took you just under
23  two hours to get from 49th and Western to 105 South
24  Menard?

Page 260

1    A.   It could have, yes.
2    Q.   And, as you said, your health screening
3  was at 11:30, correct?
4    A.   And Lenny knew it.
5    Q.   But it wasn't 11:30, correct?
6    A.   I think so, yes.
7    Q.   What time did you start heading towards
8  your health screening?
9    A.   I got there at 10:15?  I don't know what
10  time I started heading back to the South Side for my
11  screening.
12    Q.   Did you start leaving at about 11:04 to
13  get to your health screening?
14    A.   I couldn't be late.  My screening was at
15  11:00.  11:30.  Whatever time it was, you know, so I
16  wasn't late for the screening.
17    Q.   So did you get to your health screening
18  at about 11:04 a.m. then?
19    A.   I don't know what time I got there, but I
20  was on time.
21    Q.   How long was your health screening?
22    A.   When I left out of the health screening,
23  it was time for my lunch.
24    Q.   But that wasn't my question.  How long did

Page 261

1  that last?
2    A.   I don't know.  'Cause there was people
3  in front of me, and so I had to wait until they got
4  to me.
5    Q.   So how long did the actual health
6  screening last?
7    A.   I don't know.  That's why I said, "after
8  it was over I went to lunch."
9    Q.   Did it last fewer than ten minutes?
10    A.   Yes.
11    Q.   Did you see anyone you knew at the health
12  screening?
13    A.   No.
14    Q.   Did you stay at 11424 South Western after
15  your health screening ended?
16    A.   I went to lunch, and so I was in the area.
17    Q.   Where did you go to lunch?
18    A.   There was a Kentucky Fried Chicken over
19  there so I probably went there.
20    Q.   Did you leave your car at 11424 South
21  Western and walk to KFC?
22    A.   No.
23    Q.   You drove there?
24    A.   Yes.

Page 262

1    Q.   Do you know how long all together you
2  were at 11424 South Western?
3    A.   A quarter to 1:00.
4    Q.   Did you return to your work location in
5  the 29th Ward after your health screening or after
6  lunch?
7    A.   I started in that direction, yes.
8    Q.   Did you actually make it to that area?
9    A.   No.
10    Q.   And why is that?
11    A.   Because by the time I got there it would
12  have been time for me to come back to the station.
13         When I started there, like I said, it was
14  a quarter to 2:00.  We have to be back no later than
15  2:30.
16    Q.   So you were at lunch from a quarter to
17  1:00 until a quarter to 2:00?
18    A.   Yeah.  We get 15 minutes before and after
19  besides your 30 minutes lunch.
20    Q.   How far did you get before you turned back
21  to go to the station?
22    A.   I'm not sure, but I know I didn't get
23  anywhere near these stops on here.
24    Q.   Did Mr. Lewis talk to you about your



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
263–266

Page 263

1  October 4th, 2012, work performance?
2      A.  No.  He -- yes.  He asked me what had
3  happened.
4      Q.  And what did you tell him?
5      A.  That was the morning of my wellness
6  appointment, and he said that he wasn't aware that I
7  had a wellness appointment, even though I had notified
8  him a month in advance.
9      Q.  Did Mr. Lewis say anything else?
10     A.  No.
11     Q.  Did you say anything else to Mr. Lewis?
12     A.  Yes.  I asked him, "Well, you had a rate
13  taker that was scheduled over there in the area closer
14  to the wellness.  Why wasn't I scheduled along with
15  (unintelligible) instead of up on Menard?"
16         And that's when he told me he wasn't aware
17  that I had a wellness appointment that day.  If he had
18  known, he would not have put me in that area.
19     Q.  Was anything else said during that
20  conversation?
21     A.  No.
22     MS. NAVE:  All right.  Let's mark this as
23  Exhibit No. 13.
24

Page 264

1         (WHEREUPON, a certain document was
2          marked Cage Deposition Exhibit
3          No. 13, for identification, as of
4          06/09/2015.)
5  BY MS. NAVE:
6      Q.  Ms. Cage, do you recognize Exhibit 13?
7      A.  Yes.
8      Q.  Is this your posting sheet from
9  October 12th, 2012?
10     A.  Yes.
11     Q.  And this was in the area of 2849 West
12  Lyndale Street, correct?
13     A.  Yes.
14     Q.  Were you familiar with that area?
15     A.  A little.
16     Q.  Did you have trouble locating any of the
17  addresses?
18     A.  Some of 'em.
19     Q.  Which addresses did you have difficulty
20  locating?
21     A.  The ones that have nothing by 'em.
22     Q.  And why were you unable to locate those
23  addresses?
24     A.  I couldn't locate 'em.

Page 265

1      Q.  Did you look at your street guide?
2      A.  A street guide only works if you know
3  where you're going.  It can't tell you how to get
4  there.  It can only tell you what hundred the street
5  is.
6      Q.  So you didn't know where Lyndale was
7  located?
8      A.  No.
9      Q.  Did you call anyone in order to find out
10  where Lyndale was located?
11     A.  No.  I kept driving around trying to find
12  it.
13     Q.  Why didn't you call Mr. Lewis if you were
14  having difficulty finding your stops?
15     A.  I had never called a supervisor when I'm
16  having trouble finding my stops.  I drive around and
17  try and find it on my own.
18     Q.  Did you ever stop to ask somebody for
19  directions to any of these addresses on Lyndale?
20     A.  No.
21     Q.  Why not?
22     A.  Because I figured that I could find 'em
23  myself.
24     Q.  How long did you take to attempt to find

Page 266

1  these addresses?
2      A.  Not long.  I went to the ones that I did
3  know where they were.
4      Q.  And when you say, "not long," did you
5  attempt fewer than ten minutes to locate these
6  addresses?
7      A.  No.  It was a little bit more.  Maybe 10.
8  Maybe 15 minutes.
9      Q.  When did you leave your work area on
10  October 12th, 2012?
11     A.  When I'm up north, I always start back
12  to the station after I finish my lunch, and so it's
13  always a quarter to 2:00.  Sometime maybe
14  2:00 o'clock.
15     Q.  Did you meet someone for lunch on
16  October 12th, 2012?
17     A.  No.
18     Q.  Have you ever gone home during the
19  workday?
20     A.  Not me.
21     Q.  Did you go home on January 24th, 2012?
22     A.  No.
23     Q.  Did Mr. Lewis talk to you about your
24  October 12th, 2012, work performance?



OPHELIA CAGE          June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO      267–270

Page 267

1     A.   No.
2     Q.   He didn't say that he was going to
3  send you for a possible predisciplinary meeting?
4     A.   No.
5     Q.   Do you ever run errands during your
6  workday?
7     A.   I run errands on my lunch.
8     Q.   What types of errands do you run on your
9  lunch?
10    A.   Grocery store.
11    Q.   Do you take your groceries home?
12    A.   Yes.
13    Q.   During your lunch?
14    A.   No.
15    Q.   What do you do with your groceries after
16  you purchase them on your lunch hour?
17    A.   They're not perishable, and so they're in
18  my car until I go home.
19    Q.   Do you run any other types of errands
20  during your lunch break?
21    A.   No.
22    Q.   Do you ever go shopping during the
23  workday?
24    A.   That is shopping.  My grocery shopping.

Page 268

1     Q.   Any other type of shopping?  Clothes
2  shopping?  Shoe shopping?
3     A.   I wouldn't have enough time to do that
4  on lunch.
5     Q.   Are you familiar with the mall at Harlem
6  and Irving Park?
7     A.   Yes.
8     Q.   Have you ever been to that mall during the
9  workday?
10    A.   If that's where the Sears is, I think I
11  went in there on my lunch.  I went to Sears one time.
12    Q.   Did you know you were going to be
13  suspended for seven days before you received the
14  notice on October 26th, 2012?
15    A.   No.
16    Q.   Do you believe that you should not have
17  been suspended for five days in 2012?
18    A.   Yes, I do.
19    Q.   And why do you believe you should not have
20  been suspended for five days?
21    A.   Because I do no more, no less than any
22  other rate taker.
23    Q.   Is that the only reason you believe you
24  should not have been suspended?

Page 269

1     A.   Yes.  My work is good as any of the
2  other rate takers.  No more.  No less.
3     Q.   Is that the only reason you believe you
4  should not have been suspended for five days in 2012?
5     A.   Yes.
6     Q.   Okay.  Do you believe you should not have
7  been suspended for seven days in 2012?
8     A.   Yes.  I don't believe I should have been
9  suspended.
10    Q.   And why do you believe you should not have
11  been suspended for seven days in 2012?
12    A.   As I stated previously, I do the same
13  thing every other rate taker does.
14    Q.   Is that the only reason you believe you
15  should not have been suspended --
16    A.   And --
17    Q.   Let me finish my question.  Is that the
18  only reason you believe you should not have been
19  suspended for seven days in 2012?
20    A.   Yes.
21    Q.   What do you consider to be less strenuous
22  work as a water rate taker?
23    A.   Like what?
24    Q.   I'm showing you what's been previously

Page 270

1  marked as Exhibit 6.  If you turn to Interrogatory
2  No. 6.
3     MR. GOMBERG:  Let me see that.
4  BY MS. NAVE:
5     Q.   Your answer starts on Page 5.  Do you see
6  Interrogatory No. 6 and your answer on Page 5?
7     A.   Yes.
8     Q.   Is this answer accurate and complete?
9     A.   Yes.
10    Q.   Is there anything that you wanted to add
11  to this Interrogatory answer?
12    A.   Yes.  The 11420 South Western whereas
13  Lenny Califano did not make this mistake with any
14  other rate taker, and we all were scheduled to do
15  wellness.
16       But I'm the only one that he scheduled on
17  the other side of the city, and mines was over here on
18  the South Side.
19    Q.   And what facts do you have to support that
20  belief?
21    A.   No other rate taker has had problems with
22  their wellness appointment.
23    Q.   Okay.  And I'm asking you for facts.  How
24  do you know, based on personal knowledge, that no



