UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OPHELIA CAGE,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO,<br><br>Defendant. | No. 14 C 6818<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ophelia Cage ("Cage") filed this discrimination suit against her former employer, Defendant City of Chicago ("the City") on September 3, 2014. Cage alleged age, gender, race, and retaliation discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* The City has moved for summary judgment. For the following reasons, the City's motion is denied.

### BACKGROUND

Plaintiff is an African-American woman in her mid-sixties who has been employed in the City of Chicago's Department of Water Management since 1985. Ms. Cage has worked in the department as a Water Rate Taker ("WRT") since June 1, 1991, and before this, as a Clerk from October 1985 to June 1991. A WRT's responsibilities include reading and checking metered water accounts at residential and commercial properties, and may also include posting water-shutoff notices on properties with delinquent water bills and performing other related functions. Each employee is also provided with a Nextel phone with GPS tracking ability, and is required to turn this phone on at the start of their work day. The Supervisor Water Rate Takers

1

use the GPS information from these phones to ensure that employees are at their assigned work locations during the day.

Defendant is a governmental entity located in Chicago, Illinois. The Department of Water Management is an operating department within the city that is responsible for the effective and efficient delivery of water and sewer services to residents of Chicago. Plaintiff was employed as a WRT within the Bureau of Meter Services in this department.

Between 1992 and 2010, Plaintiff was disciplined twenty-five times for poor work performance and/or for misrepresenting the work she performed. Although Plaintiff has been disciplined for misrepresentation, she denies ever misrepresenting any of the work she performed. There are two specific suspensions at the forefront of this case. At a pre-disciplinary hearing on January 30, 2012, Plaintiff was accused of misrepresenting her work based on inconsistencies between the work and timings she had reported earlier that month and the GPS records for those days. Plaintiff was given a five-day suspension for this infraction on March 19, 2012. She was later required to appear at another pre-disciplinary hearing on October 15, 2012 regarding a similar issue, which resulted in a seven-day suspension on October 24th.

Although Plaintiff did not elaborate on her reasons for this belief, she asserts that the data cited by the supervisory board in these investigations was altered by management. Plaintiff also notes that, in general, the GPS tracker is not always accurate. She says the GPS data for those days was either inaccurate or must have been altered by the former Chief Water Taker, Len Caifano. Mr. Caifano is a Caucasian male who was employed by the City of Chicago's Department of Water Management as a Chief WRT from January 2007 to August 2013. He also directed the field operations for the Bureau of Meter Services.

Notably, Plaintiff alleges that on January 24th, 2012, just before her first pre-

disciplinary hearing, Mr. Caifano accused Plaintiff of questioning his authority, called her "an old nigger bitch," and instructed her to get out of his office. Plaintiff recalls telling Mr. Caifano on this date that he knew she did more work than the majority of rate takers and asking him why she was the only one getting suspended. She claims that Mr. Caifano replied, "As long as you keep filing charges, I'll keep suspending you."

A fellow WRT, Jessie Greenwood, testified that she has overheard Mr. Caifano refer to Ms. Cage as a "stupid bitch." She recalls that she heard Mr. Caifano refer to Plaintiff as an "old black bitch" at least seven times. Ms. Greenwood does not specify the exact context, but also testified to overhearing numerous arguments between supervisory personnel and other staff members where Mr. Caifano referred to various women as "black bitch" and "dumb bitch." Ms. Greenwood asserts that Mr. Caifano is a racist. In addition to making numerous pejorative remarks, Mr. Caifano also picked favorite employees and formed a "clique." According to Ms. Greenwood, Mr. Caifano would assign the better routes to members of his clique, enabling them to complete their work within a few hours. The remaining employees, such as Ms. Greenwood and the Plaintiff, were given longer, more challenging routes and more work to complete. Ms. Greenwood believes that Mr. Caifano sought out any and all excuses to suspend employees he did not like.

Plaintiff has filed numerous grievances making charges of discrimination during her employment. Her June 2012 grievance stated that her then-supervisor, a Caucasian man named Mike Duda, spoke to her in a "demeaning, derogative [sic], and belligerent manner." In a supplementary statement, she also stated that Mr. Duda called her an "old black bitch." Plaintiff also alleges that, on occasion, Mike Duda made remarks towards her such as, "Older rate takers, you all need to just retire." She believes that the timing of her protected grievances, particularly

that in June of 2012, directly correlate with her subsequent suspension. Therefore, in addition to being discriminatory, Plaintiff also alleges that the suspensions were retaliatory in nature.