OPHELIA CAGE

June 09, 2015

OPHELIA CAGE vs. CITY OF CHICAGO

271–274

1 other water rate taker was assigned somewhere else
2 on the date of his or her wellness appointment?
3     A.   Because everyone that had a wellness
4 appointment -- like I said, Mr. Lewis tells you your
5 wellness appointment.
6         No one but me was scheduled -- as a matter
7 of fact, the rate taker that he had scheduled in that
8 area he could have placed him somewhere else, but he
9 put him over there, and I had the wellness
10 appointment.  So he placed this rate taker close to my
11 wellness appointment and sent me to the West Side.
12     Q.   Did all of the water rate takers have
13 their wellness appointments on the same dates?
14     A.   No.
15     Q.   So do you have any facts to support your
16 belief that every other water rate taker was assigned
17 a work location next to the wellness appointment?
18     A.   Yes.  My supervisor Mr. Lewis had told me
19 that if he had known that I would not have been
20 scheduled over there.  So I said, "Would --did anyone
21 else wellness appointment get screwed up like" -- he
22 said, "No, just yours."
23     Q.   Now, I asked you earlier about your
24 conversation with Mr. Lewis, and you told me that you

1 had told me everything that was said during that
2 conversation.
3         So now you're telling me that there were
4 other statements made during that conversation?
5     A.   About the wellness, yes.
6     Q.   So why did you just remember that
7 statement that Mr. Lewis made about no other water
8 rate taker being assigned away from his or her
9 wellness appointment?
10     A.   Because when I seen the paper here, this
11 is what jogged my memory when I seen where it was, and
12 I remembered that was the wellness appointment that I
13 had that day.
14     Q.   Okay.  But what made you just remember
15 that statement that Mr. Lewis supposedly made?
16     A.   When I seen where I was, I just -- I
17 remembered what me and Mr. Lewis had talked about.
18     Q.   But you remembered it now --
19     A.   Yes.
20     Q.   -- but you didn't remember it earlier in
21 your deposition when I asked you about that
22 conversation, correct?
23     MR. GOMBERG:  Objection.  You're arguing with
24 the witness.

1 BY MS. NAVE:
2     Q.   Is that --
3     MR. GOMBERG:  Wait a second.  I'm still talking.
4 I've let that go on for about four or five questions
5 without objecting, and I'm strongly objecting.  And if
6 you continue it, I'll tell the witness not to answer
7 the question 'cause you're harassing her.
8         I'll let her answer now.  But if you
9 continue arguing with her, I will instruct her not
10 to answer further.  Go ahead.  Answer if you can.
11 BY THE WITNESS:
12     A.   I just remembered it.
13 BY MS. NAVE:
14     Q.   And what made you just remember that
15 statement?
16     A.   The date on this route here.
17     Q.   And what route are you referring to?
18     A.   The one on Menard.  This -- that K2998.
19     Q.   Now, in this answer to Interrogatory 6,
20 you say, "Younger, less senior employees were assigned
21 to less strenuous jobs."
22         So what less strenuous jobs are you
23 referring to?
24     A.   The AMR truck is one.  The job that

1 Marco Rodriguez does is another one.
2     Q.   Any other jobs?
3     A.   SEO 1, which is what Bridgette and
4 Pat Durant do.
5     Q.   Any other work that you believe is less
6 strenuous?
7     A.   What Rudolph Esposito does and Johnny B
8 (sic) does.  That they're on the AMR truck.  And Rudy
9 does nobody knows what 'cause he hides his work.
10     MS. NAVE:  Marilyn, can you read back her
11 answer?
12         (WHEREUPON, the record was read by
13         the reporter as requested.)
14 BY MS. NAVE:
15     Q.   What do you mean that he hides his work?
16     A.   When he brings his work in, but I did get
17 a chance to look at it the other day.  He did seven
18 stops in eight hours.
19         And when he comes in, he holds the work.
20 And if the supervisor is not there, he will not put it
21 down.  He only lays it on the desk when his
22 supervisor's present.
23     Q.   Okay.  So anything other than the AMR
24 truck and the SEO 1's that you believe is a less



OPHELIA CAGE                                          June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                      275–278

Page 275

1  strenuous job?
2      A.   And the full payment certificates, yes.
3      Q.   Anything else?
4      A.   That's it.
5      Q.   Did you ever request training on the AMR
6  truck?
7      A.   I'm the next one in line, but it has never
8  came up.  I was -- they trained two rate takers, Sims
9  and Blankus, and after them they told myself and
10  Carl Burt we were the next two in line.  But, instead,
11  they put Johnny V on there and Darryl Tignor.
12     Q.   Do you know why they were put on that AMR
13  truck?
14     A.   Well, when I asked my supervisor
15  Mr. Lewis, he told me that it doesn't go by seniority.
16     Q.   So do you know why any of the individuals
17  were assigned to the AMR truck?
18     A.   Leo Leonard (sic) decided he wanted them
19  to be on the AMR truck.
20     Q.   And do you know why he decided to put
21  those individuals on the AMR truck?
22     A.   No.
23     Q.   Did you ever talk to Leo Lillard about
24  being assigned to the AMR truck?

Page 276

1      A.   No.
2      Q.   Do you know the ages of any of these
3  employees that you identify in your answer to
4  Interrogatory No. 6?
5      A.   The only person in here that's older than
6  myself is Khan Ianyat.  He's maybe three, maybe four
7  years older than I am.  Everyone else is younger.
8      Q.   Do you know Renny Simmons' age?
9      A.   No.  But he was younger than I was.
10     Q.   Do you know Leslie Travis Cook's age?
11     A.   I'd say, "54.  55."
12     Q.   Do you know the fewest number of meter
13  readings that the individuals completed that you have
14  identified in your answer to Interrogatory No. 6?
15     A.   Repeat the question.
16     Q.   Do you know the fewest number of meter
17  readings or stops that any of these individuals
18  completed?
19          The fewest number that they were able to
20  complete.  The individuals identified in your answer
21  to Interrogatory No. 6.
22     A.   Like I said, Rudy does less than --
23  Rudolph Es -- does less than ten.  Johnny B is on the
24  AMR truck so it's in the computer.  He does a hundred

Page 277

1  plus.
2          Ron Blankus, who's on DD, but when he was
3  there, he did less than ten stops a day every day.
4          Marco Rodriguez is the dispatcher.  So he
5  doesn't do anything but sit at the desk all day, and I
6  told you that Bridgette and Pat did eight stops in
7  eight hours.
8          And I think I put in there that they had
9  assigned me one time to work with Ms. Cook, and we
10  each had a route.  Only my route was did.  So she
11  (unintelligible) back on her routes three days with no
12  stops did.
13     Q.   Does the Water Department or your station
14  have City vehicles that are available to water rate
15  takers to use?
16     A.   Yes.
17     Q.   Was that also true in 2012?
18     A.   Yes.
19     Q.   How do you know that Rodolfo Espinosa
20  completed fewer than ten stops on any occasion?
21     A.   I saw his work.
22     Q.   When did you see his work?
23     A.   The last time was two weeks ago.
24     Q.   Did you see his work before two weeks ago?

Page 278

1      A.   Yes.
2      Q.   And when did you see his work?
3      A.   Whenever he slips up and puts it on the
4  desk, I see it, but he doesn't do that often.
5      Q.   Did you see his work in 2012?
6      A.   Yes.
7      Q.   And what was the fewest number of stops
8  that you believe he was able to complete in 2012?
9      A.   Less than ten.
10     Q.   Do you know how many meter readings he was
11  assigned to on that occasion where he completed fewer
12  than ten in 2012?
13     A.   No.
14     Q.   And do you know why he was not able to
15  complete more than ten meter readings on that
16  occasion?
17     A.   Well, he wouldn't tell me.
18     Q.   When did Mr. Blankus complete fewer than
19  ten meter readings?
20     A.   Every day.
21     Q.   Are you currently assigned to do meter
22  readings?
23     A.   Right now we're on postings.
24     Q.   Okay.  But I'm asking you about meter



OPHELIA CAGE                                                    June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                                279–282

Page 279

1  readings.
2       When was Mr. Blankus able to complete only
3  fewer than ten meter readings?
4       A.   They wouldn't assign him meter readings.
5  He was in the clique so he did little, small work.
6  SEO 1's or full payment certificates.
7       Q.   And do you know why he was assigned to
8  those types of jobs?
9       A.   Lenny put him on 'em.
10      Q.   And do you know why Mr. Caifano put him on
11 those jobs?
12      A.   That's his buddy.
13      Q.   Is that the only reason you believe
14 Mr. Caifano put Mr. Blankus on those types of jobs?
15      A.   Yes.
16      Q.   Do you know the fewest number of postings
17 that any of these individuals identified in
18 Interrogatory No. 6 were able to complete in any day?
19      A.   Well, Darryl Tignor -- they had threatened
20 to write him up because he did so less work.  So they
21 like gave him a heads-up letting him know to do more.
22 "You gonna be wrote up."
23      Q.   Anyone else?
24      A.   Khan did postings, but the rest of these

Page 280

1  people didn't do postings.
2       Q.   Do you know --
3       A.   And they don't read meters.
4       Q.   Do you know the fewest number of postings
5  Khan has completed?
6       A.   80.
7       Q.   So you believe that that's the lowest
8  number he's completed in a day?
9       A.   Yes.
10      Q.   What about for Mr. Tignor?
11      A.   He was way low.  50.
12      Q.   So you believe that was the lowest number
13 he has ever completed in one day?  50?
14      A.   Yes.
15      Q.   During what year do you believe that
16 Mr. Tignor was told to improve his performance or be
17 written up?
18      A.   It was in 2012.
19      Q.   How do you know that he was told that?
20      A.   He mentioned it to the rate takers that
21 they was telling him that he wasn't doing enough work,
22 and he said, "They had told me if I didn't improve, I
23 was gonna be written up."
24      Q.   Do you know whether or not he was written

Page 281

1  up?
2       A.   Rumor has it he was suspended for curbing.
3       Q.   Do you know when he was suspended for
4  curbing?
5       A.   No.  He tried to keep that a secret, but
6  it did get out, but I just don't know when.
7       Q.   Do you know who told him in 2012 that if
8  his performance didn't improve that he would be
9  written up?
10      A.   Mike Duda.
11      Q.   Do you know if Mr. Tignor had any issues
12 or personality conflicts with Mr. Duda?
13      A.   No.
14      Q.   Are both men and women assigned to the AMR
15 truck?
16      A.   Yes.
17      Q.   Other than the individuals listed in your
18 answer to Interrogatory No. 6, do you believe that any
19 other water rate taker was treated more favorably than
20 you were?
21      A.   Sharon Brown.
22      Q.   Anyone else?
23      A.   Tony Kordowski and José.  José is
24 deceased.