Mr. Caifano denies ever taking disciplinary action on the basis of Plaintiff's age, race, or gender. He asserts that all disciplinary action was related to her poor work performance and misrepresentation of such work. Defendant also disputes the discriminatory remarks he is alleged to have made to the Plaintiff, citing GPS records from January 24, 2012—the day Mr. Caifano is alleged to have made the remarks to Plaintiff at his office—that do not indicate that the Plaintiff stopped by Mr. Caifano's office. Defendant also claims that these allegations are inconsistent with correspondence between Plaintiff and third parties, including the City's Equal Employment Opportunities investigator ("EEO"), the Illinois Department of Human Rights ("IDHR"), her union representative, and the City's other interrogatories, since Plaintiff did not originally include the allegations in her emails to these parties. Furthermore, Mike Duda also denies ever hearing about Mr. Caifano's racist comments, even though Ms. Cage supposedly mentioned it to him and asked him for paperwork to file a grievance.

In addition to the two suspensions and subsequent grievances that are the subject of this lawsuit, Ms. Cage also believes that she was repeatedly scrutinized in an attempt to locate mistakes, which created a hostile work environment for her. She mentions that Tyrone Lewis, an African-American male who supervised Ms. Cage and has served as the Supervisor of Water Rate Takers ("SWRT") since 1998, was instructed by Mr. Caifano and Mr. Duda to watch the Plaintiff carefully. Plaintiff has described Mr. Lewis as a "figurehead" who did what he was told to do by Caifano and other supervisory personnel. However, Mr. Lewis denies that he was given any instruction to investigate Ms. Cage, and states that he only ever investigated Ms. Cage of his own accord.

Plaintiff cites her suspensions, the comments she was subjected to from individuals such as Mr. Duda and Mr. Caifano, and the generally hostile work environment she endured as the bases for her claims. She has filed charges of age, race, and gender discrimination, as well as ADEA willful violation and retaliation. Plaintiff seeks back-pay for her suspensions, attorneys' fees and costs of this suit, compensatory damages for injuries to her career, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, other non-pecuniary damages, and other such relief.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether any genuine fact issue exists, the court must assess the proof as presented in the record, including depositions, answers to interrogatories, admissions, and affidavits, to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Fed. R. Civ. P. 56(c); *Scott v. Harris,* 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011). If a claim or defense is factually unsupported, the court should dispose of it at the summary judgment stage. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. In response, the non-moving party cannot rest on bare pleadings but must designate specific material facts showing there is a

genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir.2000).

## DISCUSSION

### I. ADEA and Title VII Legal Standards

The ADEA prohibits employers from discriminating against employees who are 40 years old or older because of their age. 29 U.S.C. §§ 623(a)(1); 631(a). Title VII makes it unlawful for employers to discriminate against employees because of their sex or race. 42 U.S.C. § 2000e, *et seq.* "In order to succeed in a Title VII lawsuit, a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action ... and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC,* 724 F.3d 990, 995 (7th Cir.2013) (citing *Coleman v. Donahoe,* 667 F.3d 835, 863 (7th Cir.2012) (Wood, J., concurring)).

In responding to a defendant's motion for summary judgment on a Title VII or ADEA claim, a plaintiff may proceed via the "direct" or "indirect" method as laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). No matter how the plaintiff proceeds, the Seventh Circuit has warned that although courts may get lost in the "technical nuances" of the two methods, the "central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.)." *Morgan,* 724 F.3d at 996–97; *see also Van Antwerp v. City of Peoria,* 627 F.3d 295, 297 (7th Cir.2010).

### A. Direct Method of Proof

In this case, Plaintiff asserts that she has established a prima facie case of discrimination through the direct method of proof. "Under the direct method, a plaintiff must offer direct or circumstantial evidence that 'points directly' to a discriminatory reason for the

6

employer's action." *Jordan v. Chicago Transit Authority*, 2014 WL 6910284 (N.D. Ill. 2014) (citing *Atanus v. Perry,* 520 F.3d 662, 671–72 (7th Cir. 2008)) (*quoting* Burks v. Wisconsin Dep't of Trans., 464 F.3d 744, 751 n.3 (7th Cir. 2006)). Direct evidence cannot rest upon inferences or presumptions, and is mostly clearly fulfilled through acknowledgement of intent by the defendants or the defendant's agents. Although this type of evidence is rare, direct proof can also be found through circumstantial evidence, which "suggests discrimination albeit through a longer chain of inferences." *Hemsworth v. Quotesmith.Com*, Inc., 476 F.3d 487, 491 (7th Cir.2007). In essence, circumstantial evidence requires a "convincing mosaic" of information that raises an inference of discrimination on the part of the decision-maker. Such evidence typically includes,

> "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination."

*Id*., at 491 (quoting *Sun v. Bd. of Trs. of Univ. of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007)).