Page 282

1       Q.   Anyone else?
2       A.   I think that's it.  Wait a minute.
3  Roze O'Neal isn't on here.  Roze O'Neal.
4       Q.   Is that it?
5       A.   Yes.
6       Q.   Why do you believe that Ms. O'Neal was
7  treated better than you were?
8       A.   She still is.  She uses the City truck to
9  do whatever it is she does 'cause when I get back to
10 the station she's already there.
11      You don't see anything that she has posted
12 or written up anything.  She is on, they claim,
13 special assignment.  Whatever that is.
14      Q.   Is she a water meter assessor?
15      A.   Yes.
16      Q.   So other than being given a City truck,
17 and you not knowing what she's assigned to, do you
18 believe she was treated better in any other way?
19      A.   Do I believe she was treated --
20      Q.   More favorably than you were.
21      A.   Yes.  She still is.
22      Q.   Right.  So we covered two things that you
23 mentioned.
24      Are there any other reasons you believe



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
283–286

Page 283

1 that Ms. O'Neal was treated more favorably than you
2 were?
3     A.   Before she noticed that I was noticing,
4 Ms. O'Neal came in every day five days a week late.
5        One day I was leaving out of the parking
6 lot, it was 7:45, and Ms. O'Neal was going up the ramp
7 coming to work.
8     Q.   Do you know whether or not she was
9 disciplined for that?
10     A.   I don't think she was, but I can't prove
11 it, but rumors (sic) is she never gets disciplined.
12     Q.   Other than what you've already mentioned,
13 do you believe that Ms. O'Neal was treated more
14 favorably in any other way?
15     A.   Yes.
16     Q.   And what are those reasons?
17     A.   Work.
18     Q.   What do you mean?
19     A.   She does not do -- they don't assign her
20 to do the work that I do. Like I said, she's on some
21 special project.
22     Q.   And who's they?
23     A.   Mr. Lewis and at the time Len Califano.
24     Q.   Do you know what special project she's

Page 284

1 working on?
2     A.   That's all they -- no. That's all they
3 tell you. Special project.
4     Q.   Has she been assigned to that special
5 project since Mr. Caifano was the chief water rate
6 taker?
7     A.   Yes. And it was rumored that she was
8 going home, but no one has a picture of it but...
9     Q.   Do you believe that Ms. O'Neal was treated
10 more favorably in any other way?
11     A.   The reasons that I've mentioned.
12     Q.   And then Ms. Brown. Why do you believe
13 she was treated more favorably than you were?
14     A.   They had scheduled Ms. Brown, myself, and
15 Mr. Simmons for a pre-dis based on our work. All
16 three of us went to the pre-dis different times.
17        I ended up getting suspended. When I
18 asked Ms. Brown why she wasn't suspended, she said
19 that she didn't know, but she was not suspended and
20 neither was Mr. Simmons. I was the only one that
21 ended up with a suspension.
22     Q.   Do you believe that Ms. Brown was treated
23 more favorably in any other way?
24     A.   That's the only way.

Page 285

1     Q.   And when were you suspended and Ms. Brown
2 was not?
3     A.   I think it was in 2012.
4     Q.   And what circumstances led to you being
5 suspended?
6     A.   They claim I didn't do enough work.
7     Q.   Were you working with Ms. Brown on that
8 occasion?
9     A.   No. At the end of the day she didn't come
10 in so she asked me to bring her work in. So I saw she
11 had did less stops than I had.
12     Q.   And what assignment was she given on that
13 day when she brought in less stops than you did?
14     A.   She was posting.
15     Q.   How many postings was she assigned to on
16 that day?
17     A.   According to her sheet, she was assigned
18 maybe 20, and I think she did less than ten.
19     Q.   Do you know why she completed fewer than
20 ten?
21     A.   No.
22     Q.   Now, we reviewed your suspensions in 2012
23 for activity in January of 2012 and October of 2012.
24        With that context, does that refresh your

Page 286

1 memory as to when Ms. Brown completed fewer than ten
2 stops?
3     A.   No. I just know that day she gave me her
4 work to bring in 'cause she couldn't come in. So I
5 took her work along with mines, and I happened to
6 see what she had did that day.
7     Q.   And do you know why she had to leave?
8     A.   Well, she came back to the station. She
9 just didn't bring her work in.
10     Q.   Do you know why she asked you to bring her
11 work in?
12     A.   No.
13     Q.   Do you know whether or not Ms. Brown was
14 counseled or received a reprimand?
15     A.   No. Just her, myself, and Renny all were
16 scheduled for a pre-dis. All three of us went to a
17 predisciplinary hearing.
18     Q.   And you were in the same prediscilinary
19 hearing together?
20     A.   Not at the same time.
21     Q.   And do you know whether or not Mr. Simmons
22 was suspended or disciplined?
23     A.   No.
24     Q.   Do you know whether or not Mr. Simmons



OPHELIA CAGE

June 09, 2015

OPHELIA CAGE vs. CITY OF CHICAGO

287–290

Page 287

1   went on a leave of absence at some point?

2       A.   No.

3       Q.   Do you recall him being on a leave of

4   absence?

5       A.   No.

6       Q.   Now, going to your answer to Interrogatory

7   No. 10 on Page 9, you say in your answer that

8   Mr. Tignor was still not able to read all meters

9   assigned.

10          What did you mean by that?

11      A.   No.  I think I said that he didn't do all

12  his postings.

13      Q.   I'm just referring to what is written

14  here.  Are you saying that that's not correct?

15          Do you see the line where I'm referring

16  to?

17      A.   Where it says, "answer"?

18      Q.   It says, "This was a far less strenuous

19  duty," the second sentence, "that permitted him to

20  avoid walking especially in inclement weather because

21  he could read meters from the truck and still was not

22  able to read all meters assigned."

23          So I'm asking you to explain what you mean

24  by "still was not able to read all meters assigned."

Page 288

1       A.   This statement is not true.  Darryl --

2   Renny Simmons was the rate taker that had trouble

3   walking.  There's nothing wrong with Daryl Tignor.

4       Q.   So then are you saying that this should

5   say, "Simmons," instead of Tignor?

6       A.   Yes.  Daryl Tignor is the rate taker

7   that's on the AMR truck.  He was the one that

8   Mike Doodoo (sic) had given him an ultimatum.  "Either

9   you post more properties, read meters," whatever, "or

10  you're gonna be written up."

11      Q.   Okay.  Was Mr. Simmons assigned to the AMR

12  truck?

13      A.   Never.

14      MR. GOMBERG:  It's 12:15.  We've been going for

15  two hours.  I'll need to take a break.

16      MS. NAVE:  Okay.

17          (WHEREUPON, a recess was had.)

18      MS. NAVE:  Back on the record.  Can you read

19  back the last question and answer?

20          (WHEREUPON, the record was read by

21          the reporter as requested.)

22  BY MS. NAVE:

23      Q.   Ms. Cage, did you have the opportunity

24  to speak with your attorney during the break?

Page 289

1       A.   No.

2       Q.   You did not speak with your attorney

3   during the break?

4       A.   No.  I went to the washroom.

5       Q.   Okay.  So do you believe that Mr. Simmons

6   was treated more favorably than you were?

7       A.   No.

8       Q.   Why do you believe that Tony Kordowski was

9   treated more favorably than you were?

10      A.   In 2012, Mike Doodoo -- Duda followed him

11  and his driver José from 49th and Western all the way

12  up north on City time when they were not supposed to

13  be up there.  When they returned that day, he put them

14  down for a pre-dis.

15      Q.   Who put him down for a pre-dis?

16      A.   Tony and his driver José.

17      Q.   How do you know that that happened?

18      A.   I asked José did he have a pre-dis 'cause

19  Mike had told everybody that they were off their

20  route.  As a matter of fact, my union representative

21  even mentioned it, and they went to the pre-dis.

22          After the pre-dis nothing happened, and so

23  I asked José in the parking lot at 49th and Western.

24  I said, "Did you get any time off?"  He said, "No."  I

Page 290

1   said, "Why not?"  He said, "Your guess is as good

2   as mine."

3       Q.   Do you know whether or not either Tony

4   or José received a reprimand?

5       A.   I don't know.  I just know they had a

6   pre-dis.

7       Q.   Is there any other reason that you believe

8   that Tony was treated more favorably than you were?

9       A.   No.  That's the only incident I know of.

10      Q.   And why do you believe that José was

11  treated more favorably?

12      A.   I went to the union representative.  They

13  were off their route, and they should have been

14  suspended but they weren't.

15      Q.   And when you say, "they," who are you

16  referring to?

17      A.   Tony Kordowski and José.

18      Q.   Do you know whether or not they had been

19  disciplined before that incident?

20      A.   No, I don't.

21      Q.   Was there any other reason that you

22  believe that José was treated more favorably?