In this case, Defendant has consistently denied taking any disciplinary action on the basis of race, gender, or age. Likewise, Defendant's agents have maintained that all disciplinary action against Ms. Cage was directly related to her work performance and unmotivated by discriminatory intent of any kind. Therefore, there is no direct evidence by admission. Nevertheless, Plaintiff does present circumstantial evidence of various race, gender, and age-based comments directed towards her and suspiciously timed in relation to her disciplinary hearings and suspensions. For instance, Mr. Caifano and her former supervisor Mike Duda, both allegedly labeled the Plaintiff an "old black bitch" on multiple occasions. On January 24, 2012, Mr. Caifano allegedly told the Plaintiff, "as long as you keep filing charges, I'll keep suspending

7

you." This conversation occurred just a few days before Plaintiff's January 30th pre-disciplinary hearing, which resulted in a subsequent suspension.

Defendant, on the other hand, argues that even if Ms. Cage's allegations are true, they cannot form the basis of circumstantial evidence of discrimination because neither Mr. Caifano nor Mr. Duda was the final decision-makers for disciplinary action, and circumstantial evidence rests upon inferences made in relation to the decision-maker.

The record suggests that Mr. Caifano was, in fact, a decision-maker. Although Mr. Caifano was not the only individual responsible for the ultimate decisions, he was directly involved in the decision-making process. The Seventh Circuit denied summary judgment in a case where it was unclear who the ultimate decision-maker was but likely that one discriminatory party had "decisive input" in the decision. *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, (7th. Cir. 2011). As in *Schandelmeier-Bartels*, Mr. Caifano directly influenced disciplinary decisions. For instance, Mr. Caifano was responsible for determining when to bring employees in for pre-disciplinary hearings, and he reviewed initial misconduct reports provided to him by Mr. Lewis. After reviewing the reports, Mr. Caifano had the authority to throw out the reports or decide to take further disciplinary action. If desired, Mr. Caifano could then conduct a pre-disciplinary action hearing, where he would bring employee misconduct to the attention of Managing Deputy Commissioner Julie Hernandez-Tomlin and Assistant Commissioner Maureen Egan. After the hearing, the three individuals—Mr. Caifano, Ms. Hernandez-Tomlin, and Ms. Egan—would collectively decide what disciplinary action to take.

An email exchange between Ms. Hernandez-Tomlin, Ms. Egan, and Mr. Caifano also suggests that Mr. Caifano had a significant amount of decision-making power. Mr. Caifano made the initial suggestion to suspend Ms. Cage and also suggested a time frame for this suspension.

8

Upon Mr. Caifano's suggestion, the other parties then endorsed and implemented a suitable time period for suspension, in compliance with union standards. Mr. Caifano's influence was not "singular" because the other decision-makers did consider union standards and Ms. Cage's past disciplinary history, but he was clearly an influential participant in the disciplinary process. *Brewer v. Board of Trustees of University of IL*, 479 F.3d 908, 917 (7th. Cir. 2007) (explaining that if an employer has singular influence over a decision-maker then "the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII.")

Weighing the facts in the light most favorable to the Plaintiff, I find that a jury could reasonably conclude both that Mr. Caifano heavily influenced the decision to suspend Ms. Cage and that his motives for doing so were discriminatory.

Because a reasonable jury could make this inference, the Plaintiff has provided sufficient circumstantial evidence to establish discriminatory action.

**B. Indirect Method of Proof**

In the alternative, Plaintiff asserts that she has shown discriminatory action under the indirect method of proof. "To establish a prima facie case of discrimination under the indirect method, [a p]laintiff must show that: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably." *Jordan v. Chicago Transit Authority*, 2014 WL 6910284 (N.D. Ill. 2014). As an African-American woman in her mid-sixties who was suspended on two different occasions, Plaintiff has shown that she belongs to a protected class and that she suffered adverse employment action. However, she cannot show that she was meeting her employer's legitimate expectations.

Plaintiff asserts that she has always met her employer's legitimate expectations. In support of this assertion, she maintains that she shows up to work early—often before her supervisors—and that she continues to be employed by the Defendant today. In contrast, Defendant states that Plaintiff has not always met the employer's legitimate expectations, as demonstrated in part by her disciplinary history, which predates Mr. Caifano's tenure as her supervisor. These past disciplinary reprimands primarily resulted from instances when the Plaintiff failed to complete all of her assigned work and/or submitted erroneous readings. Defendant asserts that Ms. Cage's suspensions under Mr. Caifano are consistent with this history and, in each case, were legitimate disciplinary responses to Ms. Cage's professional misconduct. The City also relies on GPS tracker information as evidence of Plaintiff's misconduct, as her GPS tracker does not corroborate her story on the days and times she alleges she was subject to harassment by Mr. Caifano in his office, and also contradicts her self-reported work schedule in some cases. Further, Caifano stated that "generally [Plaintiff's] performance was more than adequate, if not adequate, but occasionally, periodically [. . .] she has an off day, where the performance is so below standard it needs further attention." Therefore, according to agents of the Defendant and the objective disciplinary history, Plaintiff did not always meet her employer's legitimate expectations.