23      A.   Only what I just mentioned.

24      Q.   Now, going back to your answer to



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
291–294

Page 291

1 Interrogatory No. 10, you say that Mr. Blankus would
2 only be given five to ten stops per day.
3        What is your basis for that statement?
4    A.   I saw the work when he brought it in.
5    Q.   What type of stops did he receive?
6        (WHEREUPON, there was a short
7        interruption.)
8    THE WITNESS:  That's mine.  Excuse me.
9 BY THE WITNESS:
10   A.   Okay.  What was the question?
11 BY MS. NAVE:
12   Q.   What type of stops did Mr. Blankus
13 receive?
14   A.   When he didn't do postings, he would do
15 either SEO 1's or full payment certificates.
16   Q.   So those are the five to ten stops you're
17 referring to?
18   A.   Yes.
19   Q.   And how do you know that he would be asked
20 to follow other water meter takers?
21   A.   Ms. Greenwood had asked our supervisor
22 Tyrone Lewis.  She said, "Everybody supposed to be
23 tracked, but I bet you they don't track Ron Blankus,"
24 and Mr. Lewis said, "You're right," and I was standing

Page 292

1 right there when he told her that.
2    Q.   When did that conversation occur?
3    A.   When we was at 49th and Western.
4    Q.   What year?
5    A.   2012.
6    Q.   When did Ms. Greenwood retire?
7    A.   July, I wanna say, "2012," but I'm not
8 sure.  I know it was in July.
9    Q.   So you don't recall when Ms. Greenwood
10 retired?
11   A.   No.
12   Q.   Do you recall it being before 2012?
13   A.   No.  I know -- I don't think it was before
14 2012.
15   Q.   So you believe that that conversation took
16 place before July 2012?
17   A.   The conversation with Ron Blankus, yes.
18   Q.   That conversation occurred with
19 Mr. Blankus?
20   A.   No.  The conversation about Mr.
21 Ron Blankus.
22   Q.   And where did that conversation take
23 place?
24   A.   I thought it was 49th Street.  It was at

Page 293

1 39th and Iron.
2    Q.   And why were you at 39th and Iron?
3    A.   That's where we were scheduled to work out
4 of.
5    Q.   In 2012?
6    A.   Yes.  They moved us over.  I think it was
7 2012 we was at 39th and Iron.
8    Q.   And you also say that Mr. Blankus was not
9 able to read all meters assigned but was not
10 disciplined for his inability to read said meters.
11       And on what facts do you base that
12 statement?
13   A.   They didn't give Mr. Blankus a lot of
14 stops.
15   Q.   So how do you know that he was not able to
16 read all meters assigned?
17   A.   He only read what they assigned him so he
18 didn't have meters.  He did, like I said, full payment
19 certificates and SEO 1's.
20   Q.   Therefore, Mr. Blankus was able to
21 complete his assignments?
22   A.   No.  He only did, like I said, between
23 eight and ten stops in eight hours.
24   Q.   When did he only do eight to ten stops in

Page 294

1 eight hours?
2    A.   This was five days a week every day.
3    Q.   He was given five to ten stops you say --
4    A.   No.  I don't --
5    Q.   -- in your answer?
6    A.   I don't know how many he was given, but
7 that's all he brought in.
8    Q.   So are you saying that this answer's
9 incorrect?
10   A.   I don't know what he was assigned, but
11 that's all he completed every day.
12   Q.   And those were the SEO 1's and full
13 payment certificates?
14   A.   Yes.
15   Q.   Do you know why he did eight to ten stops
16 per day?
17   A.   Lenny allowed him to do it.
18   Q.   What are more favorable neighborhoods in
19 your opinion?
20   A.   The South Side.  Not the North Side and
21 not the East Side.  I prefer the South Side.
22   Q.   Why was the South Side more favorable?
23   A.   The streets are not cut off by railroad
24 tracks, or construction, or any other thing that they



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
295–298

Page 295

1  do.
2       Normally when you get on the street, you
3  can take that street all the way through.  You don't
4  have to detour and go around to get back on it.
5       Q.   Is that the only reason that the South
6  Side is more favorable?
7       A.   And the stops that they give us they're
8  not spreaded out on the South Side as they are up
9  north and on the East Side.
10      Q.   Any other reason that you believe the
11  South Side is more favorable?
12      A.   Centrally located.
13      Q.   You believe that the South Side is
14  centrally located?
15      A.   Yes.
16      Q.   Centrally located to what?
17      A.   Whatever routes they give us -- like I
18  said, you can take just about any street on the South
19  Side, and you don't get so far, and then they got
20  a construction site up, and you got to detour around,
21  and then you have to figure out which street you have
22  to take to get back on that street.
23      Q.   Do you prefer the South Side because it's
24  closer to your home?

Page 296

1       A.   No.  'Cause the routes they assign me to
2  are not close to my house.  I've been out in Roseland.
3  I don't live anywhere near Roseland.
4       Q.   Did you ever tell Mr. Lewis that you
5  prefer to be assigned to the South Side?
6       A.   No.  When I became a water rate taker,
7  that's the side that they assigned me to.
8       Q.   When you still had stations?
9       A.   Yes.
10      Q.   Now, going to your answer to No. 11, you
11  say, "After leaving the apartment, Plaintiff read two
12  to three meters and then moved on to Jewel to read
13  their meter."
14       So are you saying that you only read two
15  to three meters on January 24th, 2012?
16      A.   No.  I went into my second book.  I did
17  about 20 stops out of that second book.
18      Q.   Now, going to your answer to Interrogatory
19  No. 12, is this answer complete?
20      A.   Yes.
21      Q.   So there's nothing that you want to add
22  or change?
23      A.   No.
24      Q.   Now, you state in your answer, "he,"

Page 297

1  meaning Mr. Duda, "referred to female employees as
2  cunts."
3       Did Mr. Duda ever refer to you by that
4  term?
5       A.   No.
6       Q.   Did he also refer to male employees as
7  cunts?
8       A.   Yes.
9       Q.   Who did he refer to of the male water rate
10  takers as a cunt?
11      A.   Edward Bandero.
12      Q.   Any other male water rate takers?
13      A.   No.
14      Q.   Did you tell the City's EEO office that
15  Mr. Duda referred to you, in your opinion, as an old
16  black bitch?
17      A.   No.
18      Q.   You did not tell the EEO office that you
19  overheard Mr. Duda make that statement about you?
20      A.   No.
21      Q.   Did you tell the EEO office about the
22  comment that Mr. Caifano allegedly made to you about
23  your race?
24      A.   No.

Page 298

1       Q.   Why not?
2       MR. GOMBERG:  Asked and answered.
3  BY THE WITNESS:
4       A.   Earlier I stated that when I gave them my
5  statement I had put dispairing (sic) remarks so I
6  would later elaborate on it.
7  BY MS. NAVE:
8       Q.   No.  You referred to your Interrogatory
9  answer.  I'm referring to your EEO statement.
10      A.   No.  I did not tell them.
11      Q.   So why didn't you tell the City's EEO
12  office about the comment that Mr. Caifano allegedly
13  made to you?
14      MR. GOMBERG:  Asked and answered.
15  BY THE WITNESS:
16      A.   I didn't use exact words, but I felt like
17  I could comment on it later.
18  BY MS. NAVE:
19      Q.   And at what point did you think that you
20  would be able to comment on it?
21      A.   Well, I figured when they did their
22  investigation.
23      Q.   Do you know whether or not an
24  investigation was ever done?



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
299–302

Page 299

1     A.   No.
2     Q.   So did you ever follow up with the EEO
3  office to tell them after your initial statement about
4  the comment that Mr. Caifano allegedly made to you?
5     A.   No.
6     Q.   Did you tell the City's EEO office that
7  Mr. Caifano allegedly told you that, "As long as you
8  keep filing charges, I'll keep suspending you"?
9     A.   No.
10    Q.   And why is that?
11    A.   I kept that to myself.
12    Q.   Why did you keep that to yourself?
13    A.   Because I figured the less anyone in the
14  City knew about Mr. Califano's activities the better
15  it would be for me.
16    Q.   And why did you believe that?
17    A.   Because I was getting suspended on a
18  monthly basis.
19    Q.   Did you tell the City's EEO office about
20  the comments that Mr. Duda allegedly made in the
21  workplace?
22    MR. GOMBERG:   Asked and answered.
23  BY THE WITNESS:
24    A.   No.

Page 300

1  BY MS. NAVE:
2     Q.   You did not mention any statements?
3     A.   No.
4     MR. GOMBERG:   Asked and answered.
5  BY MS. NAVE:
6     Q.   Did you tell Mr. Lewis about the comments
7  that Mr. Caifano allegedly made to you?
8     A.   No.  I did not.
9     Q.   And why not?
10    A.   Because Mr. Lewis was like a figure head.
11  He was afraid of his job.  So a lot of things
12  Mr. Lewis thought that was wrong, but he didn't make
13  any waves about 'em.
14    Q.   I'm just asking you why you did not tell
15  Mr. Lewis about the comments that Mr. Caifano
16  allegedly made.
17    MR. GOMBERG:   Asked and answered.  Just a
18  second.  There's no question pending.
19    MS. NAVE:   That is a question.
20  BY MS. NAVE:
21    Q.   Why didn't you tell Mr. Lewis about the
22  comments that Mr. Caifano allegedly made to you?
23    MR. GOMBERG:   She just answered that question.
24    MS. NAVE:   Well, I would like her to answer it

Page 301

1  again.
2     MR. GOMBERG:   Well, I know you would, but I
3  object to it.
4     MS. NAVE:   Okay.
5     MR. GOMBERG:   You can go ahead and answer it
6  again.
7  BY THE WITNESS:
8     A.   It wasn't gonna do any good.
9  BY MS. NAVE:
10    Q.   And how do you know it wasn't gonna do any
11  good?
12    A.   My previous statement.  He was a figure
13  head.
14    Q.   Did you believe that Mr. Duda was a figure
15  head?
16    A.   No.
17    Q.   So you went to Mr. Duda and asked Mr. Duda
18  for paperwork so you could file charges about
19  Mr. Caifano?
20    A.   Yes.
21    Q.   Did you ever ask Mr. Lewis for paperwork
22  so you can file charges against Mr. Caifano?
23    A.   No.
24    Q.   So you thought it would be more effective

Page 302

1  to go to Mr. Duda than to Mr. Lewis?
2     A.   Yes.
3     Q.   And why is that?
4     A.   Because at the time Mr. Doodoo and
5  Mr. Lewis shared an office, but Mr. Doodoo was running
6  the office.  Mr. Lewis was just sitting there.
7  Mr. Doodoo ran the office.
8     Q.   And you keep referring to him as Doodoo,
9  but you know --
10    A.   Duda.
11    Q.   -- it's Duda, correct?
12    A.   Duda.
13    Q.   Did you have any issues or personality
14  conflicts with Mr. Duda?
15    A.   In the beginning when they assigned me
16  over there to his station, but after that, no.
17    Q.   So you felt more comfortable going to
18  Mr. Duda than to Mr. Lewis?
19    A.   No.
20    Q.   Did you ever speak with Leo Lillard about
21  the comments that Mr. Caifano allegedly made to you?
22    A.   No.
23    Q.   And did you ever speak with
24  Julie Hernandez-Tomlin about the comments that



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
303–306

Page 303

1 Mr. Caifano allegedly made to you?
2    A.   No.
3    Q.   Why didn't you go to either of those two
4 individuals?
5    A.   I just didn't go to -- I don't even know
6 who Julie -- I've never even seen her.  I don't even
7 know -- I know her title, but I never went to her for
8 anything.
9    MS. NAVE:  Let's mark this as Exhibit No. 14.
10       (WHEREUPON, a certain document was
11       marked Cage Deposition Exhibit
12       No. 14, for identification, as of
13       06/09/2015.)
14    MR. GOMBERG:  How much longer do you have,
15 counsel?
16    MS. NAVE:  Probably like 10 to 20 minutes.
17 BY MS. NAVE:
18    Q.   Ms. Cage, do you recognize Exhibit 14?
19    A.   Yes.
20    Q.   Is this the statement that you gave to the
21 City's EEO office on June 29th, 2012?
22       Well, you can turn to the last page.  Is
23 that your signature on the last page?
24    A.   Yes, it is.