It is established that "an employee's self-serving statements about his ability . . . are insufficient to contradict an employer's negative assertion of that ability." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir.1999) (quoting *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992)). Although Plaintiff maintains that she has never misrepresented the work she has performed and that she has always acted according to her employer's legitimate expectations, she offers nothing other than her word to support this

10

assertion. Meanwhile, the disciplinary records, which both predate and coincide with Mr. Caifano's tenure, contradict Ms. Cage's assertions that she consistently met or exceeded her employer's legitimate expectations. According to the records, Ms. Cage was disciplined a total of twenty-five times for poor work performance and misrepresentation of the work she performed, and not due to discriminatory reasons.

When a defendant offers non-discriminatory reasons for disciplinary action, the burden of proof shifts to the plaintiff to show that the non-discriminatory reason is pretextual. A pretext is "a lie, specifically a phony reason for some action." *Mustafa v. Illinois Property Tax Appeal Board*, 67 F.Supp.3d 988, 996 (N.D. Ill. 2014). Here, Defendant has shown that there was a legitimate concern about Plaintiff's work performance even before she began filing administrative charges or grievances against the City. The first cited disciplinary action against the Plaintiff occurred in 1992. Furthermore, Plaintiff was reprimanded and/or suspended twenty times before Mr. Caifano became a Chief Water Rate Taker. Therefore, Plaintiff has not demonstrated that the disciplinary actions taken against her—a total of twenty five since she was first employed—were pretexts for discriminatory behavior.

Because Plaintiff cannot show she was meeting her employer's reasonable expectations, she has not established discriminatory action under the indirect method of proof. However, because Plaintiff does meet this burden under the direct method of proof, summary judgment on Defendant's discriminatory action is still inappropriate.

## II. Title VII Retaliation Legal Standard

"Title VII forbids retaliating against an employee because he has opposed any practice made...unlawful...by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'"

11

*Collins v. Am. Red Cross*, 715 F.3d 994, 998 (7th Cir. 2013) (*quoting* 42 U.S.C. § 2000e–3(a)); *Niemiec v. Club Sports Consulting Group, Inc.*, 2015 WL 8970781 (N.D. Ill. 2015). Like discrimination claims, Title VII retaliation claims can be established through either the "direct method" or the "indirect method." *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Plaintiff has provided evidence of retaliation under the direct method of proof.

**A. Direct Method of Proof**

As previously noted, a plaintiff must offer direct or circumstantial evidence that "'points directly' to a discriminatory reason for the employer's action." *Jordan*, 2014 WL 6910284 at *3. Circumstantial evidence can include "ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Hemsworth*, 476 F.3d at 491. While it is well established that "stray remarks" do not constitute evidence of actionable discrimination, such remarks may support a circumstantial inference of retaliatory action if the remarks are made "(1) around the time of, and (2) in reference to, the adverse employment action complained of." *Merillat v. Metal Spinners, Inc.,* 470 F.3d 685, (7th Cir. 2006) (citing *Hunt v. City of Markham, III*, 219 F.3d 649 (7th Cir. 2000)).

In this case, Plaintiff filed numerous grievances during her employment with the Defendant contesting various disciplinary actions taken against her, and the City was made aware of these grievances. After her suspensions, Ms. Cage complained to management, the union, and/or IDHR/EEOC. During one particular exchange, Plaintiff asked Mr. Caifano why she kept getting suspended even though he knew she completed more work than her colleagues. He allegedly replied, "As long as you keep filing charges, I'll keep suspending you" and, "It is what it is. I am the chief." This statement indicates a direct causal relationship between the 'charges,' or the grievances Ms. Cage was filing against Defendant, and the disciplinary action

12

she continued to face. These are more than just stray remarks, as they all but state a case for retaliatory activity. Although Defendant denies that this exchange took place, I am not in a position to weigh this denial against Plaintiff's assertions, as the parties' credibility is a question for the jury. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (holding that a court may not make "credibility determinations" at the summary judgment stage). I do find that a reasonable jury could find that this statement presents a "clear mosaic" to infer that Defendant's agent was retaliating against Plaintiff for her complaints. Thus, Plaintiff has successfully established the circumstantial evidence necessary to make a viable case of retaliation under the direct method of proof.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied.

ENTER:

*[signature: James B. Zagel]*

James B. Zagel
United States District Judge

DATE: February 25, 2016