Page 304

1    Q.   And did you also put in the date next to
2 your name?
3    A.   6/29/12.
4    Q.   And does your handwriting also appear
5 within the document?
6    A.   Yes.
7    Q.   And you made changes to the statement; is
8 that correct?
9    A.   Changes where?
10    Q.   The handwriting where you made additions
11 and changes to the statement, and then you initialed;
12 is that correct?
13    A.   Yes.
14    Q.   So you reviewed this statement before you
15 signed off on it, correct?
16    A.   Yes.
17    Q.   So were you aware that you were affirming
18 that the statement was true and correct to the best of
19 your knowledge?
20    A.   Yes.
21    Q.   Now, going to Page 3417, towards the
22 bottom of the page, the paragraph that starts, "Three
23 days ago."
24       Do you see that?

Page 305

1    A.   Yes.
2    Q.   It says, "Three days ago, as I walked into
3 work at the beginning of the day and there were three
4 males in addition to Duda present, and I heard Duda
5 say my name 'Cage' followed by his statement 'old
6 black bitch.'"
7       Is that what you told the City's EEO
8 office?
9    A.   Yes, it is.
10    Q.   But you did not mention Mr. Caifano's
11 alleged statement, correct?
12    MR. GOMBERG:  Objection.
13 BY THE WITNESS:
14    A.   No.
15 BY MS. NAVE:
16    Q.   Now, going to the next page, 3418, at the
17 very bottom it says, "Lots of employees never finish
18 their work assignment for the day, but I am the only
19 one being called out for a predisciplinary."
20       Is that a true and accurate statement?
21    A.   I'm trying to see where you're reading
22 from.
23    Q.   At the very bottom.  The second to last
24 typed sentence.

Page 306

1    A.   That's correct.
2    Q.   Ms. Cage, is it true you were disciplined
3 for poor work performance even before Mr. Caifano
4 became a chief water rate taker?
5       I'm not asking about your statement.  I'm
6 just asking you the question in general so you can
7 close up that exhibit.
8    A.   I know.  I'm trying to think.  I think
9 maybe once.  Maybe twice a think.
10    MS. NAVE:  All right.  Let's mark this as Group
11 Exhibit No. 15.
12       (WHEREUPON, certain documents were
13       marked Cage Deposition Group Exhibit
14       No. 15, for identification, as of
15       06/09/2015.)
16 BY MS. NAVE:
17    Q.   Ms. Cage, Group Exhibit 15 contains copies
18 of the disciplinary actions that you received as a
19 water rate taker; is that correct?
20    A.   Yes.
21    Q.   And we can just go through a few beginning
22 at the top page where you were disciplined for poor
23 work performance, correct?
24    A.   Yes.



OPHELIA CAGE                                                    June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                                    307–310

Page 307

1    Q.    So you were disciplined more than just
2  one or two times for poor work performance, correct?
3    A.    Yes.
4    Q.    And you were disciplined under different
5  supervisors, correct?
6    A.    Yes.
7    MS. NAVE:  Let's mark this as Group Exhibit
8  No. 16.
9         (WHEREUPON, certain documents were
10             marked Cage Deposition Group Exhibit
11             No. 16, for identification, as of
12             06/09/2015.)
13 BY MS. NAVE:
14   Q.    Ms. Cage, you're being handed Group
15 Exhibit 16.  Do you recognize your performance
16 evaluations?
17   A.    Yes.
18   Q.    If you flip through year 2006 evaluation,
19 183, do you see that?
20   A.    Yes.
21   Q.    And do you see that you received seventies
22 in the first three categories?
23   A.    Yes.
24   Q.    And then going to the next page, 270, do

Page 308

1  you see that you received a 75 in the first category
2  for quality of work?
3    A.    Yes.
4    Q.    Now, going to the next page, 178, you
5  received seventies for quality of work and quantity
6  of work, correct?
7    A.    Yes.
8    Q.    And then going to the last page, 3006, you
9  received 68, 69, and 67 for the first three categories
10 respectively, correct?
11   A.    Yes.
12   Q.    And that evaluation was completed by
13 Tyrone Lewis?
14   A.    Yes.
15   Q.    Now, Ms. Cage, in your Interrogatory
16 answer No. 5, you state that, "Plaintiff did not seek
17 medical treatment with a physician.  Stress caused
18 Plaintiff anxiety, lack of sleep, lack of appetite,
19 and headaches which Plaintiff treated with
20 over-the-counter medication, rest, and relaxation
21 techniques."
22        When did you begin taking over-the-counter
23 medication?  It's on Page 5 at the top, but my
24 question isn't based on your answer.  I'm just asking

Page 309

1  you when you began taking over-the-counter medication
2  for the issues that I just mentioned.
3    A.    Probably for stress.
4    Q.    What type of medication did you take for
5  stress?
6    A.    I just -- the only medication that I used
7  to take was aspirin.
8    Q.    Did a doctor ever prescribe aspirin to
9  you?
10   A.    Not for this.  But now, yes.
11   Q.    When did you begin taking aspirin?
12   A.    Do you mean when I, or when the doctor
13 prescribed it?
14   Q.    No.  I'm asking you when you started
15 taking aspirin.
16   A.    I've always taken aspirin.
17   Q.    Have you always taken it on a daily basis?
18   A.    No.
19   Q.    Have you ever taken it on a daily basis?
20   A.    Now I do.
21   Q.    When did you begin taking it on a daily
22 basis?
23   A.    2000.
24   Q.    In 2000?

Page 310

1    A.    Yes.
2    Q.    And why did you begin taking aspirin in
3  2000 on a daily basis?
4    A.    The doctor prescribed it for me.
5    Q.    Which doctor is that?
6    A.    The doctor I have now.  Dr. Sayeff.
7    Q.    Can you spell his last name?
8    A.    Her last name is Nadine S-a-y-e-f-f.
9    Q.    And why did your doctor prescribe
10 medication, or aspirin rather, in 2000?
11   A.    Because I had a heart attack.
12   Q.    Is that the only reason that aspirin was
13 prescribed to you?
14   A.    Yes.
15   Q.    What relaxation techniques do you use?
16   A.    To sit in a room and be quiet.
17   Q.    When did you begin using those relaxation
18 techniques?
19   A.    I still use 'em.  I been using 'em all
20 along.  Whenever there's a stress, I go home, and I
21 relax.
22   Q.    All along since when?
23   A.    I started working for the City in 1990 --
24 1985.



OPHELIA CAGE                                        June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                    311–314

Page 311

1    Q.   So you have been using relaxation
2  techniques since 1985?
3    A.   Yes.
4    Q.   Have you changed your relaxation
5  techniques in any way since 1985?
6    A.   I don't do it as much as I used to.
7    Q.   When did you stop doing it as much as you
8  used to?
9    A.   1991.
10   Q.   How often would you perform relaxation
11  techniques between 1985 and 1991?
12   A.   Three to four times a week.
13   Q.   Since 1991 how many times per week have
14  you done these relaxation techniques?
15   A.   Maybe twice a week.
16   Q.   Has that gone up or gone down at any
17  point?
18   A.   Gone down.
19   Q.   When did it go down?
20   A.   I'd say, "1995."
21   Q.   So beginning in 1995 how many times would
22  you perform these relaxation techniques?
23   A.   I do it now twi -- since then twice a
24  week.

Page 312

1    Q.   I thought you said that it went down in
2  1995?
3    A.   It used to be three to four, and now it's
4  twice.
5    Q.   So then when did it go down to two times
6  per week?
7    A.   That's what I'm doing now.  So after 1985.
8  So '91 to '95.
9    Q.   Has that gone up or gone down at any
10  point?
11   A.   It's gone down.
12   Q.   It's gone down to how many times?
13   A.   Right now twice.  Twice a week.
14   Q.   I'm asking you since you have been doing
15  it two times a week has that gone down at any point?
16   A.   It's just the same.
17   Q.   When did you begin to experience
18  headaches?
19   A.   I'd say, "2005."
20   Q.   How many times a week would you get a
21  headache?
22   A.   I don't get 'em that often.  Maybe once a
23  week.
24   Q.   Has that decreased since 2005?

Page 313

1    A.   It's the same.
2    Q.   Do you know what causes your headaches?
3    A.   My job.
4    Q.   Did you ever see a doctor for your
5  headaches?
6    A.   No.
7    Q.   When did you begin experiencing a lack of
8  appetite?
9    A.   I don't know 'cause I still experience a
10  lack of appetite.
11   Q.   How often do you experience a lack of
12  appetite?
13   A.   How often?
14   Q.   Yes.
15   A.   Four, maybe five days a week.
16   Q.   Do you ever not eat a meal as a result of
17  your lack of appetite?
18   A.   Yes.
19   Q.   What meal do you skip as a result of your
20  lack of appetite?
21   A.   Breakfast.
22   Q.   How much do you weigh currently?
23   A.   I think two oh four.
24   Q.   For how long have you weighed 204 pounds?

Page 314

1    A.   Maybe a year.
2    Q.   What did you weigh last year?
3    A.   Two-fourteen.
4    Q.   How long did you weigh two-fourteen?
5    A.   Maybe since 2013.
6    Q.   What did you weigh prior to 2013?
7    A.   I think it was three oh four.
8    Q.   For how long did you weigh 304 pounds?
9    A.   Maybe a year.
10   Q.   What did you weigh prior to that?
11   A.   I'm not sure.
12   Q.   Was it more or less than 304 pounds?
13   A.   It was less.
14   Q.   How much less?
15   A.   Maybe five pounds.
16   Q.   When did your anxiety and lack of sleep
17  begin?
18   A.   In 2008 I think.
19   Q.   Has your anxiety improved since 2008?
20   A.   A little.
21   Q.   When did it improve?
22   A.   A year later.
23   Q.   Has it gotten worse at any point after
24  that?



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
315–318

Page 315

1     A.   Yes.
2     Q.   When did it get worse?
3     A.   2010.
4     Q.   And do you know why it got worse?
5     A.   Personal problems.
6     Q.   Did it improve again after 2010?
7     A.   No.
8     Q.   Has your lack of sleep improved since
9  2008?
10    A.   Yes.
11    Q.   When did it improve?
12    A.   2014.
13    Q.   And what made it improve?
14    A.   I don't know.  I just stopped worrying
15 about a lot of things.
16    Q.   Have you seen a doctor for any of these
17 issues?  Anxiety?  Lack of sleep?  Lack of appetite?
18    A.   No.
19    Q.   Have you seen a doctor for stress?
20    A.   No.
21    MS. NAVE:  I think we're going to wrap up.  I
22 just need a few minutes.
23         (WHEREUPON, a recess was had.)
24    MS. NAVE:  Back on the record.

Page 316

1  BY MS. NAVE:
2     Q.   Ms. Cage, do you know whether or not
3  Ms. Greenwood lives alone?
4     A.   No.
5     Q.   You don't know?
6     A.   I don't know.
7     MS. NAVE:  No other questions.
8     MR. GOMBERG:  I have a few questions.
9              EXAMINATION
10 BY MR. GOMBERG:
11    Q.   Ms. Cage, do you know when Mike Duda was
12 your supervisor?
13    A.   I think (unintelligible.)
14    Q.   I can't hear you.  What?  If you're not
15 sure, don't talk out loud.  Just answer the question
16 when you're sure of what your answer is because the
17 court reporter's writing everything down.  So don't
18 think to yourself out loud.  You can think, but think
19 to yourself.
20         Do you know when he was your supervisor?
21    A.   19 --
22    Q.   Mike Duda.
23    A.   I'd say, "2006."
24    Q.   Until when?

Page 317

1     A.   Until he retired off and on.
2     Q.   So until when?  What year?
3     A.   September.
4     Q.   Of what year?
5     A.   2012.
6     Q.   So he was your supervisor in 2012?
7     MS. NAVE:  Objection.  Leading.
8  BY MR. GOMBERG:
9     Q.   Is that right?
10    A.   Yes.
11    Q.   There's a person who you testified about.
12 His first name is Jeff.  I'm not sure how to pronounce
13 his last name.  I think it's spelled S-o-j-u-k-a?
14    A.   Yes.
15    Q.   Do you know that name?
16    A.   Sojka.
17    Q.   Sojka.  Is he a rate taker?
18    MS. NAVE:  Objection.  Foundation.
19 BY THE WITNESS:
20    A.   Yes.
21 BY MR. GOMBERG:
22    Q.   Do you know if he swiped in when he was
23 working for the Water Department?
24    MS. NAVE:  Objection.  Foundation.

Page 318

1  BY THE WITNESS:
2     A.   Yes.
3  BY MR. GOMBERG:
4     Q.   Do you know whether he wa -- whether he
5  did or he didn't?
6     MS. NAVE:  Same objection.
7  BY MR. GOMBERG:
8     Q.   Is that what you're saying?
9     A.   Sometimes he swiped out -- in at the
10 station I was located at which was 49th and Western.
11    Q.   Do you know whether or not he always
12 swiped out?
13    MS. NAVE:  Objection.  Foundation.
14 BY THE WITNESS:
15    A.   No.
16 BY MR. GOMBERG:
17    Q.   Do you know whether he swiped out when he
18 was supposed to swipe out?
19    MS. NAVE:  Objection to the form of the question
20 and foundation.
21 BY THE WITNESS:
22    A.   No.
23 BY MR. GOMBERG:
24    Q.   You mentioned the last time about a union



OPHELIA CAGE                                                      June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                                       319–322

Page 319

1 representative in attendance at a predisciplinary
2 hearing, and you mentioned the name of
3 Michael Tierney.
4        Is there a union representative that you
5 had by the name of John Gavin at any time?
6    A.   Yes.
7    Q.   So when you mentioned Tierney's name, was
8 that correct, or should it have been John Gavin?
9    MS. NAVE:  Objection to the form of the
10 question.
11 BY THE WITNESS:
12    A.   It should have been John Gavin.
13 BY MR. GOMBERG:
14    Q.   And was this in January of 2012, the
15 predisciplinary hearing in January of 2012, you're
16 talking about?
17    A.   Yes.
18    MS. NAVE:  Objection.  Leading.
19 BY MR. GOMBERG:
20    Q.   Is it your testimony that when the GPS was
21 being used while you were a water rate taker that the
22 GPS was not accurate?
23    A.   Yes.
24    Q.   And is it also your testimony that while

Page 320

1 you were a water rate taker that the G5 was not
2 accurate?
3    MS. NAVE:  Objection.  Leading.
4 BY THE WITNESS:
5    A.   Yes.
6 BY MR. GOMBERG:
7    Q.   Now, is it your testimony that in 2012
8 you received certain suspensions, correct?
9    A.   Yes.
10    Q.   And is it your testimony that Mr. Caifano
11 was the decision maker regarding those suspensions?
12    MS. NAVE:  Objection.  Leading.  Foundation.
13 BY THE WITNESS:
14    A.   Yes.
15 BY MR. GOMBERG:
16    Q.   Is it also your testimony that you filed
17 certain charges with the EEOC, correct?
18    A.   Yes.
19    Q.   And you also filed various grievances,
20 correct?
21    MS. NAVE:  Objection to the form of the
22 question.  Foundation.  The term various is vague.
23 BY THE WITNESS:
24    A.   Yes.

Page 321

1 BY MR. GOMBERG:
2    Q.   Were those charges with the EEOC that
3 you referred to claiming -- were they claiming
4 discrimination?
5    MS. NAVE:  Objection.  Foundation.
6 BY THE WITNESS:
7    A.   Yes.
8 BY MR. GOMBERG:
9    Q.   And were the grievances that you filed,
10 were some of those claiming discrimination?
11    MS. NAVE:  Objection.  Foundation.
12 BY THE WITNESS:
13    A.   Yes.
14    MS. NAVE:  Leading.  Counsel, do you want to
15 testify for the Plaintiff?  I just think that would
16 be a lot easier than asking her questions.
17    MR. GOMBERG:  Counsel, as long as you bring it
18 up, I'll be happy to address it.
19        I have suggested in this deposition and
20 others that you and your co-counsel have been making
21 objections that are, for the most part, baseless.
22    MS. NAVE:  Okay.  Counsel, I --
23    MR. GOMBERG:  I'm still talking.
24    MS. NAVE:  I don't care.  This is --

Page 322

1    MR. GOMBERG:  Do not interrupt me.
2    MS. NAVE:  This is a waste of time.  I'm going
3 to stop you because I am not --
4    MR. GOMBERG:  You can't stop me.  I'm here to
5 talk.
6    MS. NAVE:  -- here to listen to you lecture me.
7 Save it and finish the deposition.
8    MR. GOMBERG:  I'm still talking.  Now, if you
9 want to stop me from talking --
10    MS. NAVE:  This is completely improper.
11    MR. GOMBERG:  Please don't talk over me.
12    MS. NAVE:  I'm going to talk over you because
13 you are wasting time and obstructing this deposition.
14    MR. GOMBERG:  I'm trying to answer your
15 question.
16    MS. NAVE:  You're not answering any question
17 because I didn't ask you a question.
18    MR. GOMBERG:  Yes, you did.  Yes, you did.  You
19 want it read back?
20    MS. NAVE:  That has nothing to do with what
21 you're telling us right now based on other
22 depositions.
23    MR. GOMBERG:  I am responding -- if you don't
24 stop, I'm going to have to stop the deposition and



OPHELIA CAGE                                              June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                             323–326

Page 323

1  talk to Judge Zagel. I'm trying to answer your
2  question. You asked the question.
3      MS. NAVE: I'm asking you --
4      MR. GOMBERG: Do not interrupt me.
5      MS. NAVE: -- if you want to testify. I'm not
6  talking about prior depositions or our objections. So
7  I'm putting on the record that this is a waste of
8  time. You can continue --
9      MR. GOMBERG: I will.
10     MS. NAVE: -- but in my opinion you are
11 obstructing the deposition, and you are coaching this
12 witness.
13     MR. GOMBERG: Are you done now? Are you done?
14     MS. NAVE: Yes. I made my record.
15     MR. GOMBERG: Good. Could you read back what I
16 started to say?
17         (WHEREUPON, the record was read by
18          the reporter as requested.)
19     MR. GOMBERG: No. No. No. My -- what I was
20 saying. My questions before counsel interrupted me.
21 You don't know what I'm talking about. I'll start
22 over.
23         In answer to your question, and as I said
24 before, and before you interrupted me, there have been

Page 324

1  a number of depositions taken in this case, and I have
2  said in those depositions that you and your co-counsel
3  have made what I consider to be baseless objections.
4  Objections that were not based on the rules of
5  evidence, and that they were, in part at least,
6  obstructionist and unprofessional.
7          And despite my objections they continued.
8  Almost every question I ever asked was objected to,
9  including an objection of no foundation to a question
10 that I asked, "If you know."
11         And, in my opinion, as I understand the
12 rules of evidence, if the question is if you know, the
13 objection of no foundation is incorrect at least and
14 in bad faith.
15         So in answer to your question, no. I am
16 not improperly asking this -- my client questions, and
17 your sarcastic question of whether I want to testify
18 instead of my client, in my opinion, is unprofessional
19 and may well be sanctionable.
20         Now, I intend to continue.
21     MS. NAVE: Okay, counsel.
22     MR. GOMBERG: What was the last question I
23 asked?
24     MS. NAVE: Now I'm going to continue because

Page 325

1  what you just stated on the record is improper and
2  unprofessional.
3          We have a record of the other depositions,
4  and I certainly do not need a lecture from you. I've
5  been an attorney long enough to know what are proper
6  objections and what are proper questions, and what you
7  are asking of your client does not constitute a
8  proper question. So now you can continue.
9      MR. GOMBERG: What was the last question that
10 was asked?
11         (WHEREUPON, the record was read by
12          the reporter as requested.)
13 BY MR. GOMBERG:
14     Q.   And were some of the charges you filed
15 with the EEOC claiming retaliation?
16     A.   Yes.
17     Q.   So is it your belief that after you filed
18 the EEOC charges that you were retaliated against?
19     MS. NAVE: Objection to the form of the
20 question.
21 BY THE WITNESS:
22     A.   Yes.
23 BY MR. GOMBERG:
24     Q.   And did that retaliation take the form of

Page 326

1  future suspensions?
2      MS. NAVE: Objection to the form of the
3  question. Foundation. Leading.
4  BY THE WITNESS:
5      A.   Yes.
6  BY MR. GOMBERG:
7      Q.   And what suspensions were those --
8      MS. NAVE: Objection to the form of the
9  question. Foundation.
10 BY MR. GOMBERG:
11     Q.   -- that you're referring to?
12     A.   January 24th, 2012, and the suspension
13 after that, which was in March of 2012.
14     Q.   Okay. And who suspended you those two
15 times?
16     MS. NAVE: Objection. Foundation.
17 BY THE WITNESS:
18     A.   Len Califano.
19 BY MR. GOMBERG:
20     Q.   How do you compare your work performance
21 in the years 2011 and 2012 to your fellow rate takers?
22     MS. NAVE: Objection to the form of the
23 question.
24

OPHELIA CAGE

June 09, 2015

OPHELIA CAGE vs. CITY OF CHICAGO

327–330

Page 327

1  BY THE WITNESS:
2      A.  I did my job.
3  BY MR. GOMBERG:
4      Q.  Okay.  How do you compare to other people
5  who were water rate takers?
6      MS. NAVE:  Same objection.
7  BY THE WITNESS:
8      A.  I did more work than a lot of them did.
9  BY MR. GOMBERG:
10     Q.  And what do you base that on?
11     A.  The sheets that I would turn in.
12     Q.  I can't hear you.
13     A.  The sheets I turned in and the iPad.
14     Q.  And how do you know what -- that you did
15  more work than other rate takers?
16     A.  Mr. Leonard (sic) called me the star, and
17  I asked him what did that statement mean.  That
18  statement meant that I did more work than all the
19  other rate takers.
20     Q.  Now, during the period of 2011, 2012, were
21  you under stress on the job?
22     MS. NAVE:  Objection to the form of the
23  question.
24

Page 328

1  BY THE WITNESS:
2      A.  Yes, I was.
3  BY MR. GOMBERG:
4      Q.  And can you describe what that was?
5      A.  I knew my work was constantly being
6  scrutinized, and so I made it a point to do as much
7  or more than the other rate takers.
8      Q.  In terms of the testimony that you've
9  given in this deposition as to how you were treated on
10  the job, how did that affect your health or medical
11  condition?
12     MS. NAVE:  Objection to the form of the
13  question.
14  BY THE WITNESS:
15     A.  Well, my medical condition, in my opinion,
16  has -- it's not what it used to be.  It's really low.
17  I'm taking medication.
18  BY MR. GOMBERG:
19     Q.  For what?
20     MS. NAVE:  Asked and answered.
21  BY THE WITNESS:
22     A.  Cholesterol.  High blood pressure.
23  Glaucoma.  The majority I can't remember because I'm
24  taking a lot of medication.

Page 329

1  BY MR. GOMBERG:
2      Q.  What does that have to do with the
3  treatment that you've been testifying about that
4  you've been receiving on the job?
5      MS. NAVE:  Objection to the form of the
6  question.
7  BY THE WITNESS:
8      A.  I think my blood pressure -- the treatment
9  I received on the job has a lot to do with my blood
10  pressure.
11  BY MR. GOMBERG:
12     Q.  In what way?  Can you describe that,
13  please?
14     MS. NAVE:  Objection.  Calls for a medical
15  opinion.
16  BY THE WITNESS:
17     A.  Well, I don't eat, and my doctor told
18  me --
19  BY MR. GOMBERG:
20     Q.  I can't hear you.
21     A.  I don't eat the way I should, and I think
22  that has a lot to do with the job.  I don't eat
23  because my insides is all messed up.  I mean, my
24  stress level.

Page 330

1          So I don't feel like I'm hungry, although
2  I have to eat because if I don't I'll pass out.  But I
3  still don't eat, and that has a lot to do with this
4  job.
5      Q.  In what way is it related to the job?
6      MS. NAVE:  Objection.  Calls for a medical
7  opinion.
8  BY THE WITNESS:
9      A.  The stress that I'm under.  When I first
10  started this job in '91, none of these conditions were
11  present.  It was a joy to come to work.  Now, you
12  dread coming there.
13  BY MR. GOMBERG:
14     Q.  Does any of it have to do with the way
15  you've been describing your treatment in 2011 and 2012
16  on the job?
17     MS. NAVE:  Objection.  Form.  Foundation.
18  BY THE WITNESS:
19     A.  Yes, it does.
20     MS. NAVE:  And it calls for a medical opinion.
21  May I finish my objection, please, before you answer?
22  We don't want to talk over each other.
23     MR. GOMBERG:  Are you done?
24     MS. NAVE:  Marilyn, were you able to get my



OPHELIA CAGE                                                    June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                                   331–334

Page 331

1  objections?
2      THE COURT REPORTER:  Yes.  I got it, and she
3  answered, "Yes, it does."  You had objections to form,
4  foundation, and it calls for a medical opinion.
5      MS. NAVE:  Okay.
6      MR. GOMBERG:  What was Ms. Cage's answer?
7      THE COURT REPORTER:  "Yes, it does."
8      MR. GOMBERG:  Pardon me?
9          (WHEREUPON, the last question and
10             answered was read by the reporter as
11             requested.)
12 BY MR. GOMBERG:
13     Q.   Were you through with your answer?
14     A.   Yes.
15     MR. GOMBERG:  That's all I have.  Anything else,
16 counsel?
17     MS. NAVE:  Yes.
18         FURTHER EXAMINATION
19 BY MS. NAVE:
20     Q.   Is the G5 that you're referring to your
21 handheld device for performing meter readings?
22     A.   Yes.
23     Q.   And that's separate from the Nextel?
24     A.   Yes.

Page 332

1      Q.   Do you know whether or not the G5 has GPS
2  tracking capabilities?
3      A.   According to the supervisor, he said that
4  it does.  I don't know.
5      Q.   What supervisor told you that the handheld
6  has GPS tracking?
7      A.   Tyrone Lewis.
8      Q.   Why do you believe that Len Caifano was
9  the decision maker regarding your 2012 suspensions?
10     A.   Because Mr. Lewis told me that once he
11 submits the paperwork to Lenny that he has no more say
12 so over it.  The decision is with Lenny.
13     Q.   What decision is with Mr. Caifano?
14     A.   If you're gonna be suspended or not.
15     Q.   When did Mr. Lewis tell you that
16 Mr. Caifano decided whether or not you would be
17 suspended?
18     A.   He said, "Whenever there is" -- whenever
19 he writes up a descript (sic) of future work, he sends
20 it to Lenny, and that's the only input he has.  He
21 writes it up, and he sends it down to Lenny.
22     Q.   Now, I'm going back because you said that
23 Mr. Lewis told you that Mr. Caifano would decide
24 whether or not you would be suspended.

Page 333

1      When did Mr. Lewis make that statement
2  allegedly?
3      A.   2012.
4      Q.   When in 2012?
5      A.   January 2012.
6      Q.   Why do you believe that it was in
7  January 2012?
8      A.   Because that was one of the dates on the
9  charges I filed.  January 24th, 2012.
10     Q.   What charge are you referring to?
11     A.   The one where they claim I couldn't get
12 into any of the locations on the North Side.
13     Q.   But what charge are you referring to that
14 you filed?
15     A.   Well, I filed a charge with EEOC.
16     Q.   And you mentioned January 2012 in that
17 EEOC charge?
18     A.   I don't know if I mentioned it in the
19 charge, but I did file a charge with them.
20     Q.   So other than Mr. Lewis supposedly telling
21 you that Mr. Caifano made the decision of whether or
22 not you would be suspended, do you have any other
23 facts to support your belief that Mr. Caifano was the
24 decision maker regarding your 2012 suspensions?

Page 334

1      A.   And my union representative
2  Mr. John Gavin.
3      Q.   What did Mr. Gavin tell you?
4      A.   That when he goes to the pre-dis that he
5  listens to all the evidence, but Len Califano's the
6  one who recommends that -- for you to be suspended.
7  The union does not recommend and neither does the
8  supervisor.
9      Q.   So if Mr. Caifano just recommended whether
10 or not you would -- should be suspended, do you know
11 who the decision maker was with respect to that
12 decision?
13     A.   No.  'Cause I don't know who he talks to
14 after that.
15     Q.   So you do not know who that decision maker
16 was with respect to your 2012 suspensions?
17     A.   It's my understanding it was Mr. Califano.
18 He recommended it, and who he recommended to I have no
19 knowledge.
20     Q.   Okay.  Do you believe that you were
21 suspended on January 24th, 2012?
22     A.   Repeat the question.
23     Q.   Do you believe that you were suspended on
24 January 24th, 2012?



OPHELIA CAGE June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO 335–338

Page 335

1    A.   Yes, I do.
2    Q.   And do you have any documentation showing
3 that you were suspended on January 24th, 2012?
4    A.   Let me correct that.  The incident
5 happened January 24th, 2012.  The suspension came
6 afterwards.
7    Q.   And that was the suspension that you
8 received in March 2012, correct?
9    A.   No.
10    Q.   The five day?
11    A.   No.  I had a suspension in March.
12    Q.   So what suspension do you believe that
13 you received in 2012?  Prior to March 2012?
14    A.   The one for the route that he claimed I
15 didn't read all the meters in there.
16    Q.   The January 5th, 2012, route?
17    A.   I think that may have been the date.
18    Q.   So you believe that your poor performance
19 on January 5th, 2012, led to a suspension, and that
20 your poor performance on January 24th, 2012, led to a
21 different suspension?
22    A.   Yes.
23    Q.   So what suspension did you receive in
24 response to your poor performance on January 5th,

Page 336

1 2012?
2    A.   I'm thinking January 5th is the same one
3 for 1/24.
4    Q.   And that was the five-day suspension that
5 you received in March 2012, correct?
6    A.   No.  I had another suspension in March.
7 It had nothing to do with the January one.
8    Q.   Okay.  So what level of suspension did you
9 receive other than the five-day suspension in
10 March 2012?
11    A.   I don't know how many days it was, but I
12 received a suspension in March, and I received one in
13 January.
14    Q.   Do you have any documentation to support
15 that?
16    A.   No.
17    Q.   Because you received a second suspension
18 in October 2012, correct?  The seven-day suspension?
19    A.   Yes.
20    Q.   So you believe that you received a third
21 suspension in 2012?
22    A.   Yes.
23    Q.   And did you have any other predisciplinary
24 meetings other than the one on January 30th, 2012, in

Page 337

1 January 2012?
2    A.   Just the one that was in March and one in
3 October.
4    Q.   So you had a predisciplinary meeting in
5 March 2012?
6    A.   I had a pre-dis for every suspension that
7 I received.
8    Q.   Who attended the predisciplinary meeting
9 in March 2012?
10    A.   Len Califano, Tyrone Lewis, myself, and
11 the union representative.
12    Q.   What was discussed during the March 2012
13 predisciplinary meeting?
14    A.   Poor job performance.
15    Q.   What specifically did you fail to do?
16    A.   I don't know.  I would have to see the
17 document.
18    Q.   Have you seen a document either today or
19 during the first day of your deposition that reflects
20 a predisciplinary meeting in March 2012?
21    A.   No.
22    Q.   When did Leo Lillard call you a star?
23    A.   2014.
24    Q.   Did he ever call you a star before 2014?

Page 338

1    A.   No.
2    Q.   Do you know whether or not Leo Lillard was
3 ever apprised of the fact that you performed poorly in
4 January 2012 and in October 2012?
5    MR. GOMBERG:  Objection.
6 BY THE WITNESS:
7    A.   I'm sure he did.
8 BY MS. NAVE:
9    Q.   And why do you believe that he was
10 apprised of that fact?
11    MR. GOMBERG:  Objection.
12 BY THE WITNESS:
13    A.   The Deputy Commissioner.
14 BY MS. NAVE:
15    Q.   What does that mean?
16    A.   He -- that's his title.
17    Q.   So you believe that as the Deputy
18 Commissioner Leo Lillard would be informed of all
19 water rate takers who performed poorly?
20    MR. GOMBERG:  Objection.
21 BY THE WITNESS:
22    A.   Yes.
23 BY MS. NAVE:
24    Q.   When were you diagnosed with high blood



OPHELIA CAGE                                                    June 09, 2015
OPHELIA CAGE vs. CITY OF CHICAGO                                  339–342

Page 339

1  pressure?
2      A.    2000.
3      Q.    What doctor diagnosed you with high blood
4  pressure?
5      A.    The doctor I mentioned earlier.
6      Q.    Did she tell you the causes of your high
7  blood pressure?
8      A.    I'm not sure.
9      Q.    When were you diagnosed with glaucoma?
10     A.    In the '70s.
11     Q.    What doctor diagnosed you with glaucoma?
12     A.    I don't know.  I went to the emergency
13  room.
14     Q.    Do you believe that your glaucoma is
15  related to your work?
16     A.    No.  But I think it plays a factor in it
17  because you use your eyes a lot.
18     Q.    What do you mean that you use your eyes a
19  lot?
20     A.    When we were reading meters, we had to go
21  into the house.  So if the sun is high in the sky, and
22  it's 90 degrees, and then you go into the basement,
23  your eyes have to get used to the darkness.
24     Q.    Did a doctor ever explain to you the

Page 340

1  possible causes of glaucoma?
2      A.    Yes.
3      Q.    And what did that doctor tell you about
4  the possible causes of glaucoma?
5      A.    It's hereditary.
6      Q.    Did he tell you that there was any other
7  cause?
8      A.    Something about the drainage in your eye.
9      Q.    Do you have any medical evidence showing
10  that your high blood pressure was caused by anything
11  at work?
12     A.    I don't have any medical evidence, but it
13  plays a big part in it.
14     Q.    Have you ever received any medical
15  training?
16     A.    No.
17     MS. NAVE:  Counsel, if your client is relying on
18  her high blood pressure, and glaucoma, and any other
19  condition, or medication that she's taking to support
20  her emotional distress damages, then we're going to
21  need to see her medical records related to those
22  conditions and medications.
23     MR. GOMBERG:  Are you done?
24     MS. NAVE:  I'm making a request for that

Page 341

1  information.
2      MR. GOMBERG:  Are you done with the deposition?
3      MS. NAVE:  So you're not going to acknowledge my
4  request?
5      MR. GOMBERG:  I asked you a question.  Are you
6  done with the deposition?
7      MS. NAVE:  Well, why don't you answer my
8  question first, and then I'll answer your question?
9      MR. GOMBERG:  Put it in writing, and I'll
10  respond to it.
11     THE COURT REPORTER:  Signature, counsel?
12     MR. GOMBERG:  Reserved.
13         FURTHER DEPONENT SAITH NOT.
14     THE COURT REPORTER:  Counsel, will you be
15  ordering the transcript?
16     MS. NAVE:  Yes.  I'll take an e-trans with the
17  exhibits.
18     THE COURT REPORTER:  Okay.  Thank you.
19         Mr. Gomberg, would you like to order a
20  copy of the transcript?
21     MR. GOMBERG:  I'll let you know.
22     THE COURT REPORTER:  Okay.  Thank you.
23
24

Page 342

1  STATE OF ILLINOIS    )
2                       ) SS:
3  COUNTY OF C O O K    )
4          I, MARILYN T. LaPORTE, a Notary Public
5  within and for the County of Cook, State of Illinois,
6  and a Certified Shorthand Reporter of said state, do
7  hereby certify:
8          That previous to the commencement of the
9  examination of the witness, the witness was duly sworn
10  to testify the whole truth concerning the matters
11  herein;
12         That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction and
15  constitutes a true record of the testimony given and
16  the proceedings had;
17         That the said deposition was taken before
18  me at the time and place specified;
19         That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in the
23  outcome of this action.
24         IN WITNESS WHEREOF, I do hereunto set my

OPHELIA CAGE

June 09, 2015

OPHELIA CAGE vs. CITY OF CHICAGO

343–346

---

Page 343

1  hand of office at Chicago, Illinois, this 18th day of

2  June, 2015.

3

4  _Marilyn LaPorte_

5  Notary Public,

6  Cook County, Illinois

7  My commission expires 6/21/17.

8

9

10

11  OFFICIAL SEAL
    MARILYN LAPORTE
12  Notary Public - State of Illinois
    My Commission Expires Jun 21, 2017

13

14  CSR Certificate No. 84-2095.

15

16

17

18

19

20

21

22

23

24

---

Page 344

1              I N D E X

2  WITNESS                      EXAMINATION

3  OPHELIA CAGE

4     By Ms. Nave              205, 331

5     By Mr. Gomberg               316

6

7           E X H I B I T S

8  NUMBER                          PAGE

9  CAGE DEPOSITION

10    Exhibit No. 6 (Referenced)     270

11    Exhibit No. 11                 228

12    Exhibit No. 12                 256

13    Exhibit No. 13                 264

14    Exhibit No. 14                 303

15    Group Exhibit No. 15           306

16    Group Exhibit No. 16           307

17

18

19

20

21

22

23

24

---

Page 345

1              DEPOSITION ERRATA SHEET

2

3  Assignment No. 342363

4  Cage v. The City of Chicago

5

6      DECLARATION UNDER PENALTY OF PERJURY

7

8          I declare under penalty of perjury that I

9  have read the entire transcript of my Deposition taken

10 in the captioned matter or the same has been read to

11 me, and the same is true and accurate, save and except

12 for changes and/or corrections, if any, as indicated

13 by me on the DEPOSITION ERRATA SHEET hereof, with the

14 understanding that I offer these changes as if still

15 under oath.

16

17              Signed on the _____ day of

18              _____, 20___.

19

20 _____

21      OPHELIA CAGE

22

23

24

---

Page 346

1              DEPOSITION ERRATA SHEET

2  Page No._____Line No._____Change to:_____

3  _____

4  Reason for change:_____

5  Page No._____Line No._____Change to:_____

6  _____

7  Reason for change:_____

8  Page No._____Line No._____Change to:_____

9  _____

10 Reason for change:_____

11 Page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 Page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 Page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 Page No._____Line No._____Change to:_____

21 _____

22 Reason for change:_____

23 SIGNATURE:_____DATE:_____

24              OPHELIA CAGE

---



OPHELIA CAGE
OPHELIA CAGE vs. CITY OF CHICAGO

June 09, 2015
347

```
                                        Page 347
 1                 DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No._____Line No._____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No._____Line No._____Change to:_____
12     _____
13     Reason for change:_____
14     Page No._____Line No._____Change to:_____
15     _____
16     Reason for change:_____
17     Page No._____Line No._____Change to:_____
18     _____
19     Reason for change:_____
20     Page No._____Line No._____Change to:_____
21     _____
22     Reason for change:_____
23     SIGNATURE:_____DATE:_____
24                      OPHELIA CAGE
```

